## UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

| | |
|---|---|
| M.M.C., ON HER OWN BEHALF AND ON BEHALF OF HER MINOR CHILDREN, M.C.C. AND A.T.C. AND N.A.B., ON HIS OWN BEHALF AND ON BEHALF OF HIS MINOR CHILD, N.A.C., | Case No. |
| Plaintiffs, | **COMPLAINT** |
| v. | |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

Plaintiffs M.M.C. and N.A.B. bring this complaint, on behalf of themselves and their minor

children, Plaintiffs M.C.C., A.T.C., and N.A.C., against the United States of America pursuant to

the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b) and §§ 2671-2680, stating as follows:

## INTRODUCTION

1.      In or around the summer of 2018, the United States government intentionally and

forcibly separated the Plaintiff parents (M.M.C. and N.A.B.), who were seeking asylum, from their

Plaintiff children (M.C.C. and N.A.C.) for the express purpose of inflicting as much pain and

suffering on the families as possible.

2.      As federal agents ripped Plaintiff M.M.C. from her screaming six-year-old

daughter, Plaintiff M.C.C., M.M.C. sought to soothe her child by telling her that they would see

each other soon.  Sadly, that turned out not to be true.

3.      The United States government kept mother and daughter apart for 52 days, only

permitting a handful of short calls and refusing to tell M.M.C. where her daughter was located.

During the separation, M.M.C. learned that she was pregnant as a result of the rape by a former

partner whose physical, sexual, and emotional abuse was one of the reasons she sought asylum in

the United States.  During her detention and while pregnant, she was malnourished, shackled,

taunted, forced to sleep in squalor, and lacked access to appropriate prenatal care.  As a result,

Plaintiff M.M.C. has one daughter, Plaintiff M.C.C., who is deeply traumatized and a second,

Plaintiff A.T.C., who suffers from a vitamin deficiency requiring twice daily injections, as well as

other developmental delays.

4.      On or around June 10, 2018, federal agents pulled Plaintiff N.A.B.'s seven-year-

old son, Plaintiff N.A.C., from him.  N.A.C. being dragged away, crying out "Papi, Papi, Papi,"

was the last image his father had of his young son for 45 days.  During that time, N.A.B. was

forced to eat rotten food; was denied medical attention for an injury; slept in an overcrowded room that stank from a single, dirty toilet.  He was even placed on a plane to be deported—without his son—only to be pulled off the plane at the last moment.  The physical and psychological burdens N.A.B. endured every hour of this separation caused him to attempt suicide.  He survived, but when he was able to speak with his son again, his worst fears were confirmed—N.A.C., choking back tears, asked why his father had abandoned him.  This 10-minute phone call was the *only* communication they had during the 45 days of separation.  In the weeks that followed, N.A.B. endured even worse conditions.  Even their reunion brought pain because N.A.B.'s son—who had always shown his father affection and tried to spend as much time with him as possible—now displays severe anxiety and emotional difficulties.

5.      While the Plaintiff parents were desperate to be with—or at the very least speak to—their vulnerable and confused young children, the government prevented all but the most minimal and infrequent communication.  Meanwhile, the government placed the Plaintiff parents and children in facilities that were completely unprepared to handle either group, resulting in devastating and lasting consequences.  This was no accident.  The United States government intended to cause this severe harm.  The Plaintiffs' suffering was the critical piece of the government's plan to inflict maximum pain on asylum seekers who entered the country in an effort to deter other asylum seekers from Central America from making the journey north to the United States.

6.      Plaintiffs ask that this Court hold the government responsible for its purposeful and inhumane conduct pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b)(1), 2671, et seq. ("FTCA").

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over the subject matter of this Complaint under 28 U.S.C. §§ 1331 (federal question), 1346(b) (United States as defendant).

8.     On May 19, 2020, within two years of their separation on May 26, 2018, Plaintiffs M.M.C. and M.C.C. submitted a completed Standard Form 95 and a detailed description of the basis of their claims as well as the claims of A.T.C.  On June 5, 2020, within two years of their separation on June 10, 2018, Plaintiffs N.A.B. and N.A.C. submitted a completed Standard Form 95 and a detailed description of the basis of their claims.  Thus, Plaintiffs' claims were timely presented to the United States within the two-year statute of limitations pursuant to 28 U.S.C. § 2401(b).

9.     Defendant never made a final disposition of Plaintiffs' administrative claims or sent any substantive response.

10.    Because Defendant failed to make a final disposition of Plaintiffs' claims within six months, Plaintiffs' claims are deemed finally denied.  28 U.S.C. § 2675(a).  Accordingly, Plaintiffs have exhausted all potential administrative remedies.

11.    Venue is proper in the District of Rhode Island under 28 U.S.C. § 1402(b) because Plaintiffs reside in this District.

## THE PARTIES

12.    Plaintiff M.M.C. was 33 years old at the time of the forced separation from her child.  She is the mother of Plaintiff M.C.C. who was six years old at the time of the separation, and Plaintiff A.T.C., with whom Plaintiff M.M.C. was pregnant during her detention.  M.M.C. and M.C.C. are nationals of Guatemala and are presently seeking asylum in the United States.  A.T.C. is a United States citizen.  The family resides in Providence, Rhode Island.

13.     Plaintiff N.A.B., was 25 years old at the time of the forced separation described in this Complaint.  He is the father of Plaintiff N.A.C. who was six years old at the time of the forced separation.  N.A.B. and N.A.C. are nationals of Honduras and are presently seeking asylum in the United States.  They reside in Central Falls, Rhode Island.

14.     Defendant United States of America is the appropriate defendant under the FTCA. 28 U.S.C. § 1346(b), 2671, et seq.

15.     On information and belief, all federal officers referenced in this Complaint were at all relevant times employees of the United States, working within the scope and course of their employment with federal agencies including, but not limited to, the U.S. Department of Homeland Security ("DHS"), U.S. Immigration and Customs Enforcement ("ICE"), U.S. Customs and Border Protection ("CBP"), U.S. Department of Health and Human Services ("HHS"), Office of Refugee Resettlement ("ORR") and United States Citizenship and Immigration Services ("USCIS").

16.     At all relevant times, all DHS employees referenced in this Complaint who interacted with Plaintiffs were acting as investigative or law enforcement officers.  *See* 28 U.S.C. § 2680(h).

## STATEMENT OF FACTS

## I.     THE FAMILY SEPARATION POLICY

17.     In 2017, the Trump administration overturned decades-long immigration policies and practices for the express purpose of inflicting maximum pain and suffering on asylum seekers fleeing their home countries.  The government implemented these intentionally cruel measures to deter other immigrants who may have been contemplating seeking protection from doing so in the United States.

A. **Before 2017, the United States government had a policy of family unity to ensure that families would stay together throughout their immigration proceedings.**

18.     Since at least 1992, CBP officials on the southwest border largely practiced the "family unit policy," in which adults traveling with their minor family members were not referred to the local United States Attorney's Office for criminal prosecution and families were permitted to stay together throughout the pendency of their immigration proceedings.[1]

19.     In 1997, following a series of lawsuits filed on behalf of unaccompanied alien children ("UACs") who had been held by the government in poor conditions,[2] the government consented to the *Flores* settlement agreement, which (i) set a national standard for the detention and treatment of minors; (ii) prioritized the timely release of UACs to qualified adults, preferably their parents; (iii) and required detained minors to be placed in the "least restrictive environment possible."[3]

20.     Among other requirements, the *Flores* Agreement requires facilities holding minors to "provide . . . contact with family members who were arrested with the minor," and the agreement requires the government to make a prompt and continuous effort toward family reunification with the aim of releasing the child to a parent.[4]

21.     Parts of the *Flores* Agreement have been codified in the Trafficking Victims Protection Reauthorization Act ("TVPRA"), Pub. L. 110-457, 110 Stat. 5044 (2008).  The TVPRA

---

[1] *See* U.S. Dep't of Jus., Office of Inspector General, *Review of the Department of Justice's Planning and Implementation of Its Zero Tolerance Policy and Its Coordination with the Departments of Homeland Security and Health and Human Services* 2 (Jan. 2021) ("DOJ OIG Report") (Exhibit A).

[2] *The History of the Flores Settlement and its Effects on Immigration*, NPR (June 22, 2018) (Exhibit B).

[3] *See Flores v. Reno*, No. CV-85-4544-RJK (C.D. Cal. Jan. 28, 1997) ("*Flores* Agreement"); *see also United States v. Dominguez-Portillo*, No. EP-17-MJ-4409-MAT, 2018 WL 315759, at *8 (W.D. Tex. Jan. 5, 2018), *aff'd sub nom. United States v. Vasquez-Hernandez*, 314 F. Supp. 3d 744 (W.D. Tex. 2018), *aff'd*, 924 F.3d 164 (5th Cir. 2019) (family reunification, with a clear preference for custody by a parent, is an immediate and ongoing requirement under the *Flores* Agreement).

[4] *See Flores* Agreement, *supra* note 3, at ¶ 12.A; *see also Dominguez-Portillo*, No. EP-17-MJ-4409-MAT, 2018 WL 315759, at *7, *aff'd sub nom. Vasquez-Hernandez*, 314 F. Supp. 3d 744, aff'd, 924 F.3d 164 (5th Cir. 2019).

assigns the Office of Refugee Resettlement ("ORR") the responsibility for the care, release, and custody of UACs and limits the amount of time that children can be held in CBP facilities to 72 hours.[5]  In keeping with the *Flores* Agreement's preference for maintaining family unity, the TVPRA allows ORR to assign UACs to group home and foster care only "if a suitable family member is not available to provide care."[6]

22.     The *Flores* Agreement remains binding on federal agencies, including DHS, HHS, and all respective agency components, such as ICE, CBP, USCIS, and ORR, and is under the supervision of a federal judge in the Central District of California.[7]  The agreement continues to protect the central importance of family unity and the welfare of children, limiting the conditions under which minors can be detained and requiring the government to "make and record prompt and continuous efforts towards family reunification." [8]

23.     In addition, DHS formed an Advisory Committee on Family Residential Centers to develop best practices for how to care for families apprehended at the border.  In 2016, this Committee issued a report stating that the separation of families for immigration enforcement, immigration management, or detention "raises serious concerns and ***violates the best interests of the child***—which requires prioritizing family integrity and the maintenance of emotional ties and relationships among family members."[9]  The report advised that DHS "should operationalize the presumption" that separation "is ***never*** in the best interest of children."[10]

---

[5] *See* National Immigration Forum, *Fact Sheet: Unaccompanied Migrant Children (UACs)* (Exhibit C).

[6] *See* 8 U.S.C.A. § 1232 (c)(2)(a).

[7] *See* National Center for Youth Law, *The Flores Settlement Agreement & Unaccompanied Children in Federal Custody*, 3 (Feb. 2019) (Exhibit D).  In 2002, Congress enacted the Homeland Security Act, Pub. L. 107–296, 116 Stat. 2135 (2002), and transferred authority over the care and placement of unaccompanied minors to ORR.

[8] *See Flores* Agreement, *supra* note 3, at ¶ 12A; *Flores v. Lynch*, 212 F. Supp. 3d 907, 914, 916 (C.D. Cal. 2015), *aff'd in part, rev'd in part and remanded*, 828 F.3d 898 (9th Cir. 2016).

[9] *See* U.S. Dep't of Homeland Sec., Advisory Committee on Family Residential Centers, *Report of the DHS Advisory Committee on Family Residential Centers* 10 (2016) (emphasis added) (Exhibit F).

[10] *See id. at* 2.

**B.    In 2017, the United States government began "experimenting" with family separation as a means of deterring immigration on the Southwest Border in a program dubbed the "El Paso Initiative."**

24.     Despite the clear direction from the DHS Advisory Committee and a federal court regarding the importance of maintaining family unity, the Trump Administration began to develop a plan to separate immigrant families.

25.     Specifically, on February 2, 2017, high-ranking federal officials met to outline a plan to separate parents from their children as a means of deterring immigration from Central America.[11]   In a March 3, 2017, press release, the government publicized its intent to separate families in order to deter migration.[12]

26.     The proposal was met with an immediate outcry from the medical community.  The following day, the American Academy of Pediatrics ("AAP"), among others, warned that such a policy would affect "vulnerable, scared children" and urged policymakers to "exercise caution to ensure that the emotional and physical stress children experience as they seek refuge in the United States is not exacerbated by the additional trauma of being separated from their siblings, parents, or other relatives and caregivers."[13]

27.     At the time, government officials knew the immigration system did not have the capacity to handle the influx of parents or children.  Earlier that year, a review of the policy had

---

[11] *See Examining the Failures of the Trump Administration's Inhumane Family Separation Policy,* House of Representatives, Subcomm. on Oversight and Investigations, Committee on Energy and Commerce Hearing (Feb. 7, 2019), Unofficial transcript, 1000–1024, 1114–1147 (testimony of Commander Jonathan White, U.S. Public Health Service Commissioned Corps, Department of Homeland Security) ("Testimony of Commander White") (Exhibit G).

[12] *See* Julia Edwards Ainsley, *Exclusive: Trump Administration Considering Separating Women, Children at Mexico Border,* Reuters (Mar. 3, 2017) (Exhibit H); *see also* Mary Kate Mallonee, *DHS Considering Proposal to Separate Children from Adults at Border,* CNN (Mar. 4, 2017) (Exhibit I).

[13] *See* Fernando Stein & Karen Remley, *AAP Statement Opposing Separation of Mothers and Children at the Border,* American Academy of Pediatrics (Mar. 4, 2017) (Exhibit J); *see also* Women's Refugee Commission, *Letter to Secretary Kelly on Plan to Separate Migrant Families at the Border* (Mar. 22, 2017) (Exhibit K).

been conducted, revealing that it would cost millions of dollars to build new facilities and months to train new staff.[14]

28.    Nevertheless, on March 7, 2017, the Secretary of DHS John Kelly affirmed the Administration's intention to separate immigrant families "in order to deter more movement."[15]

29.    Later that month, the CBP in the El Paso region began referring adults apprehended with children for criminal prosecution to the United States Attorneys for the Western District of Texas ("WDTX").[16]  This isolated change in policy was known as the "El Paso Initiative."[17]

30.    When CBP informed the U.S. Attorney for the WDTX, Richard Durbin, that CBP would be referring family unit adults to his office for criminal prosecution, U.S. Attorney Durbin remarked that "[h]istory would not judge prosecuting family units kindly."[18]

31.    To justify the prolonged separation, CBP distorted the protections codified in the TVPRA.  After CBP referred the parents for prosecution and took them away from their children, CBP perversely declared that the children were now "unaccompanied" and thus would be classified as UACs.  Never before had the government declared that children *accompanied by their parents at the border* would be deemed "unaccompanied alien children."

32.    The government later acknowledged it was wrong to misclassify accompanied immigrant children as unaccompanied children.  At a Senate hearing in late July 2018, Commander Jonathan White of DHS noted: "What went wrong is the children separated from their parents were

---

[14] Caitlin Dickerson, *"We Need to Take Away Children": The Secret History of the U.S. Government's Family-Separation Policy,* The Atlantic (Aug. 7, 2022) (Exhibit E).

[15] *See* Daniella Diaz, *Kelly: DHS Considering Separating Undocumented Children from their Parents at the Border*, CNN (Mar. 7, 2017) (Exhibit L).

[16] *See* DOJ OIG Report, *supra* note 1, at 14 (Exhibit A).

[17] *See id.* at 13.

[18] *See id.*

referred as unaccompanied alien children when in fact they were accompanied."[19]  He also acknowledged that "[t]here's no question that separation of children from parents entails significant potential for traumatic psychological injury to the child."[20]

33.     After CBP reclassified the accompanied immigrant children as unaccompanied alien children, CBP then transferred custody of the children to ORR.  But ORR only had experience with children who were genuinely unaccompanied, and therefore had no formalized process to track parent-child relationships.[21]  ORR officials raised concerns that the agency lacked the infrastructure necessary to track these "unaccompanied" children's families, but their warnings went unheeded.[22]

34.     Commander White repeatedly alerted his supervisors that HHS did not have the capacity to deal with the influx of minor children, noting at one point that there was a "shortage last night of beds for babies."[23]

35.     Assistant U.S. Attorneys in the WDTX also raised concerns with the Deputy Criminal Chief.  These concerns included that the government has been "taking breast feeding defendant moms away from their infants."  The Deputy Criminal Chief reported to U.S. Attorney Durbin that "parents are asking for the whereabouts of their children and they can't get a response." He noted that "the courts are turning to us for help with providing contact information to defense counsel," which, upon information and belief, the WDTX U.S. Attorney's Office did not have.[24]

---

[19] *See* Nick Miroff & Karoun Demirjian, *Senate Panel Skewers Trump Officials Over Migrant Family Separations*, Wash. Post (July 31, 2018) (Exhibit M).

[20] *See* Testimony of Commander White, *supra* note 11, 1006–1024; 1131–1138 (Exhibit G).

[21] *See* U.S. Dep't of Health & Hum. Servs., *Communication and Management Challenges Impeded HHS's Response to the Zero-Tolerance Policy* 6, 27 (2020) (Exhibit N).

[22] *See id.* at 20-27; *see also* Testimony of Commander White, *supra* note 11, 1012–1024; 1131–1138; 2058–2064 (Exhibit G).

[23] *See* Dickerson, *supra* note 14 (Exhibit E).

[24] *See* DOJ OIG Report, *supra* note 1, at 15. (Exhibit A)

36.     During a November 1, 2017 hearing, a federal judge sitting on the United States District Court for the Western District of Texas expressed concerns about such reports.[25]  The court noted that it "has repeatedly been apprised of concerns voiced by defense counsel and by defendants regarding their limited and often non-existent lack of information about the well-being and whereabouts of their minor children from whom they were separated at the time of their arrest."[26]  The court then ordered briefing on the agency's administrative procedures, whether undocumented parents retained their "fundamental right" to "familial association" while detained, and the constitutionality of the government using family separation as a means to coerce a guilty plea from a detained parent.[27]

37.     Although the court eventually denied the defendants' motion to vacate their illegal entry convictions, the court's ruling emphasized that "family reunification, with a clear preference for custody by a parent, is an immediate and ongoing requirement under the *Flores* Settlement."[28]

38.     The court further instructed the government that both child and parent had an "enforceable right" to "have immediate and ongoing contact with the family member who they were arrested with, regardless of immigration status," and that it was the government's obligation to facilitate that communication.[29]

39.     As if prescient, the court warned against even more "outrageous conduct" by the government, including "denying Defendants information on their minor children" with the intent

---

[25] *See Dominguez-Portillo,* No. EP-17-MJ-4409-MAT, 2018 WL 315759, at *3, *aff'd sub nom. Vasquez-Hernandez,* 314 F. Supp. 3d 744, *aff'd,* 924 F.3d 164 (5th Cir. 2019); *see also Dominguez-Portillo*, No. EP-17-MJ-4409-MAT, Doc. No. 12 (Nov. 1, 2017).

[26] *Dominguez-Portillo*, No. EP-17-MJ-4409-MAT, Doc. No. 3 (Nov. 2, 2017).

[27] *See id.*

[28] *See Dominguez-Portillo*, No. EP-17-MJ-4409-MAT, 2018 WL 315759, at *8.

[29] *See id.* at *9.

"to purposefully try to coerce a guilty plea or gain a litigation advantage over Defendants."[30]  The court explained that forcing defendants to "mak[e] these decisions in a vacuum, without knowledge of the well-being and location of their children" would likely violate immigrants' constitutional rights to family unity and counsel recognized by the Supreme Court.[31]

40.     This ruling put the government on notice that its efforts through the El Paso Initiative to separate families implicated fundamental constitutional rights.

41.     In response to the court's decision, CBP effectively ended the El Paso Initiative by ordering its El Paso unit to reinstitute the family unit policy.

42.     From July through November 2017, the CBP El Paso Unit separated approximately 280 families.   Even though these families represented only approximately 15% of those apprehended by CBP during that time period, CBP and ORR were unable to track separated parents and children.[32]

43.     The media reported on the many failings of the El Paso Initiative.  A November 25, 2017 *Houston Chronicle* article reported that separated families would "lose track of each other" in governmental custody and that asylum seekers abandoned their lawful, and often meritorious, asylum claims in order to be reunited with their children.   The article quoted a federal public defender who observed: "Even the worst drug addicts still have rights to their children, but here we are just removing them without even a hearing."[33]

44.     In December 2017, the U.S. Attorney for the WDTX briefed the DOJ leadership on the El Paso Initiative.  During this briefing, the U.S. Attorney referenced the *Houston Chronicle*

---

[30] *See id.* at *10.

[31] *See id.*

[32] *See* DOJ OIG Report, *supra* note 1, at 15 (Exhibit A).

[33] *See* Lomi Kriel, *Trump Moves to End 'Catch and Release', Prosecuting Parents and Removing Children Who Cross Border*, Houston Chronicle (Nov. 25, 2017) (Exhibit O).

article, relayed the federal court's warnings about the constitutional implications of separating families, and informed the DOJ leadership that "ORR may have become overwhelmed and asked for relief" regarding housing and keeping track of the separated children.[34]

45.    Also, in December 2017, immigration advocates filed an official Complaint with the Inspector General of DHS, detailing the experiences of hundreds of children who had been moved to far-flung corners of the country after being separated from their parents.[35]

46.    In response, the Office for Civil Rights and Civil Liberties of DHS proposed establishing criteria that would prohibit the separation of young children from their parents and recommended the creation of a database to help track the separated families.  Neither initiative was implemented.[36]

> **C.    In spring 2018, the United States government implemented a wide-scale policy of family separation without even attempting to mitigate any of the known harms to families inflicted during the El Paso Initiative.**

47.    The El Paso Initiative resulted in (i) a federal court warning that the policy implicated constitutional rights; (ii) ORR concluding that it lacked the infrastructure necessary to provide care for separated children; (iii) CPB failing to maintain communication between the separated parents and children; and (iv) federal prosecutors expressing concern that the policy caused undue and irreparable harm.  Even DHS's own staff attorney John Mitnick warned in a memorandum to DHS Secretary Kirstjen Nielsen that family separation likely violated "various laws or the Fifth Amendment due process clause."[37]  Nevertheless, DHS and DOJ expanded the family separation policy to the rest of the southwest border in early April 2018.

---

[34] *See* DOJ OIG Report, *supra* note 1, at 17 (Exhibit A).

[35] *See* Dickerson, *supra* note 14 (Exhibit E).

[36] *See id.*

[37] *See id.*

48.     The government's decision to expand the policy was *because of*, rather than in spite

of, the terrible harms inflicted on families apprehended at the border.  For example, the DHS Chief

of Staff explained that family separation would be the best way to deter immigration because the

separation of families and the prosecution of family unit adults would assuredly be reported by the

media, terrifying future migrants contemplating entering the United States.[38]

> **1.     The government implemented the family separation policy with intent to inflict harm on immigrant families.**

49.     On April 6, 2018, Attorney General ("AG") Jeff Sessions issued a memorandum

that announced a new "zero tolerance" policy.  The policy directed "each [USAO] along the

Southwest Border—to the extent practicable, and in consultation with DHS—to adopt immediately

a zero-tolerance policy for all offenses referred for prosecution under section 1325(a)."[39]

50.     The effect of this policy was to separate families by sending parents to criminal

detention and children to ORR custody.  Although the initial memorandum did not explicitly

include information on family separation, AG Sessions intended for the policy to result in the

separation of families.[40]

51.     DOJ did not inform DHS, ORR, HHS, the U.S. Marshals Service (USMS), the U.S.

Attorneys, or, upon information and belief, any of the independent contractors that ran the ICE

facilities that the zero-tolerance policy would result in an immediate and drastic increase of

separated adult and child detainees.[41]  This lack of notice prevented any coordination of logistics

for what would inevitably result in an immediate influx of detained parents and children on the

---

[38] See DOJ OIG Report, *supra* note 1, at 11 (Exhibit A).

[39] *See* Memorandum from Jeff Sessions, U.S. Attorney General, *Zero-Tolerance Offenses Under 8 U.S.C. § 1325(a)* (Apr. 6, 2018) (Exhibit P).

[40] *See* DOJ OIG Report, *supra* note 1, at 21–23 (Exhibit A).

[41] *See* DOJ OIG Report, *supra* note 1, at 21–22, 26 (Exhibit A).

Southwest border.[42]  By way of example, there was no advance planning to care for detained pregnant women.

52.    This lack of coordination was a feature, not a bug, of the new policy. The government sought to create such terrible conditions for Central American migrants in the United States that the persecution that other potential asylum seekers suffered in their home countries appeared preferable.

53.    At numerous points leading up to and during the program's implementation, senior administrative officials, including DHS Secretary Nielsen herself, acknowledged that the government was woefully unprepared to house and detain migrants.  For example, even after family separation had already begun, John Kelly recalled Secretary Nielsen stating, "We're not ready to do this.  We don't have any facilities.  We don't have any training."[43]  There was no plan.

54.    After the southern border U.S. Attorneys learned that the zero-tolerance policy did not include any exception for family unit adults, they raised concerns to DOJ leadership about insufficient resources and inability to comply with constitutional requirements.  Specifically, on April 27, 2017, the Executive Office of the U.S. Attorneys (EOUSA) wrote a message to the DOJ leadership, explaining that:

> [T]he offices will not, at their present resource levels, be able to accommodate those numbers with criminal prosecutions. . . . The USAOs and other interested stakeholders could not absorb this increase. Furthermore, DHS/CBP would not be able to process these numbers within the time constraints set for presentment in criminal court.  The medical screening for TB, chicken pox, measles; much less the processing of these individuals in establishing identity, alienage, criminal and/or immigration history, etc. would be practically impossible to accomplish within the

---

[42] *See* DOJ OIG Report, *supra* note 1, at 9 (Exhibit A).

[43] *See* Dickerson, *supra* note 14 (Exhibit E).

constitutionally mandated time constraints to present the defendants in court.[44]

55.     Despite this clear statement from the EOUSA that implementation of the policy without further planning or resources would result in ***constitutional violations*** and that the USAOs, DHS, and CBP ***could not handle the influx of prosecutions***, AG Sessions insisted that the DOJ was "prepared" for full scale implementation at a senior Administration meeting on May 3, 2018.[45]

56.     Secretary Nielsen's talking points for this May 3rd meeting also lauded the pilot program in the El Paso region as "successful," without any mention of the severe harms inflicted on the separated families, constitutional concerns implicated by the program, or the lack of preparation that she herself identified to John Kelly.

57.     The government received many warnings about the suffering caused by—and lack of preparation for—family separation from diverse parties, including a federal district court, federal prosecutors, federal public defenders, employees of ORR, and the EOUSA.  Nevertheless, on May 4, 2018, DHS initiated the family separation policy by instructing CBP to refer all adults, including those apprehended with children, for criminal prosecution.[46]

> **2.     The government failed to implement any policies and procedures that would mitigate the harms inflicted on separated families.**

58.     CBP estimated to the Office of Management and Budget (OMB) that the family separation policy would result in the separation of *more than 26,000 children* by September

---

[44] *See* DOJ OIG Report, *supra* note 1, at 28–29 (Exhibit A); *see also* Dickerson, *supra* note 14 (Exhibit E).

[45] *See* DOJ OIG Report, *supra* note 1, at 30 (Exhibit A).  These forecasted problems were not a surprised.  Past efforts to refer all border apprehensions to criminal prosecutions likewise overwhelmed the judicial system, as when Arizona had to declare a judicial emergency in 2011 due to the drastic influx of prosecutions.  *See* Dickerson, *supra* note 14 (Exhibit E).

[46] In contrast, when the U.S. previously considered implementing a similar initiative, former Secretary of Homeland Security Jeh Johnson rejected the idea because (1) it was inhumane, and (2) it would overrun the government's capacity to house children.  *See* Dickerson, *supra* note 14 (Exhibit E).

2018,[47] a 100-fold increase over the number of children separated during the failed El Paso Initiative.  The government, however, took no effective steps to mitigate the harm that would be inflicted on these thousands of families.  Instead, the harm was the purpose, to further the government's goal of deterring immigration from South and Central America.

59.    CBP had no centralized system to connect the separated children to their parents.[48] Some CBP offices used different Excel spreadsheets to record names of children and parents. Another office used a whiteboard for the same purpose.[49]  Young children who often did not know their parents' full names, let alone any other useful identifying information like a birthdate, were separated from their parents without so much as an identification number.  Indeed, only after a full two-and-a-half weeks did CBP leadership instruct their agents to record which child belonged to which parent, leading to haphazard, unreliable, and incomplete records.[50]

60.    The U.S. Attorneys had no discretion to decline prosecuting parents in any circumstances. In an interview with the DOJ-OIG, the U.S. Attorney for the WDTX stated:

> Zero tolerance, per our instructions, i[s] basically sapping prosecutorial discretion. . . . [W]ith respect to age of the child, it was a categorical, 'We're prosecuting all.'  No one in this office, including me, had any discretion on whether to accept if we were under the zero tolerance requirement from the Attorney General.[51]

61.    By way of example, the U.S. Attorney noted in an email to his staff that he "had understood that the Border Patrol itself had a policy of not referring parents to us when doing so would separate children under 5 from the parents," but when the Border Patrol did refer two cases

---

[47] *See* U.S. Dep't of Homeland Sec., Office of Inspector General, *DHS Lacked Technology Needed to Successfully Account for Separated Migrant Families* 17–18 (Nov. 2019) (Exhibit Q).

[48] *See* DOJ OIG Report, *supra* note 1, at 48–49 (noting that there was no master list of separated children) (Exhibit A).

[49] *See* Sharyn Alfonsi, *Families Separated by Trump Administration at the Border Still Waiting for Reunification*, 60 Minutes (Oct. 10, 2021) (Exhibit R).

[50] *See* Dickerson, *supra* note 14 (Exhibit E).

[51] *See* DOJ OIG Report, *supra* note 1, at 41 (Exhibit A).

with children under five years old and the office declined prosecution, the Deputy Attorney General clarified the administration's directive and instructed the U.S. Attorney that "those two cases should not have been declined."[52]

62.     In the four days after CBP began referring all parents for prosecution, each U.S. Attorney in charge of a southwest border region independently contacted either DOJ or DHS to report concerns about implementing the policy.  The U.S. Attorneys emphasized the impossibility of executing practical obligations, like medical examinations, while staying within the constitutional mandates of due process.[53]  On information and belief, no changes were made.

63.     Despite the pleas for help from members of his own Justice Department, on May 11, 2018, AG Sessions doubled down on the family separation policy, baldly stating in a call with the U.S. Attorneys, "We need to take away children."[54]

64.     Acting on behalf of the U.S. Attorneys, the EOUSA again reached out to the DOJ, writing in a May 11 email:

> What is happening with these children when they are being separated from the parent?  It appears that once DHS turns the child over to HHS, DHS is out of the picture and cannot give information.  What are the safeguards to the children…. Also, what is the age cutoff for children and parents to be separated? . . . .
>
> How is DHS arranging for Central and South American family units to be deported after the misdemeanor prosecution of the parent?  How are they getting the child back to the parent? . . . Where are the kids during that time?[55]

Upon information and belief, there was no plan to reunite the families because the goal of the program was to make the process as emotionally excruciating as possible.

---

[52] *See id.*

[53] *See id.* at 37.

[54] *See id.* at 39.

[55] *See id.*

65.     Attorney General Sessions again ignored these warnings.  Instead, he reiterated that there would be no exceptions to prosecuting adults and the concomitant separation of families, stating in public remarks on June 14, 2018: "I have ordered our prosecutors to pursue 100 percent of the illegal entries on the Southwest border that DHS refers to us.  If you cross the Southwest border unlawfully, then the Department of Homeland Security will arrest you and the Department of Justice will prosecute you."[56]

66.     The Administration was clear in its public statements that it implemented the family separation policy for the express purpose of deterrence—that is, the Administration intended to inflict as much pain and suffering on vulnerable families as possible to stop immigrants from Central and South America from seeking asylum in the United States.  For example, Trump's Chief of Staff John Kelly boasted on a national radio program that "a big name of the game is deterrence . . . . It could be a tough deterrent – would be a tough deterrent."  Offhandedly, he added, "The children will be taken care of — put into foster care *or whatever*."[57]

> **3.**     **The government continued to separate families despite widespread evidence that the program was causing serious harm to children and parents.**

67.     Almost immediately, news outlets began reporting on the cruel treatment inflicted on these families by the U.S. government in the name of deterrence.[58]  On June 18, *Time* reported that children were being held in a converted Walmart in Texas.[59]  That same day, *The Atlantic*

---

[56] *See id.* at 55–56.

[57] *See Transcript: White House Chief of Staff John Kelly's Interview with NPR*, NPR (May 11, 2018) (emphasis added) (Exhibit S).

[58] *See* Jill Colvin, *Trump's Family Separation Policy Starts Dividing Republicans*, PBS News Hour (June 18, 2018) (Exhibit T).

[59] *See* Maya Rhodan, *Here Are the Facts About President Trump's Family Separation Policy*, Time (June 18, 2018) (Exhibit U).

reported that children as young as two were held in cells resembling cages, sleeping on a tile floor without any source of comfort or warmth like a blanket.[60]

68.     At the end of May, the Federal Public Defender's office in the Southern District of Texas ("SDTX") detailed the harrowing experiences of their clients in an email to local federal judges and the U.S. Attorney for the SDTX: "[O]ur office has routinely represented parents in misdemeanor court who have been separated from their children and who have been given no information about their whereabouts, their well being, or any plans to reunite them. . . . None of the parents are being told when the children will be returned to them."[61]

69.     Despite the overwhelming evidence of inhumane conditions and cruel treatment, members of the Administration continued to laud the family separation policy's "effectiveness" in a series of public pronouncements.  For example, on a June 19, 2018, conference call with reporters, Assistant Secretary of HHS Steve Wagner promised that "the new policy will result in a deterrence effect."[62]  The cruelty was the point.

70.     Children were separated even when their parents were not prosecuted.  Senior ICE officials raised concerns that families were being reunited *too quickly*, and began brainstorming ways, like sending the child across the country, to prolong the separation to inflict maximum punishment.  Matt Albence, an ICE official, wrote, "[c]onfirm that the expectation is that we are NOT to reunite the families and release."[63]

---

[60] David A. Graham, *Are Children Being Kept in "Cages" at the Border?*, The Atlantic (June 18, 2018) (Exhibit V).

[61] *See* DOJ OIG Report, *supra* note 1, at 44 (Exhibit A).

[62] Philip Bump, *Here Are the Administration Officials Who Have Said that Family Separation Is Meant as a Deterrent*, Wash. Post (June 19, 2018) (Exhibit W).

[63] Dickerson, *supra* note 14 (Exhibit E).

**4.     The government failed to coordinate with its contractors, and as a result, the detention centers were not equipped to handle the influx or type of detainees the government forced them to detain.**

71.     Many parents were held at the Port Isabel Detention Center ("PIDC") in Los Fresnos, TX, a private, for-profit detention facility run by Ahtna Support and Training Services, a subsidiary of Ahtna, Inc.[64]

72.     Upon information and belief, from May through mid-June 2018, the government forced PIDC and other facilities to accept detainees well above the contracted-for capacity.[65]

73.     As a result, PIDC and other facilities were unable to meet minimum standards of care for those detained.  For example, ICE standards require detainees to be "served two hot meals and one sack lunch each day,"[66] but detainees were rarely, if ever, given hot food.  In addition, ICE standards require that detainees have access to adequate medical care, but detainees' requests for care were often ignored, causing minor medical issues to worsen into serious medical emergencies and causing unnecessary pain.  Finally, even though pregnant women were not to be housed at PIDC,[67] pregnant women were regularly sent to PIDC after being separated from their children.

---

[64] *A Message From Ahtna, Inc. Regarding the Port Isabel Detention Center (PIDC)*, Ahtna Inc. (June 26, 2019) (Exhibit X).

[65] PIDC's 2008 contract with ICE calculates guaranteed monthly minimum payments for detention and food services based on 500 beds.  *See SPC Contract – Port Isabel Service Processing Center (Ahtna Inc.)* (Exhibit Y).  An annual inspection of PIDC, conducted in February 2016, found that although the facility had a rated capacity of only 960, PIDC had an average daily population of 967 for the previous twelve months and a population count of 1162 on the first day of the inspection.  *See Performance-Based National Detention Standards 2011 Inspection Worksheet for Over 72 Hour Facilities (G-324A)* (2016), at pdf p. 185 ("Port Isabel Inspection Report") (Exhibit Z).  In other words, PIDC was consistently overcapacity *even before the family separation policy caused an influx of detainees.* DOJ OIG Report, *supra* note 1, at 63-64 (Exhibit A).

[66] *Performance-Based National Detention Standards 2011 Inspection Worksheet for Over 72 Hour Facilities (G-324A)* 83, 85 (2016) ("Port Isabel Inspection Report") (Exhibit Z).

[67] *See id.* at 114.

**D.      Judicial intervention ended the family separation policy.**

74.      At an arraignment for separated parents on June 4, 2018, a federal judge ordered the government to "identify where [the parents'] children [are] sent, where the parents are sent, when and where the parents and the child are to be rejoined or if the parent and child are not to be rejoined, then with whom or to whom the child has been placed."  The judge further emphasized that the point of this order was simply that "the children not suffer unnecessarily."[68]

75.      The government could not fulfill the judge's simple request.  In that hearing, the government admitted that CBP "does not have all the information because they send the kids to HHS, and [CBP] does not keep track.  HHS in turn has set up a hotline for the parents to find their kids, but the hotline does not work."[69]

76.      Despite these judicial concerns, on June 23, 2018, DHS explained in a directive that it would only reunite families who agreed to be deported and only "for the purposes of removal."[70]  This directive imposed an impossible choice on parents: They had to choose between seeing their children again or continuing to seek asylum in the United States.  The next day, a senior official confirmed that the government intended to reunite families only on condition of their deportation.[71]

77.      Then another federal court stepped in.  On June 26, 2018, the U.S. District Court for the Southern District of California enjoined the government from separating parents from their children absent a finding of parental unfitness or danger to the child and ordered the government to reunite parents with children under age five within 14 days and children age five and older

---

[68] *See* DOJ OIG Report, *supra* note 1, at 45 (Exhibit A).

[69] *See id.*

[70] U.S. Dep't of Homeland Sec., *Fact Sheet: Zero-Tolerance Prosecution and Family Reunification* (June 23, 2018) (Exhibit AA).

[71] Maria Saccheri, Michael E. Miller & Robert Moore, *Sen. Warren Visits Detention Center, Says No Children Being Returned to Parents There*, Wash. Post (June 24, 2018) (Exhibit BB).

within 30 days.[72] The court expressed its grave concern that the "practice has resulted in the casual, *if not deliberate*, separation of families" in a manner that "is **unlikely to pass constitutional muster**."[73]

78.     The court held that "the right to family integrity still applies" at the border, even when families do not formally present themselves at an official crossing.[74]

79.     The court warned of the irreparable harm imposed by the policy, quoting first-hand accounts of parents who had been separated.  In particular, the court observed that one father was so distraught from the separation that he committed suicide in custody.  The court also emphasized the "toxic stress" on "the development of brain architecture and other organ systems" of young children, including an "increase [of] risk for stress-related disease and cognitive impairment[,] . . . anxiety and post-traumatic stress disorder, [] poorer behavioral and educational outcomes, and [] higher rates of poverty and food insecurity" for children who experience traumatic events like family separation when they are young.[75]

80.     The court was unequivocal in its holding that the government's failure to create an effective means for communication and reunification likely violated due process:

> We are a country of laws, and of compassion.  We have plainly stated our intent to treat refugees with an ordered process, and benevolence, by codifying principles of asylum.  The Government's treatment of Ms. L. and other similarly situated class members does not meet this standard, and it is unlikely to pass constitutional muster. . . .
>
> [T]he practice of separating these families was implemented without any effective system or procedure. . . . This is a startling reality.  The government readily keeps track of personal property of detainees in criminal and immigration proceedings.   Money, important documents, and

---

[72] *See Ms. L. v. U.S. Immigr. & Customs Enf't ("ICE")*, 310 F. Supp. 3d 1133, 1146, 1149 (S.D. Cal. 2018), *modified*, 330 F.R.D. 284 (S.D. Cal. 2019), and enforcement granted in part, denied in part *sub nom. Ms. L. v. U.S. Immigr. & Customs Enf't*, 415 F. Supp. 3d 980 (S.D. Cal. 2020).

[73] *See id.* at 1143–44 (emphasis added).

[74] *See id.* at 1143.

[75] *See id.* at 1147.

automobiles, to name a few, are routinely catalogued, stored, tracked and produced upon a detainees' release, at all levels—state and federal, citizen and alien.  Yet, the government has no system in place to keep track of, provide effective communication with, and promptly produce alien children.  *The unfortunate reality is that under the present system migrant children are not accounted for with the same efficiency and accuracy as property.*  Certainly, ***that cannot satisfy the requirements of due process***.[76]

81.     Throughout the period between May 5 and June 26, 2018, the U.S. government tore almost 4,000 children from their parents.  While reunification efforts continue, earlier this year, over 1,000 children still remained separated from their parents, revealing the depths of the government's failure.[77]

## II.     <u>M.M.C. AND M.C.C.</u>

82.     M.M.C. and M.C.C. provide a vivid illustration of the intentional harm resulting from the government's systemic violations legal rights.

### A.     The Forced Separation of M.M.C. and M.C.C.

83.     On or about May 25, 2018, M.M.C. entered the United States with her then six-year-old daughter, M.C.C., after fleeing Guatemala to escape her physically, sexually, and psychologically abusive former partner and M.C.C.'s father.

84.     In early May 2018, M.M.C.'s abuser kidnapped M.C.C. and held her hostage to lure M.M.C. to a hotel room and rape her.  Fearing for their safety, M.M.C. left Guatemala with M.C.C. only days later, unaware at the time that she had been impregnated by her rapist.

85.     When M.M.C. and M.C.C. crossed the border in Texas, immigration officers— including Border Patrol Officers Humberto N. Flores, Homar Garza, J. Troncoso, and G. Estrada—

---

[76] *Id.* at 1144 (emphasis added).

[77] *See* DOJ OIG Report, *supra* note 1, at 43 (Exhibit A); Daniel Bush, *Biden May Open Reunification Process to More Families Separated Under Trump*, Newsweek (Apr. 15, 2022) (Exhibit CC).

apprehended them and took them to a detention center commonly referred to as the "*hielera*" or "ice box" due to its freezing temperatures.

86.    At the *hielera*, officers confiscated all M.M.C.'s and M.C.C.'s belongings including a sweatshirt, hair ties, and identifications before detaining them in a very cold room with only an aluminum sheet to cover themselves.

87.    Despite arriving at the *hielera* around 1:00 p.m. or 2:00 p.m., M.M.C. and M.C.C. were not offered anything to eat or drink until 8:00 p.m. at which point they were only given a juice and a sandwich to share between them.

88.    The detention officers left the mother and daughter in a room that was so overcrowded that M.M.C. and M.C.C. were unable to lie down.  Instead, they were forced to spend the night sitting in a corner near a bathroom that was open to everyone in the room.

89.    At 4:30 a.m., officers banged on the metal door with a paddle to awaken the sleeping women, shouting M.M.C.'s name through the door.  When they opened the door, the officers were still holding the paddle as they shouted again for M.M.C. to identify herself.

90.    A detention officer told M.M.C. that they were taking her daughter from her for 24 hours while M.M.C. went to court.  M.C.C. started crying and grabbing onto her mother, begging not to be separated. After repeated assurances by the officers that the separation would last only one day, the officers pried M.C.C. away from her mother.  The officers lied.  That was the last time mother and daughter saw each other for approximately 52 days.

91.    M.M.C. pleaded with an officer for information about her daughter—namely where they had taken the girl.  The officer refused.  Instead, he replied that the daughter now belonged to the President.  The officer also told M.M.C. that if, during her credible fear interview, she said she came to the United States because she was afraid to return to Guatemala, she would never see her

daughter again, but if she said she came for work, she would be reunited with her daughter and deported.

92.     M.M.C. was terrified; she had no idea where her daughter was or if she would ever see her again.  As a result, M.M.C. followed the officer's advice during her credible fear interview and was slated to be deported without her daughter.

**B.     Mistreatment of M.M.C. in Federal Custody**

93.     Later that day, M.M.C. was taken in front of a federal magistrate by Border Patrol Agent Carlos Sanchez.  At this hearing, she pled guilty to unlawful entry into the United States and sentenced to serve four days.  She was then transferred to the Central Processing Center ("CPC") in McAllen, Texas, a place known as the *perrera* or "kennel."

94.     On the way to the *perrera*, M.M.C. and the other immigrants were chained together at their ankles and wrists and had to walk slowly and together because the wristlocks pinched their wrists.  The bus ride was four to five hours, and M.M.C. was not given anything to eat until approximately six that evening.  At this point, M.M.C. was four weeks pregnant with A.T.C.

95.     The *perrera* was so crowded that M.M.C. could not even lie on the floor.  Instead, she sat with another woman on a bench.  Some people had to sleep on the bathroom floor, which was open to the room.

96.     In the nine days M.M.C. was detained at the *perrera*, her physical health and hygiene suffered. M.M.C. was not allowed to bathe, brush her teeth, or comb her hair.  None of the women were given enough food, and the officers repeatedly denied the women's requests for water, forcing them to drink the excessively chlorinated sink water, which made them sick.

97.     The officers' psychological abuse of M.M.C. and the other women in the *perrera* exacerbated the poor mental health effects of being separated from their children.  Officers occasionally threw a limited number of cookies at the women and teased them as they leapt over

each other in the hopes of satiating their hunger.  Officers also woke the women up in the middle of the night and told them to mop or move out of the cell so it could be cleaned.  When women inquired into the whereabouts of their children, officers would respond that the children were no longer theirs, that they now belonged to the President and that the women were going to be deported without their children.  When the women cried at these responses, officers would call them names such as "Magdalene," a biblical figure known for crying.

98.     After nine days in the *perrera*, M.M.C. was transferred to a third facility, the whereabouts of which are unknown.  Upon information and belief, this third location was a deportation center close to PIDC.

99.     At this third location, M.M.C. underwent a physical examination through which she learned she was pregnant.  She believed that her pregnancy was the direct result of her abuser's rape in Guatemala.

100.     The following day, M.M.C. had a second appointment with a doctor in which it was confirmed that she was about one-month pregnant.  As the pregnancy was a result of rape, she inquired about her options, to which the doctor replied that she had to go to another state if she wanted to terminate the pregnancy.  The doctor never offered M.M.C. the opportunity to seek additional counsel, nor did he inform her of the risks associated with carrying the pregnancy to term.

101.     The doctor gave M.M.C. one tablet of prenatal vitamins, but otherwise made no changes to her detainment conditions, and the officers continued to treat her in the same way she was treated when she had arrived at the facility.  For example, the officers did not allow her to use the bathroom outside of scheduled times and forced her to sleep in intense heat and to drink over-chlorinated water.

102.    After four days at this facility, M.M.C., a few other women, all of whom had been separated from their children at the border, and one man were removed from the facility and transferred to PIDC.  There was no explanation given as to why they were transferred.

103.    PIDC was required under its contract with ICE to maintain minimum standards of care, including the provision of "clean, indoor/outdoor temperature-appropriate and presentable" clothing, "enough undergarments to ensure a daily change is available," and "gender-appropriate personal hygiene items," including "feminine hygiene items."  ICE Standards also required PIDC to allow access to "an adequate number of toilets provided 24 hours per day," "an adequate number of washbasins with temperature controlled hot and cold running water," and an "adequate number of showers" that are "thermostatically controlled to temperatures between 100 to 120 degrees Fahrenheit."[78]

104.    At PIDC, M.M.C. was forced to sleep on a bunk in a room with 75 other women and broken air conditioning.  She continued to be deprived of basic nourishment, and she was forced to continue drinking highly chlorinated water.  M.M.C. was only allowed to use the bathroom at a specifically designated time.  Also, she had to shower in groups of approximately 15 women in front of the officers, despite the trauma and humiliation.  The officers at PIDC never gave her any clothing, undergarments, or personal hygiene products.

105.    PIDC was not supposed to house pregnant detainees.[79]  Accordingly, pregnant women like M.M.C. should have been "immediately transferred to another facility within 24 hours of their arrival."[80]  M.M.C. was never transferred to a different facility.  Likewise, she received no additional prenatal vitamins or medical exams.

---

[78] *See* Port Isabel Inspection Report, *supra* note 66, at 118–119 (Exhibit Z).

[79] *See id.* at 114.

[80] *See id.*

106.    Although ICE standards required "detainees with certain conditions – chronic or temporary . . . [to] be prescribed special diets as appropriate,"[81] M.M.C. was not given any extra food for her pregnancy.  The little food she did receive she could not keep down because she was nauseous from the water and the dread she felt about being apart from M.C.C.

107.    PIDC's failure to adhere to standards were the direct result of the government's concerted effort to overwhelm detention facilities with an influx of detainees, including many women with young children.  Because they detained so many women of childbearing age, it was inevitable that a number of those women would be pregnant.  Yet, the government took no steps to provide care to the pregnant women.

108.    One of the few bright spots in M.M.C.'s time at Port Isabel was her bible study group she formed with other detainees.  However, the officers soon stopped the women from practicing their religion and told them they could not get together to pray in groups.

109.    At one point, another detained woman helped M.M.C. write a letter to request that she be allowed to speak to M.C.C.  This woman also told M.M.C. that she believed M.C.C. was in Pennsylvania.

110.    The officers at Port Isabel never provided any information to M.M.C. about the location and condition of her daughter.  Eventually, M.M.C. was able to speak with her daughter on the phone for no more than 10 minutes at a time.  Throughout the entire 52 days of separation, they were allowed a total of six check-in calls, adding up to only an hour of interaction for the almost two-month period.

111.    When they spoke, M.C.C. could not speak.  She would only cry and cry, asking why her mother left her and using single-word responses to questions by M.M.C.  M.M.C. feared

---

[81] *See id.* at 85.

that her young daughter was regressing, unable to string together the full sentences that she had previously used to communicate with her mother.  All M.M.C. could do was assure M.C.C. that she was nearby, attending to some errands, but that she would see her soon, not knowing whether she would ever see her daughter again.

112.    Instead of facilitating contact with her daughter, officers at Port Isabel repeatedly pressured M.M.C. to abandon her asylum claim.  On one occasion, the officers asked her to sign documents that M.M.C. believed were deportation orders, but she refused.  On another occasion, she received a call from a man who claimed to be from the Guatemalan consulate.  He urged M.M.C. to leave the United States so she could be reunited with her daughter.  She refused to do so.

### C.    M.C.C.'s Separation from Her Mother

113.    Six-year-old M.C.C. was severely traumatized during this period of separation. After her mother assured her that they would only be separated for a day, the government sent this confused and disoriented little girl thousands of miles away from her mother, whom she did not see for approximately 52 days.

114.    On information and belief, the government sent M.C.C. to the ICE Berks Family Residential Center in Philadelphia.  M.C.C. told her mother that she had been put on an airplane, a mode of transportation that she had never used, at 2:00 a.m. to be flown away from her mother without any explanation from the officers.

115.    It took a full year before M.C.C. was able to say anything to her mother about their separation.  Eventually, M.C.C. reported to her mother that she had been kept in a room with one other girl around her age, and upon information and belief, received no mental health care.

116.     Throughout her time in Pennsylvania, M.C.C. was scared and distraught, believing she had been abandoned by her mother.  They spoke only six times over their 52 days of separation, and in those calls, M.C.C. consistently asked her mother why M.M.C. had left her.

117.     Around midnight on July 17, 2018, after nearly two months of forced separation, the government flew M.C.C. back to Texas.  Around 2 a.m., ICC officials, including Jerardo Martinez and J. Guzman Jr., reunited M.M.C. and M.C.C. at PIDC.  Officials told M.M.C. that the middle-of-the-night reunion was necessary to avoid the news reporters who waited outside of the facility.

118.     M.M.C. and M.C.C. were then released from custody and traveled to a Catholic Charities shelter in San Juan, Texas to begin the long and ongoing process of recovering from their separation.

**D.     M.M.C., M.C.C., and A.T.C. Suffered Severe and Lasting Effects.**

119.     M.M.C. suffered severe emotional distress as a result of the forcible separation from her daughter by the government.  For the first two weeks of the family's separation, M.M.C. had no knowledge of her daughter's whereabouts.  For the entire course of her separation, she did not know if they would ever be reunited.  M.M.C. is now afraid to allow M.C.C. out of her sight outside of school hours because she fears she will be unable to protect her.

120.     In addition, M.M.C. was pregnant with A.T.C. during her entire time in custody. Not only did the government fail to provide basic prenatal care, but the government assigned M.M.C. to a facility that was incapable of providing minimal health care to a pregnant woman.  As a result of the government's actions and failure to implement minimal safeguards, M.M.C. was denied the right to gather information about her options and was then forced to remain in a facility where she lacked access to clean drinking water and sufficient nourishment and where she had to

forego prenatal check-ups.  The government's conduct impeded M.M.C. from giving birth to a healthy baby.

121.    As a result, her daughter, A.T.C., was born with lasting health issues. A.T.C. has a vitamin D deficiency for which she is required to take injections twice a day for the first five to seven years of her life.  A.T.C. has also shown delayed development, including a delay in learning to crawl and general weakness.  Although A.T.C. was attending a program to help her learn to walk and to better communicate with her peers, that program was suspended during the pandemic and has not yet restarted.  M.M.C. has paid extensively for A.T.C.'s medical treatment and believes that A.T.C. will have lifelong health issues due to the government's failure to provide adequate care for M.M.C. in custody.

122.    M.C.C. is also suffering from the effects of the traumatic separation.  She has developed extreme separation anxiety. For the first year or so in the U.S., whenever M.M.C. left, M.C.C. thought M.M.C. would not return.   Additionally, M.C.C.'s personality has changed dramatically.  She used to be an outgoing child who loved singing and dancing.  Following the separation, she was afraid to talk to strangers and regressed in her development, speaking in one-word responses like a toddler learning how to speak instead of the sentences that she used before the separation.  While she is now able to speak in full sentences again, she cannot read or write in English and struggles in school.  She also has fears about foods that she ate while in the facility and will only eat cereal and certain fruits.

**III.    N.A.B. AND N.A.C.**

123.    N.A.B. and N.A.C. provide yet another vivid illustration of the intentional harm resulting from the government's systematic violations of legal rights.

A.    **The Forced Separation of N.A.B. and N.A.C.**

124.    On or around June 10, 2018, N.A.B. entered the United States with his six-year-old son, N.A.C., after fleeing Honduras.

125.    N.A.B. fled Honduras because of the violent persecution he faced as a result of his work as a prominent political activist.

126.    When N.A.B. and N.A.C. crossed the Rio Grande near Hidalgo, Texas, immigration officers apprehended them and took them to the *hielera*, the "icebox."

127.    On the way to the *hielera*, N.A.B. and N.A.C. were held on a bus with approximately 50 other individuals where they were prohibited from going to the bathroom while officers collected information from each person.

128.    At the *hielera*, officers confiscated N.A.B.'s bible and N.A.C.'s original birth certificate—which were never returned—and then directed N.A.B. and N.A.C. to a spot on the concrete floor.  The officers provided the family with only one aluminum sheet, which did not protect them from the freezing temperatures.  N.A.B. and N.A.C. did not sleep, and they spent their first night in the United States huddled together, crying.  The family went an entire day and night without anything to eat or drink.

129.    In the early morning, the officers returned.  This time, they announced that they were taking N.A.C. from his father.  As the officers forced N.A.C. down the hallway, N.A.B. could hear his son's repeated cries of "Papi! Papi! Papi!" slowly fade into the distance.

130.    N.A.B. had no idea why the officers took his son from him, how long they would be separated, or if there was anything he could do to see—or at least speak with—his son.

131.    Later that day, CBP officers brought N.A.B. into a room and questioned him repeatedly.  N.A.B. desperately inquired about his son, but the officers only told him that they had

taken N.A.C. pursuant to an order by the President of the United States.  N.A.B. started sobbing and became increasingly helpless, but the officers continued their intense questioning without the slightest regard to the father's profound concern for his little boy.  N.A.B. was unable to focus on his answers, and at the end of the interview, the officers told N.A.B. that he could not have an attorney and that he would be deported.

132.    For weeks, the officers did not give the desperate father N.A.B. any information about where his son was or if his son was being taken care of by anybody.  In fact, his son had been taken almost two thousand miles away to Cayuga Centers in the Bronx, New York.

**B.     Mistreatment of N.A.B. in Federal Custody**

133.    N.A.B. spent the days following his separation in the *hielera* alone and crying.  He asked the guards at every opportunity for information about his son, but his pleas for information were met only with hostility, as the officers called him names like "*intruso*" (intruder).  The *hielera* reeked of human waste, and N.A.B.'s health deteriorated, as the only food available was nearly inedible, sometimes partially liquefied.

134.    After three days in the *hielera*, the guards got ready to move N.A.B.  He was brought to a judge in chains, anxious and confused.  On information and belief, he was charged with entry without inspection.  The process was chaotic, unfamiliar, and each detainee was faced with the overwhelming weight of the others pleading guilty one after the other.  He did not understand he had the right to plead "not guilty."  Following this hearing, he was transferred to a facility in Laredo, Texas.

135.    At this facility, N.A.B. confronted the conclusion that he was facing deportation, leaving his young son alone in a foreign country.  N.A.B. fixated on his concern for his son.  In the inhumane conditions, with no nourishment and officers consistently insulting him, these fears

overwhelmed and eventually swallowed him.  In these darkest days of his life, N.A.B. attempted to commit suicide.  He found razor blades and sliced open his wrists in the bathroom.  Fortunately, N.A.B. survived, but his wrists retain these scars—a permanent physical manifestation of the psychological scars he will carry for the rest of his life.

136.    N.A.B.'s worst fears, however, were then almost realized when he was taken from detention in Laredo and placed on a plane for deportation.  As he sat on the plane, ICE officers boarded the plane and said his name was on a list to return to detention.  Without further explanation, the officers removed N.A.B. from the plane and sent him to a detention center in Falfurrias, Texas.  Soon thereafter, he was transferred to PIDC.

137.    At PIDC, N.A.B. lived in a crowded cell crammed with approximately 150 detainees.  His health further deteriorated as he barely slept in this noisy room where the lights were on all day and night, and the little food he received was so rotten that it made him ill.  Even the water made him sick.  As discussed *supra*, the poor food and highly chlorinated water did not meet ICE's standards of care.

138.    Ingenesis, a federal contractor, provided the medical care at PIDC.  According to ICE standards, Ingenesis was expected to provide "a comprehensive evaluation by a licensed mental health provider as soon as possible but not later than 72 hours" for newly arrived detainees with mental health concerns.[82]  As proof of this exam, providers were instructed to fill out an HSC Form 834.  Despite his earlier suicide attempt while in custody, on information and belief, N.A.B. never received a mental health evaluation or related care.

139.    During this time, N.A.B. slipped on a filthy bathroom floor and injured his foot. He asked to see a doctor at least three times, and each time he was told he would have to wait

---

[82] *See* Port Isabel Inspection Report, *supra* note 66, at 94, 97, 102 (Exhibit Z).

despite communicating that he was in great pain.  Only after four days of repeated requests was he able to receive basic medical attention, which resulted in an injection, bandaging, and crutches.

140.    Twenty days after federal officials tore N.A.C. away from his father, N.A.B. was finally able to hear his child's voice again.  But the ensuing 10-minute phone call was the *only* communication N.A.B. had with his son during their entire period of separation.  Father and son spent most of the time crying on the phone.  When N.A.C. finally spoke, he accused his father of abandoning him, asking why he had left him alone when they could have been together.  N.A.B. tried to assure his son that he loved him and that everything would work out, but the line was cut before he could finish.  The officers then gave N.A.B. a phone number to contact his son.  N.A.B. called that number multiple times each day, but nobody ever answered the phone.

141.    During the final eight days of N.A.B.'s detention, the government transferred him to a fifth facility, the exact whereabouts of which are unknown to N.A.B.  Upon information and belief, this fifth location was a center close to PIDC.  Here, the conditions were even more deplorable.  He was sick, injured, sleep-deprived, and in a constant state of anxious panic about the welfare of his son.  He spent these final days in an overcrowded room with the other parents who had been separated from their children.  They had no phone access, no ability to attend religious services, and received consistent verbal abuse from the officers.  They also only received one meal a day and were forced to sleep on the hard floor.  This single room had one toilet, and it stank of unwashed bodies and human waste—a stench that grew ever more horrible with each passing day.  N.A.B. and the other detained parents pleaded for better treatment and information.  They even went on a hunger strike, but the officers continued to subject them to the same dehumanizing conditions.

142.    The above conditions violated numerous ICE standards, including those governing food provision, access to toilets, showers, clean water, and access to telephones.[83]

143.    On or around July 23, 2018—after five continuous days in this overcrowded room with other anxious and scared parents—N.A.B. learned that he would be reunited with his son. But when he went into an office, expecting to see his son, N.A.C. was not there.  N.A.B. fell deeper into depression as he returned to the stench of the overcrowded cell, surrounded by other desperate parents anxious to reunite with their children.

144.    Then, three days later, on or around July 26, 2018, and six weeks after being forcibly separated, N.A.B. was finally reunited with his son.

**C.    N.A.B. and N.A.C. Suffered Severe and Lasting Effects.**

145.    The reunion was not as joyous as N.A.B. had hoped, because his son N.A.C. appeared to have become wary of his father.  N.A.C. accused his father of not loving him anymore because he left him alone to freeze on a cold floor.  To this day, their relationship remains strained, and N.A.C. speaks with his father much less frequently than before.

146.    N.A.C. used to be a calm child who treasured every moment he was able to spend with his father.  But he is now acting out in school, unable to sleep alone, and distrusts his father. He is also experiencing acute anxiety around police officers because they remind him of the officers at the border.  N.A.C. has also never told his father about his experiences at the Cayuga Center, and N.A.B. fears that N.A.C. experienced trauma there.  N.A.C. recently started meeting with a psychologist to whom he was referred by his school because he gets jittery when he hears sirens and has memories of the Cayuga Center.

---

[83] *See id.* at 118, 119, 82, 143.

147.     N.A.B. expected the immigration process to be challenging, but he never expected that the U.S. government would separate him from his child, nor did he expect the lasting effect that separation would have on his family.  N.A.C. still lives in fear of being separated again and of police generally.  N.A.B. is haunted by the time he lost and the impact the separation had on his son.

## COUNT I

## <u>INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS</u>

### (By Plaintiffs M.M.C., M.C.C., N.A.B. and N.A.C. Against the Government)

148.     Plaintiffs M.M.C., M.C.C., N.A.B., and N.A.C. incorporate all of the preceding allegations in this Complaint as if fully set forth here.

149.     By engaging in the acts described in this Complaint—including without limitation suddenly separating M.M.C. from her daughter M.C.C. and N.A.B. from his son N.A.C. and failing to timely reunite the families—Defendant engaged in extreme and outrageous conduct that went beyond all possible bounds of decency and is regarded as atrocious and utterly intolerable in a civilized community with the intent to cause or with a reckless disregard of the probability of causing Plaintiffs M.M.C., M.C.C., N.A.B., and N.A.C. to suffer severe emotional distress.

150.     As a direct and proximate cause of Defendant's conduct, Plaintiffs suffered emotional distress so severe that no reasonable person could be expected to endure it, including, as described above, severe depression, anxiety, and attempted suicide.

151.     Under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680, the United States is liable to Plaintiffs for intentional infliction of emotional distress.

## COUNT II

## ABUSE OF PROCESS

### (By Plaintiffs M.M.C., M.C.C., N.A.B., and N.A.C. Against the Government)

152.    Plaintiffs M.M.C., M.C.C., N.A.B., and N.A.C. incorporate all of the preceding allegations in this Complaint as if fully set forth here.

153.    As described in this Complaint, after initial issuance of legal process under 8 U.S.C. § 1325(a), Defendant subsequently made an illegal, improper, or perverted use of the legal process that was neither warranted nor authorized in order to accomplish ends that are beyond the purview of such process, including, but not limited to, the designation of M.C.C. and N.A.C. as unaccompanied minors and the resulting separation of the families used as leverage to influence Plaintiffs' asylum claims.

154.    Defendant had an ulterior motive or purpose in exercising such illegal, perverted, or improper use of process, including but not limited to the stated purpose behind the family separation policy of inflicting as much pain and suffering as possible on the separated families to deter asylum seekers, particularly from Central and South America, from coming to the United States as well as to interfere with Plaintiffs' asylum claims.

155.    For example, and without limitation, Defendant improperly designated both M.C.C. and N.A.C. as unaccompanied minors to improperly effect and justify the separation of M.M.C. and her daughter M.C.C. and the separation of N.A.B. and his son N.A.C.

156.    Defendant then attempted to coerce M.M.C. to abandon her asylum claim by leveraging her desire to be reunited with her young child, M.C.C.  Similarly, Defendant subjected N.A.B. to a credible fear interview while he was suffering from severe emotional distress due to his separation from his young child, N.A.C.

157.    Defendant abused and perverted these processes in order to achieve the improper and collateral purposes detailed above.

158.    The Defendant's abuse of process described herein resulted in damages, including emotional distress, to the Plaintiffs.

159.    Under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680, the United States is liable to Plaintiffs for abuse of process.

## COUNT III

## GROSS NEGLIGENCE

### (By Plaintiffs Against the Government)

160.    Plaintiffs incorporate all of the preceding allegations in this Complaint as if fully set forth here.

161.    Defendant had a legal duty to Plaintiffs to act with ordinary care and prudence so as not to cause harm or injury to Plaintiffs.  Defendant also had mandatory, non-discretionary duties including, but not limited to, those imposed by the *Flores* Agreement, federal statutes, and federal regulations.

162.    Defendant failed to act with ordinary care and breached the duty of care owed to Plaintiffs as described in this Complaint including without limitation by separating M.M.C. from her daughter M.C.C.; by separating N.A.B. from his son N.A.C.; and by failing to ensure that the facilities housing Plaintiffs could provide minimum living standards, resulting in Plaintiffs residing in facilities with inhumane conditions, including facilities that lacked any basic ability to care for and provide medical treatment for pregnant women.

163.    As a direct and proximate result of the referenced conduct, Plaintiffs suffered substantial damages.

164.     The Defendant's actions objectively imposed extreme risk of serious injury to Plaintiffs, including but not limited to the harm caused by forcibly breaking a parent/child bond; the physical harm from placing Plaintiffs in facilities with inadequate living conditions and medical care; and the physical harm to A.T.C. from the living conditions and lack of care provided to her mother, M.M.C.

165.     As described herein, Defendant was subjectively aware of this risk, but nevertheless proceeded in conscious indifference to the rights, safety, or welfare of the Plaintiffs.

166.     Under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680, the United States is liable to Plaintiffs for gross negligence.

## COUNT IV

## NEGLIGENCE

### (By Plaintiffs Against the Government)

167.     Plaintiffs incorporate all of the preceding allegations in this Complaint as if fully set forth here.

168.     Defendant had a legal duty to Plaintiffs to act with ordinary care and prudence so as not to cause harm or injury to Plaintiffs.  Defendant also had mandatory, non-discretionary duties including but not limited to those imposed by the *Flores* Agreement, federal statutes, and federal regulations.

169.     Defendant failed to act with ordinary care and breached the duty of care owed to the Plaintiffs.  Defendant breached the duty of care owed to Plaintiffs as described in this Complaint, including without limitation by separating M.M.C. from her daughter M.C.C.; by separating N.A.B. from his son N.A.C.; and by failing to ensure that the facilities housing Plaintiffs could provide minimum living standards, resulting in Plaintiffs residing in facilities with inhumane

conditions and inadequate medical care.  As a direct and proximate result of the referenced conduct, Plaintiffs suffered substantial damages.

170.    Under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680, the United States is liable to Plaintiffs for negligence.

## COUNT V

## ABDUCTION OF A CHILD

**(By Plaintiffs M.M.C., M.C.C., N.A.B., and N.A.C. Against the Government)**

171.    Plaintiffs M.M.C., M.C.C., N.A.B., and N.A.C. incorporate all of the preceding allegations in this Complaint as if fully set forth here.

172.    Defendant, with knowledge that Plaintiff parents did not consent, caused Plaintiff children to leave the custody of Plaintiff parents and not to return to Plaintiff parents after they had been separated.  Defendant compounded this harm by only permitting the most minimal contact between parents and children during their separation.

173.    Defendant caused Plaintiff parents M.M.C. and N.A.B. from their Plaintiff children M.C.C. and N.A.C. to lose the society, affection, and companionship of their children or parents, and to suffer harms therefrom.

174.    Under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680, the United States is liable to Plaintiffs for child abduction.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request:

175.    Compensatory damages;

176.    Attorneys' fees and costs pursuant to, among other provisions, the Equal Justice Act, 28 U.S.C. § 2412; and

177.    Such other and further relief as the Court deems just and appropriate.


                                        Respectfully submitted,

Dated: April 13, 2023

                                        */s/ Dennis Coleman*
                                        Dennis Coleman (RI Bar 2310)
                                        dennis.coleman@ropesgray.com
                                        Andrew J. O'Connor (*pro hac vice
                                        forthcoming*)
                                        andrew.oconnor@ropesgray.com
                                        Ropes & Gray LLP
                                        800 Boylston Street
                                        Boston, MA 02199-3600
                                        Tel: (617) 951-7000
                                        Fax: (617) 951-7050


                                        */s/ Kathryn C. Thornton*
                                        Kathryn C. Thornton (*pro hac vice
                                        forthcoming*)
                                        kathryn.thornton@ropesgray.com
                                        Nicholas Curry (*pro hac vice forthcoming*)
                                        nick.curry@ropesgray.com
                                        2099 Pennsylvania Avenue, NW
                                        Washington, DC 20006-6807
                                        Tel: (202) 508-4600
                                        Fax: (202) 508-4650

                                        *Attorneys for Plaintiffs*