# Exhibit A



# Review of the Department of Justice's Planning and Implementation of Its Zero Tolerance Policy and Its Coordination with the Departments of Homeland Security and Health and Human Services

★ ★ ★

EVALUATION AND INSPECTIONS DIVISION

21-028

JANUARY 2021 (REVISED)

**NOTICE**

---

This report was originally issued on January 14, 2021. The report was revised on April 13, 2022, following an independent referencing review conducted by the Department of Veterans Affairs (VA) Office of Inspector General (OIG) at the request of the Department of Justice (DOJ) OIG. The VA OIG recommended that the DOJ OIG make a number of changes to the text of the report to more closely align with the supporting evidence in our underlying work papers, as verified by VA OIG during its independent review. The DOJ OIG made all of the changes proposed by VA OIG in this revised report. The VA OIG concluded that none of the report changes were material or affected the report's findings, conclusions, or recommendations. These changes are visible in the redlined version of the report accessible here and listed separately in a Notice at the end of that redlined version of the report. The VA OIG's memorandum reporting the results of its independent referencing review is available here.



# Executive Summary

*Review of the Department of Justice's Planning and Implementation of Its Zero Tolerance Policy and Its Coordination with the Departments of Homeland Security and Health and Human Services*

## Introduction

On April 6, 2018, then Attorney General Jeff Sessions announced that the U.S. Department of Justice (DOJ, Department) had adopted a "zero tolerance policy" for immigration offenses involving illegal entry and attempted illegal entry into the United States. The policy required each U.S. Attorney's Office (USAO) on the Southwest border to prosecute all referrals for illegal entry violations, including misdemeanors, referred by the U.S. Department of Homeland Security (DHS) "to the extent practicable, and in consultation with DHS."

A month later, during a May 7, 2018 speech in San Diego, California, Sessions stated, "I have put in place a 'zero tolerance' policy for illegal entry on our Southwest border. If you cross this border unlawfully, then we will prosecute you. It's that simple. If you are smuggling a child, then we will prosecute you and that child will be separated from you as required by law."

The decision to prosecute adults entering the country as part of a family unit represented a change in long-standing DOJ and DHS practice. Historically, when DHS apprehended adults with children illegally crossing the border, DHS, with the concurrence of the Southwest border USAOs, would place the family unit in administrative deportation proceedings without referring the family unit adult to DOJ for criminal prosecution. Following the DOJ issuance of the zero tolerance policy, DHS changed its practice and began referring family unit adults to DOJ for criminal prosecution and the Department agreed to prosecute these cases. As a result, DHS OIG estimated that approximately 3,000 children were separated from their families and issues regarding reuniting children with their parents remain as of this date.

On June 20, 2018, President Donald J. Trump issued an Executive Order that largely curtailed the DHS practice of referring family unit adults to DOJ for prosecution. In July 2018, multiple members of Congress requested that the DOJ Office of the Inspector General (OIG) review the Department's role in the creation and implementation of the zero tolerance policy. The OIG conducted this review to assess the Department's planning for and implementation of the zero tolerance policy, including its internal coordination with the Southwest border USAOs, the U.S. Marshals Service (USMS), and with DHS and the U.S. Department of Health and Human Services (HHS). Consistent with the Inspector General Act of 1978, this review does not substitute the OIG's judgment for the judgments made by DOJ leadership regarding the substantive merits of the zero tolerance policy.

## Results in Brief

We found that Department leadership and, in particular, the Office of the Attorney General (OAG), which had primary responsibility for the policy's development, failed to effectively prepare for, or manage, the implementation of the zero tolerance policy. Sessions and a small number of other DOJ officials understood that DHS would change its policy in response to the zero tolerance policy and begin referring to DOJ for criminal prosecution adults who entered the country illegally with children and that prosecution of these family unit adults would result in children being separated from them, at least temporarily. The OIG found that the OAG advocated for this DHS policy change and therefore was a driving force in the DHS decision to begin referring family unit adults for prosecution.

However, DOJ leadership, and the OAG in particular, did not effectively coordinate with the Southwest border USAOs, the USMS, DHS, HHS, or the federal courts prior to DHS implementing the new practice of referring family unit adults for criminal prosecution as part of the zero tolerance policy. We further found that the OAG's expectations for how the family separation process would work significantly underestimated its complexities and demonstrated a deficient understanding of the legal requirements related to the care and custody of separated children. We concluded that the Department's single-minded focus on increasing immigration prosecutions came at the expense of careful and appropriate consideration of the impact of family unit prosecutions and child separations.

In addition, the increase in immigration prosecutions under the zero tolerance policy created operational, resource, and management challenges for the USMS, the USAOs, and the courts. DOJ officials were aware of many of these challenges prior to issuing the zero tolerance policy, but they did not attempt to address them until after the policy was issued.

*The Department Did Not Effectively Plan for or Coordinate with the USAOs, the USMS, DHS, or HHS About the Impact that Family Unit Adult Prosecutions Under the Zero Tolerance Policy Would Have on Children, Despite Senior Leaders' Awareness that It Would Result in the Separation of Children*

The April 6, 2018 announcement of the zero tolerance policy was the culmination of a yearlong period during which the Department sought to increase criminal immigration enforcement on the border. DOJ officials told us that Sessions was not satisfied with the Southwest border USAOs' response to an April 2017 memorandum that he had issued, and in 2017 the OAG discussed, within DOJ and with DHS, potential policy changes to address the



# Executive Summary

*Review of the Department of Justice's Planning and Implementation of Its Zero Tolerance Policy and Its Coordination with the Departments of Homeland Security and Health and Human Services*

number of apprehensions on the Southwest border. This discussion included the prosecution of family unit adults apprehended at the border and the separation of children.

In formulating the zero tolerance policy, Sessions and OAG officials referenced an initiative conducted from March to November 2017 by the U.S. Border Patrol's El Paso Sector and the USAOs for the Western District of Texas (WDTX) and later the District of New Mexico (the El Paso Initiative). The El Paso Initiative sought to increase illegal entry prosecutions and allowed for prosecution of family unit adults, resulting in the separation of approximately 280 families. These separations, and the government's inability in many cases to identify the whereabouts of separated children, generated concerns from prosecutors, judges, and other stakeholders. Despite the concerns, the OAG focused solely on the increase in illegal entry prosecutions resulting from the El Paso Initiative and did not seek readily available information that would have identified for them the serious issues that arose as a result of the prosecutions of family unit adults and the corresponding child separations.

On May 4, 2018, with the urging of Sessions, DHS changed its policy of not referring family unit adults and began referring them to Southwest border USAOs for criminal prosecution. However, DOJ leadership had not effectively coordinated with the Southwest border U.S. Attorneys in advance of this policy change, advised them that DOJ leadership expected that family unit referrals would begin, or informed them that Sessions expected that all such referrals would be criminally prosecuted by the USAOs, despite the "to the extent practicable" language in the zero tolerance policy. As a result, the USAOs learned of the policy change from their DHS counterparts and did not receive guidance about the change from DOJ headquarters until after the policy change was made by DHS.

During a call with Sessions on May 11, the U.S. Attorneys discussed their concerns about family separations, including the whereabouts of children separated as a result of the policy. Sessions promised additional resources but also stated his support for continued prosecution of family unit adults.

We found that the OAG's stated expectations of how the family separation process would work demonstrated a lack of understanding of the legal framework governing DHS's detention of alien children and significantly underestimated the complexities of the prosecution process. For example, Sessions told the Southwest border U.S. Attorneys that prosecution of family unit adults would be swift and would be followed by

immediate reunification of the separated family. However, federal law requires DHS to place separated children in the custody of HHS's Office of Refugee Resettlement (ORR) within 72 hours of their apprehension. Completing a prosecution within such a timeline was, in most cases, a practical and legal impossibility, even if a defendant sought to plead guilty and be sentenced immediately. Indeed, following implementation of the zero tolerance policy, the Southwest border USAOs had reported to DOJ headquarters that prosecuted adults typically remained in DOJ custody for 3 to 7 days and in some districts even longer. Yet, we determined that Department leadership did not take steps, after receiving this information and learning about DHS's and HHS's difficulties in identifying the location of separated children, to reconsider their prior assumptions about the ability to immediately reunify separated families.

*The Department Did Not Plan for the Operational, Resource, and Management Impacts that a Substantial Increase in Immigration Prosecutions Resulting from the Zero Tolerance Policy Would Have on the USMS, the USAOs, and the Federal Courts*

The OAG did not include the USMS in its discussions about increasing illegal entry prosecutions prior to issuing the zero tolerance policy. As a result, we found that the USMS did not have an opportunity to address the significant resource and operational needs associated with housing an increased number of defendants until after the Attorney General's announcement in April 2018. A subsequent USMS assessment concluded that, without additional resources, implementation of initiatives including the zero tolerance policy would result in a fiscal year 2019 funding shortfall of $227 million and a shortage of about 3,000 beds.

In addition, we found that the USMS did not have policies or procedures in place to facilitate communications between migrant children in HHS ORR custody and their parents in USMS custody. As a result, USMS district staff faced challenges as HHS ORR case managers began reaching out to coordinate communications between members of separated families. We identified similar unmet operational and resource needs experienced by the USAOs and the courts on account of the Department's failure to coordinate with stakeholders prior to issuing the zero tolerance policy.

## Recommendations

Based on our findings, the OIG made three recommendations to assist the Department in implementing future policies.

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

    Background ................................................................................................................ 1

    The DOJ, DHS, and HHS Roles in the Federal Immigration Enforcement Process and the 72-hour Rule for Detaining Children ............................................................. 3

    Scope and Methodology of the OIG Review ....................................................... 7

RESULTS OF THE REVIEW ............................................................................................. 9

    The Department Did Not Effectively Plan for or Coordinate with the U.S. Attorney's Offices, the U.S. Marshals Service, the Department of Homeland Security, or the Department Health and Human Services About the Impact that Family Unit Adult Prosecutions Under the Zero Tolerance Policy Would Have on Children, Despite Senior Leaders' Awareness that It Would Result in the Separation of Children ................ 9

    The Department Did Not Plan for the Operational, Resource, and Management Impacts that a Substantial Increase in Immigration Prosecutions Resulting from the Zero Tolerance Policy Would Have on the USMS, the USAOs, and the Federal Courts .. 58

CONCLUSION AND RECOMMENDATIONS ............................................................... 69

    Conclusion ............................................................................................................... 69

    Recommendations ................................................................................................. 70

APPENDIX 1:  PURPOSE, SCOPE, AND METHODOLOGY ....................................... 71

    Standards ................................................................................................................. 71

    Site Visits .................................................................................................................. 71

    Interviews ................................................................................................................. 72

    Policy and Document Review ............................................................................... 72

APPENDIX 2:  THE ATTORNEY GENERAL'S APRIL 6, 2018 MEMORANDUM .......................................... 74

APPENDIX 3:  FEDERAL LAW AND GOVERNANCE ON ILLEGAL ENTRY ............................................... 75

    Operation Streamline ............................................................................................ 75

    *Flores* Settlement, Trafficking Victims Protection Reauthorization Act Legislation, and *Ms. L. v. ICE* Court Ruling .......................................................................... 77

APPENDIX 4:  FEDERAL IMMIGRATION ENFORCEMENT ...................................................................... 79

APPENDIX 5:  PREVIOUS RELATED OFFICE OF INSPECTOR GENERAL AND GOVERNMENT ACCOUNTABILITY OFFICE WORK ............................................................................................... 80

    *Special Review–Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy* (September 2018) .............................................................. 80

    *Unaccompanied Children:  Agency Efforts to Reunify Children Separated from Parents at the Border* (October 2018) .................................................................. 80

    *Separated Children Placed in Office of Refugee Resettlement Care* (January 2019) ....... 80

    *Immigration Enforcement:  Immigration-Related Prosecutions Increased from 2017 to 2018 in Response to Attorney General's Direction* (August 2019) ............................... 81

    *DHS Lacked Technology Needed to Successfully Account for Separated Migrant Families* (November 2019) ...................................................................................... 81

    *Southwest Border:  Actions Needed to Improve DHS Processing of Families and Coordination Between DHS and HHS* (February 2020) ....................................................... 81

    *Communication and Management Challenges Impeded HHS's Response to the Zero Tolerance Policy* (March 2020) .................................................................... 82

APPENDIX 6:  THE ATTORNEY GENERAL'S APRIL 11, 2017 MEMORANDUM ...................................... 83

APPENDIX 7:  THE DEPARTMENT'S RESPONSE TO THE DRAFT REPORT .............................................. 86

APPENDIX 8:  OIG ANALYSIS OF THE DEPARTMENT'S RESPONSE ...................................................... 87

# INTRODUCTION

## Background

On April 6, 2018, then Attorney General Jeff Sessions issued a memorandum to federal prosecutors along the Southwest border directing them to adopt a "zero tolerance policy" for prosecuting immigration offenses under 8 U.S.C. § 1325(a), a statute that prohibits illegal entry and attempted illegal entry into the United States (see Appendix 2 for the Attorney General's memorandum and Appendix 3 for an explanation of the statute).[1]  The zero tolerance policy required each U.S. Attorney's Office (USAO) along the Southwest border to prosecute all U.S. Department of Homeland Security (DHS) referrals for illegal entry violations "to the extent practicable, and in consultation with DHS."[2]  On May 4, 2018, with the urging of Sessions, DHS changed its policy of not referring family unit adults and began referring them to Southwest border USAOs for prosecution.  Three days later, on May 7, Sessions delivered a speech in San Diego on his recently issued zero tolerance policy.  He stated:

> Today we are here to send a message to the world:  we are not going to let this country be overwhelmed.  We need legality and integrity in the system.  That's why the Department of Homeland Security is now referring 100 percent of illegal Southwest border crossings to the Department of Justice for prosecution.  And the Department of Justice will take up those cases.
>
> I have put in place a "zero tolerance" policy for illegal entry on our Southwest border.  If you cross this border unlawfully, then we will prosecute you.  It's that simple.  If you smuggle illegal aliens across our border, then we will prosecute you.  If you are smuggling a child, then we will prosecute you and that child will be separated from you as required by law.

The decision to criminally prosecute adults illegally entering the country as part of a family unit (family unit adults) represented a change in U.S. Department of Justice (DOJ, Department) and DHS practice.  Historically, when DHS apprehended adults with children crossing the border, in most cases DHS would not refer the adult to DOJ for criminal prosecution.  One reason for not referring the family unit adult to DOJ for criminal prosecution had been to avoid the separation of the

---

[1]  Jeff Sessions, Attorney General, memorandum for Federal Prosecutors along the Southwest Border, Zero-Tolerance for Offenses Under 8 U.S.C. § 1325(a), April 6, 2018.  See Appendix 2 for the full text of the memorandum.

[2]  DOJ Office of Public Affairs, Press Release, "Attorney General Announces Zero-Tolerance Policy for Criminal Illegal Entry," April 6, 2018.

Throughout this report, all references to the "Southwest border USAOs" include the Districts of Southern California, Arizona, New Mexico, Western Texas, and Southern Texas.  For purposes of brevity, throughout this report we refer to the policy set forth in the April 6, 2018 memorandum as the zero tolerance policy and we refer to offenses under 8 U.S.C. § 1325(a) as illegal entry offenses.

family during the pendency of the adult's prosecution. Rather than separate the family unit by referring the adult to DOJ for criminal prosecution, DHS would typically detain and administratively remove from the United States the adult and children together or provide the family with a Notice to Appear before an Immigration Judge and release them on their own recognizance into the United States until their immigration hearing date. The practice of releasing the adult and children into the United States until his or her immigration hearing date is referred to by some as "catch and release." The issuance of the zero tolerance policy by Sessions on April 6, 2018, coincided with a presidential memorandum, issued on the same day, that directed the Attorney General, DHS Secretary, and other cabinet officials to report on steps taken by their agencies to end catch and release.[3]

We were told that, since at least 1992, immigration officials, with the concurrence of the USAOs on the Southwest border, largely avoided separating families by not prosecuting family unit adults. Although some family separations occurred prior to the zero tolerance policy, according to the Government Accountability Office (GAO), in November 2016 only 0.3 percent of migrant children in the U.S. Department of Health and Human Services' (HHS) custody were known to be separated from their parents.[4]

Multiple DOJ leaders told us that Sessions understood at the time the zero tolerance policy was issued that its strict implementation, as he detailed in his San Diego speech on May 7, would result in DHS's referral for criminal prosecution of adults entering the country illegally with children and that the prosecution of these family unit adults would result in family separations. Indeed, under the zero tolerance policy, from May to June 2018, an estimated 3,000 children were separated from their families when the family unit adult was referred to DOJ for prosecution, and issues regarding reuniting children with a parent remain as of the date of issuance of this report.[5]

---

[3] For more information on federal immigration laws and on criminal prosecutions and administrative immigration processes related to illegal entry, see Appendices 3 and 4.

[4] GAO, *Unaccompanied Children: Agency Efforts to Reunify Children Separated from Parents at the Border,* GAO-19-163 (October 2018), www.gao.gov/assets/700/694918.pdf (accessed January 12, 2020), 14.

[5] DHS Office of Inspector General (OIG), *DHS Lacked Technology Needed to Successfully Account for Separated Migrant Families,* OIG-20-06 (November 2019), www.oig.dhs.gov/sites/default/files/assets/2019-11/OIG-20-06-Nov19.pdf (accessed January 12, 2020), 8.

Note: This DHS OIG report estimated that 3,014 children were separated from their families while the zero tolerance policy was in place, though it also stated that "Without a reliable account of all family relationships, [DHS OIG] could not validate the total number of separations, or reunifications." Recently, the government and plaintiffs in a class action litigation working to reunite separated minors with their parents jointly reported that, as a result of separations that took place under the zero tolerance policy as well as during earlier immigration enforcement efforts in 2017 and 2018, "545 children remain for whom [outreach efforts have] not yet reached the separated parent." See *Ms. L* v. *[U.S. Immigration and Customs Enforcement (ICE)]*, No. 18-0428 (S.D. Cal. October 20, 2020) (joint status report, 7). For more information on the *Ms. L* v. *ICE* litigation, see Appendix 3.

In July 2018, multiple members of Congress requested that the DOJ Office of the Inspector General (OIG) review the Department's role in the creation and implementation of the zero tolerance policy. The OIG conducted this review to assess the Department's planning for and implementation of the zero tolerance policy, including its internal coordination with the Southwest border USAOs and the U.S. Marshals Service (USMS) and its coordination with DHS and HHS (see Appendix 1 for the scope and methodology of our review).

## The DOJ, DHS, and HHS Roles in the Federal Immigration Enforcement Process and the 72-hour Rule for Detaining Children

The federal immigration enforcement process has multiple components. DOJ's roles include prosecuting criminal offenses in federal court, managing detained immigration defendants during the course of any criminal proceedings, and adjudicating civil immigration cases. DHS's mission and roles include securing U.S. borders, enforcing federal immigration laws, administering immigration detention facilities for noncriminal detainees, and administering immigration benefits. HHS, as part of its broad mission to enhance and protect health, administers humanitarian assistance programs for eligible refugees from other countries, including children.

DHS's U.S. Customs and Border Protection (CBP), which includes the U.S. Border Patrol, is responsible for apprehending persons attempting to enter the United States outside of official ports of entry. The Border Patrol screens the apprehended persons to determine their criminal and immigration history before processing them administratively into the federal immigration system or referring them to DOJ, through the appropriate USAO, for possible criminal prosecution.[6]

One federal statute often at issue in such apprehensions is 8 U.S.C. § 1325(a), "Improper entry by an alien—Improper time or place; Avoidance of examination or inspection; Misrepresentation and concealment of facts." The statute specifically states:

> Any alien who (1) enters or attempts to enter the United States at any time or place other than as designated by immigration officers, or (2) eludes examination or inspection by immigration officers, or (3) attempts to enter or obtains entry to the United States by a willfully false or misleading representation or the willful concealment of a material fact, shall, for the first commission of any such offense, be fined under Title 18 or imprisoned not more than 6 months, or both, and, for a

---

[6] Administrative processing can include a credible fear screening interview by an Asylum Officer with DHS's U.S. Citizen and Immigration Service, administrative (as opposed to criminal) detention in a DHS facility, expedited removal proceedings, or the initiation of formal removal proceedings through a Notice to Appear at a future hearing before an immigration judge. See Appendix 4 for more information on criminal prosecutions and administrative proceedings for suspected illegal entry offenders.

subsequent commission of any such offense, be fined under Title 18, or imprisoned not more than 2 years, or both.

Such an entry into the United States is often referred to as "illegal entry." Under Section 1325(a), a first-time offender is subject only to misdemeanor prosecution, absent aggravating circumstances such as the presence of drugs or firearms that would allow for felony prosecution under a different federal statute.

When the Border Patrol refers an apprehended person to DOJ for prosecution, the USAO reviews the case and accepts or declines it for prosecution.[7] According to DOJ guidelines on federal prosecution, a USAO may decline to prosecute a case for several reasons, including insufficient evidence or local prioritization of cases to manage limited resources.[8] If a USAO accepts an illegal entry case for prosecution, prosecutors may charge illegal entry either as a misdemeanor under 8 U.S.C. § 1325 or as a felony if aggravating circumstances are present. Prior to the zero tolerance policy, individuals apprehended between ports of entry who were not considered an enforcement priority (e.g., a public safety threat, repeat illegal border crosser, convicted felon, or suspected child trafficker) were not consistently prosecuted for illegal entry under Section 1325, whether or not the individual entered with children, in part to avoid having DOJ resources committed to prosecuting sizable numbers of misdemeanors. However, as described in Appendix 3, in a limited number of jurisdictions, prosecution-based deterrence initiatives (sometimes referred to as "Operation Streamline") resulted in the prosecution of some first-time Section 1325 offenders.

After a USAO makes a charging decision on an illegal entry case, a misdemeanor case is generally assigned to a Magistrate Judge and a felony case is assigned to a U.S. District Judge. According to observations made by the GAO and the DHS OIG, the overwhelming majority of illegal entry misdemeanor cases do not go to trial, as judges sentence the defendant on the basis of a guilty plea that the defendant has agreed to in advance.[9] In addition, the overwhelming majority of

---

[7] In some USAOs, employees detailed from government agencies outside DOJ serve as Special Assistant U.S. Attorneys and perform duties that would otherwise be the responsibility of DOJ attorneys. In several of the Southwest border USAOs, Special Assistant U.S. Attorneys from the Border Patrol, ICE, or the Department of Defense's Judge Advocate General have prosecuted illegal entry cases referred by the Border Patrol.

[8] Justice Manual 9-27.220-230. The guidelines state that prosecutors should accept cases for prosecution only if they believe that "admissible evidence will probably be sufficient to obtain and sustain a conviction." The guidelines also allow declination in circumstances in which prosecution would not serve a "substantial federal interest." The Justice Manual acknowledges that federal law enforcement resources are limited and therefore prosecutors may consider national and local enforcement priorities in accepting or declining cases for prosecution.

[9] DHS OIG, _DHS Lacked Technology_, 33.

misdemeanor illegal entry cases result in a sentence of time served (i.e., the amount of time in detention between the defendant's arrest and sentencing).[10]

According to data provided to the Office of the Attorney General (OAG) by the Southwest border USAOs after the implementation of the zero tolerance policy, the average amount of time that a defendant remained in DOJ custody for an illegal entry prosecution was 3 to 7 days, although it was longer in some districts due in part to sentencing practices.  For example, in Arizona, New Mexico, and the Southern District of Texas, defendants with no prior criminal or immigration history were given a time-served sentence, which was typically 3 to 7 days, with weekend arrests taking longer to process.  In contrast, the Southern District of California reported that defendants with no prior criminal or immigration history were typically sentenced to 10 to 14 days.

Federal defendants who are detained following their arrests, including those arrested for illegal entry under Section 1325, are held in the custody of the USMS while awaiting trial or sentencing. Convicted illegal entry offenders with sentences longer than time served also typically serve their term of incarceration in USMS custody.[11]  In addition to providing detention services for pre-conviction and post-conviction illegal entry offenders, the USMS processes apprehended persons in preparation for court appearances, transports and escorts detainees to their court appearances, facilitates consultations between detainees and their attorneys, and provides courtroom security.

After convicted illegal entry offenders are sentenced and serve their term of incarceration, they are transferred by DOJ to the custody of DHS's U.S. Immigration and Customs Enforcement (ICE) for removal proceedings.[12]  See Appendix 4 for an illustration of federal criminal and civil proceedings for individuals suspected of illegal entry.

The immigration process differs for unaccompanied children apprehended by the Border Patrol, as well as for children apprehended while traveling in family units with adults.  A settlement agreement entered into by the United States following a 1997 Supreme Court decision, *Flores v. Reno,* set standards for federal immigration authorities' treatment of detained undocumented minors, including a requirement that the government hold the minors in the least restrictive setting appropriate to their age and needs.[13]  The *Flores* settlement also required that the

---

[10]  GAO, *Immigration Enforcement:  Immigration-Related Prosecutions Increased from 2017 to 2018 in Response to Attorney General's Direction*, GAO-20-172 (December 2019), www.gao.gov/assets/710/702965.pdf (accessed January 12, 2020), 26.

[11]  The USMS may transfer prisoners with longer sentences, typically over 90 days, to the custody of the Federal Bureau of Prisons, the DOJ component responsible for the incarceration of federal inmates.

[12]  If the USAO declines to prosecute a case, the individual enters ICE custody and DHS begins the same removal proceedings as would otherwise occur after prosecution.

[13]  Stipulated Settlement Agreement, *Flores* v. *Reno,* No. 85-4544 (C.D. Cal. Jan. 17, 1997).

government hold children separately from unrelated adults.[14]  In 2008, the Trafficking Victims Protection Reauthorization Act (TVPRA) codified some of the *Flores* settlement's restrictions into law and further stipulated that undocumented children who enter the United States without a parent or guardian, referred to as Unaccompanied Alien Children (UAC), must be transferred to the custody of HHS's Office of Refugee Resettlement (ORR) within 72 hours of being apprehended.[15]

Prior to implementation of the zero tolerance policy, as noted above, when DHS apprehended adults with children crossing the border, DHS typically would detain and administratively remove the adults and children together under civil immigration proceedings or would provide the family unit adult with a Notice to Appear before an Immigration Judge and then release the family to remain in the United States until the adult's immigration hearing date.[16]  The long-standing DHS practice of deferring to civil immigration proceedings and enforcement, rather than criminally prosecuting adults entering the United States with children as a family unit, was related to concerns about separating children from their family during the pendency of the parent's prosecution.  Under the *Flores* settlement and the TVPRA, detained children may not be held in restrictive settings such as detention facilities pending prosecution and sentencing of a family unit adult.[17]  Thus, if a USAO accepts a referral from DHS of a family unit adult for criminal prosecution, the adult is transferred to USMS custody and separated from the child.  In the vast majority of illegal entry prosecutions, the criminal proceedings involving the adult last longer than 72 hours, as noted above.

Because illegal reentry prosecutions generally take more than 72 hours, even when the defendant pleads guilty, when a child enters the country as part of a family unit and the parent is transferred to USMS custody for criminal prosecution, DHS designates the child as a UAC and places the child into the custody of ORR within 72 hours, absent "exceptional circumstances," as required under the TVPRA.[18]  In practice, at most Border Patrol stations, staffing and space limitations related to

---

[14] Stipulated Settlement Agreement, *Flores* v. *Reno*.

[15] 8 U.S.C. § 1232 (b)(3).  Although the statute includes an exception to the 72-hour requirement under "exceptional circumstances," during our review the HHS OIG told us that it was not aware of any use of this exception to account for the increased number of unaccompanied children during the period in which the zero tolerance policy was in effect.

[16] In 2015, a subsequent judicial decision in the *Flores* case stipulated that children could not be held in administrative detention with their parents for longer than 20 days.  *Flores* v. *Reno*, No. 85-4544 (C.D. Cal. Jul. 24, 2015) (in chambers-order).

[17] See Appendix 3 for more information about the *Flores* settlement and the TVPRA.

[18] While the statute does not define "exceptional circumstances," we did not find evidence that the Department gave serious consideration to applying this provision to the zero tolerance implementation period; as explained in the Results of the Review, not all DOJ leaders were fully aware of the 72-hour rule and did not consider its impact in the context of prosecutions of family unit adults.

children (who must be held separately from unrelated adults under *Flores*) often result in the transfer of children to ORR custody in significantly less time.

## Scope and Methodology of the OIG Review

This review examined DOJ's planning for and implementation of the zero tolerance policy and the Department's coordination with DHS and HHS regarding the policy.  We analyzed documents and emails from the OAG, Office of the Deputy Attorney General (ODAG), Executive Office for Immigration Review, Executive Office for United States Attorneys, Southwest border USAOs, and USMS from January 1, 2017, through September 30, 2018.  The methodology for the review consisted of document analysis, interviews with DOJ leadership and component headquarters officials, and site visits to USAOs and USMS locations along the Southwest border.  We did not consider issues related to asylum, as we determined these to be outside the scope of this review.  Consistent with the standard practice in all of our reviews, we provided a draft of this report to the Department on August 27, 2020, for the purpose of factual accuracy review.  The Department provided comments on September 28, 2020, and at that time, requested that the OIG interview other Department personnel who had responsibilities related to immigration or DHS policy issues.  Additionally, also consistent with our standard practice and for the purpose of ensuring factual accuracy, in September 2020 we contacted certain individuals who were interviewed during the review to provide them an opportunity to review the portions of the draft report that pertained to their testimony to the OIG.  As a result, the OIG conducted a follow up interview of former Deputy Attorney General Rod Rosenstein in October 2020 based on his comments and comments of others.

The OIG contacted former Attorney General Jeff Sessions numerous times throughout this review to seek an interview, but he did not agree to an interview.[19]  The OIG does not have the authority to compel the testimony of individuals who are no longer DOJ employees.  Additionally, former Principal Associate Deputy Attorney General Edward O'Callaghan did not agree to be interviewed after he left the Department.[20]  All other individuals contacted by the OIG agreed to the OIG's request and appeared for a voluntary interview.

---

[19]  The OIG has routinely interviewed other Attorneys General and former Attorneys General in connection with their involvement in matters under our review.

[20]  As noted, after reviewing a draft of this report, the Department suggested that the OIG interview additional Department personnel.  The OIG sought to interview O'Callaghan and an ODAG official who served as ODAG's liaison to DHS and other cabinet-level agencies for immigration issues.  O'Callaghan declined our interview request.  The other ODAG official told the OIG that the official "didn't have any role in drafting the [zero tolerance] policy and [didn]'t recall any conversations about it."

The OIG also reviewed prior work on the zero tolerance policy conducted by the DHS and HHS Offices of Inspector General and the GAO and references these works where appropriate in this report.[21]

Consistent with the Inspector General Act of 1978 and the OIG's role within DOJ, this review does not substitute the OIG's judgment for the judgments made by the Department regarding the substantive merits of the zero tolerance policy.  The focus of this review is the planning and implementation of the policy.  Appendix 1 describes our methodology in greater detail.

---

[21]  See Appendix 5 for further details on these reports.

# RESULTS OF THE REVIEW

## The Department Did Not Effectively Plan for or Coordinate with the U.S. Attorney's Offices, the U.S. Marshals Service, the Department of Homeland Security, or the Department Health and Human Services About the Impact that Family Unit Adult Prosecutions Under the Zero Tolerance Policy Would Have on Children, Despite Senior Leaders' Awareness that It Would Result in the Separation of Children

Then Attorney General Jeff Sessions's April 6, 2018 announcement of the zero tolerance policy was the culmination of a yearlong period during which the Department, beginning with an April 2017 memorandum, sought to increase criminal immigration enforcement on the Southwest border in response to an increasing number of individuals illegally entering the United States. Despite that yearlong effort, Sessions's ongoing concerns about increases in border apprehensions, as well as a migrant caravan then moving toward the United States, contributed to his decision to issue the zero tolerance policy in April 2018. The new policy directed that Southwest border U.S. Attorneys, "to the extent practicable," immediately adopt a zero tolerance policy for all illegal entry offenses referred by the U.S. Department of Homeland Security (DHS) to the U.S. Attorneys for criminal prosecution. The policy did not address how DHS immigration arrests involving family unit adults traveling with children should be handled. At the time, DHS was pursuing such family unit adult cases administratively rather than criminally, consistent with its longstanding policy related to concerns about separating children from parents.

As detailed below, we determined that Sessions intended that the zero tolerance policy would be strictly implemented by the U.S. Attorneys, that it would result in DHS changing its longstanding policy and referring for criminal prosecution adult family unit members who entered the country illegally with children, and that the U.S. Attorneys' discretion to decline such cases would be limited, despite the "to the extent practicable" language.

According to then Deputy Attorney General Rod Rosenstein and Counselor to the Attorney General Gene Hamilton, Sessions was aware at the time he announced the zero tolerance policy that the prosecution of these apprehended family unit adults would result in children being separated from families. When the OIG asked Rosenstein whether he knew that strict implementation of the zero tolerance policy would result in the separation of families, Rosenstein stated: "I think the answer is yes. I think everybody understood that what it meant was we are going to prosecute without—everybody who committed a crime without regard [to] whether they brought a child."[22]

---

[22] In a follow-up interview, after reviewing a draft of this report, Rosenstein stated, "On this issue of when I knew [that DHS would begin referring family unit adults for prosecution], I remember that May [7] announcement [by the Attorney

(Cont'd)

On May 4, 2018, with the urging of Sessions, DHS announced that it was changing its policy of not referring family unit adult members for criminal prosecution and began referring them to the Southwest border U.S. Attorney's Offices (USAO), resulting in the separation of children from these family unit adults. We concluded that, prior to the formal announcement by DHS of this policy change, the Department did not effectively coordinate with the U.S. Marshals Service (USMS), DHS, the U.S. Department of Health and Human Services (HHS), or the federal courts, nor did it provide the Southwest border USAOs with sufficient notice or guidance to allow them to prepare for the criminal prosecution of family unit adults and the separation of children from their parents.[23] Additionally, the OIG review found that the OAG's stated expectations of how the family separation process would work significantly underestimated its complexities and demonstrated a deficient understanding of the legal requirements related to the care and custody of Unaccompanied Alien Children (UAC). We further found that, even as significant problems were being raised about the implementation of the child separation policy by the Southwest border U.S. Attorneys, including concerns about DHS's and HHS's inability to reunite parents with their children, the zero tolerance policy remained unchanged until the issuance of a presidential Executive Order on June 20, 2018. In this section, we describe the Department's lack of preparation for implementing the zero tolerance policy and the Department's failure to address the problems that arose following its implementation.[24]

## The Department's 2017 Efforts to Increase Criminal Immigration Enforcement on the Southwest Border

On April 11, 2017, about 1 year before the announcement of the zero tolerance policy, then Attorney General Sessions issued an immigration enforcement memorandum, "Renewed Commitment to Criminal Immigration Enforcement," which directed all federal prosecutors to prioritize the prosecution of several types of felony immigration offenses.[25] Sessions's memorandum set forth guidelines for charging illegal entries as felony offenses for repeat offenders or those with aggravating circumstances. It also required the Southwest border USAOs to develop district-specific guidelines for charging first-time offenders with misdemeanor illegal

---

General] as being very dramatic and significant. I know that there were some family unit referrals prior to that, I just can't pinpoint when, you know, I learned about it [in connection with the zero tolerance policy]."

[23] After reviewing a draft of this report, ODAG discussed the lack of coordination between DOJ headquarters and DOJ components prior to the DHS change to its referral practices, noting, "had ODAG known that DHS was going to significantly alter the number and nature of its proposed prosecutions, ODAG would have provided notice to the Southwest border U.S. Attorneys and all relevant DOJ Headquarters components and coordinated preparative action in advance. Instead, like the U.S. Attorneys and other DOJ stakeholders, ODAG was unaware of the DHS policy until after it was issued." The OIG agrees that the Attorney General and other DOJ officials who were aware that DHS was likely to begin referring family unit adults for prosecution in May 2018 did not share that information widely within the Department and that this impacted the Department's overall ability to effectively prepare for prosecuting these cases.

[24] After reviewing a draft of this report, ODAG suggested that the Department's lack of preparation for implementing the zero tolerance policy "was the result of the Attorney General's failure to provide notice [about family unit adult prosecutions to relevant stakeholders, including ODAG], and its impact on the policy's implementation."

[25] Appendix 6 provides the full text of the April 11, 2017 memorandum.

entry under 8 U.S.C. § 1325.[26]  With regard to illegal entry misdemeanor prosecutions, the memorandum stated:

> I ask that each U.S. Attorney's Office on the Southwest border...work with the U.S. Department of Homeland Security and any other appropriate agency to develop a set of guidelines for prosecuting such violations.  These guidelines should aim to accomplish the goal of deterring first-time improper entrants.  Each District should submit its guidelines to the Office of the Deputy Attorney General by April 24, 2017.

The Southwest border USAOs submitted their illegal entry misdemeanor guidelines to the Office of the Deputy Attorney General (ODAG) on April 24, 2017.  Each of the USAOs' revised guidelines stated that they would prioritize prosecutions of illegal entry cases that presented aggravating circumstances, such as a prior criminal history or multiple prior apprehensions.  With respect to misdemeanor prosecutions for illegal entry, only the District of Arizona's (DAZ) guidelines addressed such prosecutions by providing that the USAO would prosecute all first time entrants referred for prosecution for illegal entry in addition to those cases presenting aggravating circumstances and repeat offenders.  None of the USAOs' written guidelines explicitly contemplated the prosecution of family unit adults as part of efforts to deter first-time improper entrants.

According to Counselor to the Attorney General Hamilton, Sessions was frustrated with the USAOs' implementation of the April 2017 memorandum.  Hamilton told the OIG, "It was almost as if no one paid attention to the AG's memo, especially with respect to [misdemeanor] illegal entries, that is, violations under [8 U.S.C.] Section 1325."  Hamilton, in a second OIG interview, explained:

> We weren't prosecuting as many as you would expect under the April 2017 guidance.  You would expect that folks would be falling in line with it.  [Sessions] wasn't pleased with what he was hearing and seeing about our efforts....  He was big on seeing stats and metrics to understand what was occurring.  He was very interested in making sure there was follow through....  The numbers didn't indicate that [the Department had treated misdemeanor illegal entry offenses with any prioritization] at all.

Then Deputy Attorney General Rosenstein agreed with this assessment, stating, "The Attorney General I think was very clear in his view that failure by the Department to sufficiently prosecute immigration law was inconsistent with the rule of law, and the statistics bore that out."  He added that the number of illegal entries was increasing in 2017, but the overall number of immigration prosecutions had fallen since its peak in 2013, and that Sessions was insistent that DOJ prosecute

---

[26]  The Attorney General's April 2017 immigration enforcement memorandum also created a Border Security Coordinator position within each USAO to work with DHS law enforcement partners to "coordinate specific immigration enforcement initiatives...and facilitate information sharing."

a larger number of cases in response to the increased level of crime at the border.  Rosenstein further told us that, before the zero tolerance policy, some USAOs were prosecuting a larger volume of illegal entry cases while others had a low volume of cases, which in his view meant that DOJ was enforcing the law unequally.  He added that if somebody were caught in San Diego they might go free, while if they committed the same crime in El Paso they might get prosecuted, so Sessions's objective was to have less variation in immigration enforcement.

In 2017, the OAG, under Sessions's direction, discussed, within DOJ and with DHS, potential policy changes to address the number of apprehensions on the Southwest border.  This policy discussion explicitly included considering the prosecution of adults apprehended at the border in family units, as well as the separation of the children from the adults in those units.  On December 15, 2017, Hamilton asked the then DHS Chief of Staff to the Secretary about the status of a policy options memorandum related to immigration initiatives that DHS started drafting in August 2017 at the request of then acting DHS Secretary Elaine Duke.[27]  In response, on December 16, at Hamilton's request, the then DHS Chief of Staff emailed Hamilton a document, "Policy Options to Respond to Border Surge of Illegal Immigration," and asked for Hamilton's feedback.  The first 2 of 16 overall policy options proposed in the document were:

> **1. Increase Prosecution of Family Unit Parents:**  Instruct [U.S. Customs and Border Protection (CBP)] and [U.S. Immigration and Customs Enforcement (ICE)] to work with DOJ to significantly increase the prosecution of family unit parents when they are encountered at the border.  The parents would be prosecuted for illegal entry (misdemeanor) or illegal reentry (felony) and the minors present would be placed in HHS custody as UACs.  Because the parents would be criminally prosecuted, they would be placed in the custody of the U.S. Marshal to await trial.  This would require close coordination with DOJ, to ensure there are sufficient prosecutors at the border and sufficient U.S. Marshal's detention space.  Because of the large number of violators, not all parents could be criminally prosecuted.  However, the increase in prosecutions would be reported by the media and it would have substantial deterrent effect.  A public announcement of the policy could be made before implementation.
>
> > *Status:  CBP is currently executing this policy on a limited basis in the El Paso Sector.*
> >
> > *Implement:  Secretarial memo needed for further expansion.*
>
> **2. Separate Family Units:**  Announce that DHS is considering separating family units, placing the adults in detention, and placing the minors under the age of 18 in the custody of HHS as unaccompanied alien children (UACs) because the minors will meet the definition of "unaccompanied alien child," i.e., (1) has no lawful

---

[27]  Before joining the OAG in October 2017, Hamilton had been Senior Counselor to the DHS Secretary on immigration issues.

immigration status in the U.S.; (2) has not attained the age of 18; and (3) has no parent or legal guardian in the U.S., or no parent or legal guardian in the U.S. is available to provide care and physical custody.  *See* 6 U.S.C. § 279(g)(2).  This will require close coordination with HHS, to ensure that sufficient capacity is available to detain the UACs.  Advocacy groups are aware that this policy shift may occur and therefore are seeking to identify families who have been separated in order to bring a class action lawsuit.  Hence, close coordination with DOJ will also be required.

> *Status:  Currently under consideration; dependent on policy determination.*

> *Implement:  Direct DHS [Office of Public Affairs] to develop messaging options.*

The next day, Sunday, December 17, Hamilton responded to the email from the then DHS Chief of Staff by expressing his support for the proposals.  With regard to the policy options concerning the prosecution of family unit parents and separation of family units, Hamilton suggested that the U.S. Border Patrol issue expedited removal orders for the "entire family unit" at the time the family was apprehended and before the parent was referred for prosecution and the child placed in the custody of HHS.  According to Hamilton's comments, this would allow HHS to more effectively work with DHS to repatriate the minor to his or her home country, ideally with the parent, in contrast to placing the child in normal removal proceedings, which Hamilton characterized as slow.  Hamilton told the OIG that his reaction to the proposals may have reflected his consultation with Sessions and then OAG Chief of Staff Matthew Whitaker and reflected the OAG's overall interest in working with DHS to reduce the number of illegal entries at the border by increasing the number of prosecutions.

Whitaker told us that he remembered reviewing the DHS policy options memorandum and "having a discussion about it, philosophically about what we could do," with Hamilton and Sessions; but he could not identify the date that occurred or the specific discussion.  He told us that Sessions and Hamilton were primarily responsible for immigration policy at the time and "were on the same page" about options to increase the number of immigration prosecutions at the border, including by signaling to DHS the Department's support for prosecuting family unit adults.

Also on December 17, Hamilton sent an email to nine DOJ officials, including two OAG officials and four ODAG officials, asking them to review the latest DHS statistics on Southwest border apprehensions and requesting a meeting to discuss the statistics and immigration matters.  The meeting was scheduled to occur on December 20.  Additionally, on December 20 or 21, the newly confirmed U.S. Attorney for the Western District of Texas (WDTX), John Bash, was asked to brief DOJ headquarters officials on a 2017 program, since ended, in the WDTX USAO.  That effort, which we refer to as the El Paso Initiative or the Initiative, was started in March 2017 when the Border Patrol's El Paso Sector began referring family unit adults for criminal prosecution, and the WDTX USAO developed guidelines to prosecute family unit adults in certain circumstances even if this resulted in the separation of children from those prosecuted adults.  The Initiative highlighted

many of the child separation issues that would later present themselves during implementation of the zero tolerance policy.  The briefing for DOJ headquarters on the El Paso Initiative occurred on or about December 27, 2017.

### The 2017 El Paso Initiative

In early March 2017, the Border Patrol's El Paso Sector suspended what local WDTX USAO and Border Patrol officials referred to as the sector's "family unit policy."  Under this policy, the Border Patrol did not refer parents in family units who were apprehended at the border for illegal entry prosecution if the referral would result in children being separated from their parents.  According to the then acting WDTX U.S. Attorney, Richard Durbin, and the then WDTX Criminal Chief, they were unaware of a written DHS policy or directive prohibiting the referral of family unit adults for criminal prosecution but both had been aware of this practice for many years and questioned whether it should be applied as a blanket rule.  After learning of the Border Patrol's decision to begin referring family unit adults for prosecution, Durbin and senior USAO officials worked to develop the criteria under which the USAO would accept family unit adults for prosecution.

Durbin's emails with several supervisory WDTX Assistant U.S. Attorneys (AUSA) indicate that he was initially reluctant to begin accepting family unit referrals because of the potential consequences associated with the separation of families at the time of referral.  Durbin wrote in one email to the AUSAs that "History would not judge [prosecuting family units] kindly."  He also wrote to USAO officials that he believed DHS had sufficient "administrative tools" to handle family unit adult apprehensions.  He told the OIG, however, that "there were obvious problems with the [family unit] policy."  He noted the potential for smuggling organizations to "exploit" the policy by traveling with children with whom they had no relationship and posing as a family unit in order to avoid prosecution if apprehended.  Durbin noted that he had anecdotal evidence of this occurring but that he could not assess the reliability of that evidence or the frequency with which the smuggling of children occurred.[28]

After additional discussions with supervisory AUSAs, Durbin decided that a blanket policy with regard to family unit apprehensions and referrals was not the right approach.  He said that he wanted to provide the Border Patrol more guidance on individual referrals to promote consistency in prosecution decisions and ensure that the Border Patrol was not failing to refer an individual who should be prosecuted under WDTX prosecution guidelines.[29]  Durbin told the OIG: "In my mind, the suspension of the family unit policy as explained to me made good sense.  Border Patrol

---

[28]  One WDTX official we interviewed offered an example in which the application of the policy resulted in a person of interest to U.S. law enforcement who was traveling with children almost being released before he could be interviewed.

[29]  In a March 8 email to several supervisory AUSAs, Durbin noted:  "I don't know if we will prosecute any of these [family unit] cases, but we will not leave it to the discretion of [the Border Patrol].  Criminal prosecution decisions are not mere administrative issues.…  I have no confidence in [the Border Patrol]'s judgment in making prosecution decisions in this area.  The agents are responsible for arrests.  We're responsible for prosecutions."

should have been referring aliens for prosecution who met the conditions of our usual misdemeanor guidance."

A March 9, 2017 email from Durbin to the USAO's El Paso Division outlined these revised guidelines for family unit prosecutions.  Durbin instructed AUSAs to consider the child's age, whether familial relations could be reasonably established, and the adult defendant's prior apprehensions, among other factors, in determining whether to refer a family unit adult for prosecution.  He stated:

> Bottom line:  we should be looking at each individual and making a prosecution decision based on their culpability.  If culpability is very low and they have their own children we don't need to prosecute.  If they are a *sicario* [cartel hitman] we should prosecute and figure out how to deal humanely with children.  It's a sliding scale.

Durbin told the OIG that, in making the decision to prosecute certain family unit adults, "We were operating on assumptions that [DHS] was prepared and competent to deal with the placement of children, but we did not want to prosecute where it would require the separation of very young children from their parents."

The Border Patrol's El Paso Sector, which covers part of the WDTX as well as the District of New Mexico (DNM), also reached out to the DNM USAO to initiate a family unit referral program.  (See Appendix 3 for a map of Southwest border USAO districts and Border Patrol sectors.)  In August 2017, following consultation with the WDTX Criminal Chief, the DNM provided the Border Patrol's El Paso Sector with criteria for referring adults for prosecution when apprehended in a family unit.[30]  The DNM criteria stated that the Border Patrol should refer family unit adults when a close familial relationship could not be established, when the child in the family unit was at least 10 years old, or when other aggravating circumstances were present that warranted prosecution of the family unit adult.

---

[30]  On July 28, 2017, in an email proposing that the El Paso Initiative be expanded to the DNM, a Border Patrol official explained to Jim Tierney, the acting U.S. Attorney for the DNM:

> As a way of addressing the prosecution and separation of the family units...a meeting was held with the [acting] U.S. Attorney of [the WDTX].  During the meeting, the [WDTX] expressed the desire to be notified of all family units that are arrested so that they can decide if the individual would be prosecuted.  As a result of this request, El Paso Sector Border Patrol Stations in Texas have been requesting the prosecution of all adults, including parents travelling with children, and many of these requests have been approved and subsequently the family unit is separated.  Although it is always a difficult decision to separate these families, it is the hope that this separation will act as a deterrent to parents bringing their children into the harsh circumstances that are present when trying to enter the United States illegally....  It is expected that once immigrants become aware that there is a higher probability of being prosecuted and separated if apprehended in Texas, the traffic will move to the areas surrounding the New Mexico Stations.

The number of family unit adults referred for prosecution by the El Paso Sector steadily increased during the summer of 2017.  According to a report by the DHS OIG, the El Paso Initiative resulted in the separation of approximately 280 families in the Border Patrol's El Paso Sector (covering DNM and part of WDTX) from July to November 2017, "an increase from prosecuting 0 percent of adults with a family the month before the initiative began to prosecuting 15 percent during the initiative."[31]  A WDTX memorandum on the Initiative, prepared in January 2018 for Bash after his confirmation as U.S. Attorney, stated that the Border Patrol presented 303 family unit cases for prosecution to the WDTX during the Initiative, and that these parents were traveling with a total of 338 children, including 146 children age 5 years or younger, to include 11 infants.[32]  WDTX accepted 99 of these 303 cases for prosecution.  The WDTX memorandum did not include any data on prosecutions of family unit adults in the DNM.

The development of the new WDTX guidelines for prosecuting family unit adults, the resulting prosecutions, and the corresponding separation of children from the family units prompted concerns from, among others, USAO officials and federal judges in the WDTX.  For example, in August 2017, the Deputy Criminal Chief emailed acting U.S. Attorney Durbin, raising his own concerns about the lack of consistent communication with the Border Patrol and relaying concerns raised by defendants and a judge about the whereabouts of separated children.  The Deputy Criminal Chief noted:

> The issue has become which cases we accept involving [illegal entry] defendants who are coming in with children as we've seen a mass influx of these type of case[s]....  Some AUSAs have declined cases with very young children, 1 through six year olds, whereas others have accepted cases involving the same age group.  We have now heard of us taking breast feeding defendant moms away from their infants, I did not believe this until I looked at the duty log and saw the fact we had accepted prosecution on moms with one and two year olds.  The next issue is that these parents are asking for the whereabouts of their children and they can't get a response, the courts are turning to us for help with providing contact information to defense counsel.

To address these concerns, the Deputy Criminal Chief refined the WDTX guidelines for prosecution of family unit adults referred by DHS.  Prior to the El Paso Initiative briefing by Bash for DOJ headquarters that occurred on or about December 27, 2017, the Deputy Criminal Chief reiterated similar concerns in a meeting with Bash, Durbin, and the Criminal Chief on December 21 and later

---

[31]  DHS OIG, *DHS Lacked Technology,* 14.

[32]  Following Bash's appointment, Durbin returned to his position as First Assistant U.S. Attorney.  Durbin told the OIG: "Nobody sought out my observations about [the El Paso Initiative]....  I don't remember any conversation with Mr. Bash about the family unit policy change in El Paso.  I was kind of like a mushroom when [zero tolerance planning and implementation] was going on."

authored a memorandum for Bash that clarified the selection criteria used by the WDTX in determining whether to accept a case involving a family unit adult.

Additionally, U.S. Magistrate Judge Miguel Torres expressed concern in a WDTX case involving the illegal entry prosecution in November 2017 of five Central American immigrants who were accompanied by minor children. The defendants, who had been separated from their children and a grandchild, asked Judge Torres to dismiss their illegal entry prosecutions, citing constitutional concerns related to the separation of the children. On November 2, Judge Torres ordered the WDTX to provide further briefing on the issue of the defendants' separated children. The court noted:

> In a number of recent illegal entry cases over the last several months, the Court has repeatedly been apprised of concerns voiced by defense counsel and by defendants regarding their limited and often non-existent lack of information about the well-being and whereabouts of their minor children from whom they were separated at the time of their arrest.

On November 25, the *Houston Chronicle* reported extensively about the case and the concerns Judge Torres had expressed. The article quoted from Judge Torres's November 1 order and explored problems related to family reunification, including a study by immigration advocates, which alleged: "There aren't mechanisms in place to systematically allow a parent or child to locate one another once they have been separated.... Family members lose track of each other."

Ultimately, Judge Torres denied the defendants' motion to dismiss the prosecution and upheld their convictions after a bench trial in January 2018. In the summary of his January decision denying the defendants' motion to dismiss, Judge Torres expressed skepticism about the government's practice of separating families in misdemeanor cases while noting the court's lack of jurisdiction to address the specific claims made by the defendants. The opinion stated: "Defendants, accused of the petty offense of illegal entry, have made novel legal arguments that appear to stem from their understandable concern for their children, and from being completely incommunicado with them while being prosecuted for a very minor offense."

On November 18, while the matter was still pending before Judge Torres, Border Patrol headquarters instructed the El Paso Sector to discontinue the El Paso Initiative and to reinstate the family unit policy, absent aggravating circumstances for the defendant, so that headquarters could further review the referral policy. According to a report by the DHS OIG, this decision occurred around the same time a senior HHS Office of Refugee Resettlement (ORR) official contacted the acting CBP Commissioner and the acting ICE Director about an increased number of detained migrant children needing placement in ORR shelters. The DHS OIG report noted that CBP headquarters instructed the El Paso Sector to curtail the Initiative around the same time as this contact from HHS. According to WDTX officials, the USAO was not consulted on the decision and was not fully aware that referrals of family unit adults had been discontinued until the second

half of December, when the Deputy Criminal Chief contacted the Border Patrol prior to the briefing on the El Paso Initiative that had been requested by DOJ headquarters.

### The December 2017 Briefing on the El Paso Initiative for OAG and ODAG Officials

On or about December 20 or 21, Bash was asked by ODAG to brief DOJ headquarters officials about the El Paso Initiative and was told by an ODAG official, "Folks are interested in getting as much detail about the program as you can provide." Bash replied, "I'll get up to speed with my team."[33] The same day, to prepare for the briefing, Bash emailed senior WDTX officials and asked to discuss "the prosecution of members of family units in El Paso…[because the] AG and DAG front offices have scheduled a call with me next Wednesday to learn about the issue."

The OIG could not independently confirm who participated in the briefing, but we were provided emails reflecting a phone call with DOJ headquarters officials on December 27, 2017. In addition to Bash and Hamilton, officials invited to the briefing included a Criminal Division Deputy Assistant Attorney General and three ODAG officials. Although Bash told the OIG that he had no specific recollection of the briefing, he said that his notes for the briefing indicate that he most likely discussed the criteria the WDTX used when making prosecution decisions on family unit referrals. The notes include a reference to significant "pushback" from the local community, the press, and other stakeholders with regard to family separations. The notes also include references to the litigation before Judge Torres and the *Houston Chronicle* reporting and state that the "ORR may have become overwhelmed and asked for relief" during the El Paso Initiative. Bash stated during his OIG interview that he did not recall specifically whether he shared these exact details about the Initiative; but he subsequently wrote to us, "As best I can infer from correspondence I recounted what I had learned from our senior staff on December 21 about the pilot program that had been implemented and had ended before I began as U.S. Attorney." Bash also told us that he believed that during the meeting the possibility was raised that his district could assist ODAG and the OAG in developing "nationwide prosecution guidelines modeled on the case-by-case, young- child-protective approach the [WDTX] had used in 2017" for the prosecution of family units for other districts to use.

Counselor to the Attorney General Hamilton told the OIG that he did not recall any group discussions specifically about the El Paso Initiative. Hamilton stated that he recalled hearing in late 2017 that the WDTX and the Border Patrol's El Paso Sector "had a prosecution initiative and it was going well." He said that he wasn't sure where the information he received came from, but that it may have come from DHS "because they'd seen a decrease in apprehensions in their sector following this Initiative." Hamilton told us that he believed he first heard of the Initiative in November 2017. Hamilton also stated that he was "vaguely familiar" that the El Paso Initiative resulted in the prosecution of family unit adults and that such adults were not "off limits."

---

[33] The ODAG official who was directed to make the request of Bash to brief DOJ headquarters on the El Paso Initiative told the OIG that the official did not know at the time of the request of the El Paso Initiative involving the prosecution of family unit adults. The ODAG official did not attend the briefing about the El Paso Initiative.

Hamilton stated that he was not made aware of any issues with the reunification of separated families and "just assumed those were happening."[34]

### Lack of Post-Briefing Follow-up

On January 8, 2018, WDTX U.S. Attorney Bash emailed the Deputy Criminal Chief and said that "ODAG would like to know the total volume of family unit members we prosecuted for immigration offenses since we started receiving referrals this summer." The email continued, "ODAG also might ultimately be interested in having us put together guidelines for other offices for these prosecutions along the lines you have conveyed to our office (e.g., the need to take into account the age of the child in deciding whether to prosecute a parent)."

In response to this email, the Deputy Criminal Chief prepared a memorandum for Bash, dated January 17, 2018, that provided the number of family unit cases prosecuted during the Initiative and the criteria for accepting referrals. The memorandum stated that the WDTX based its prosecutorial decisions on factors such as the maturity (and not necessarily the age) of the child that would be separated from the family unit, the child's ability to provide identifying information such as nationality and home address, the language spoken by the family, the criminal history of the parent(s), and whether a family relationship could be reasonably established. The memorandum specifically explained:

> Once the familial relationship was established, and language was not an issue, we the turned to the maturity of the child. The analysis focused on whether the child was mature enough to be separated from the accompanying parent. The agents were to determine if the child could effectively communicate where they were from, where they lived, their address, where they were going to, who they were going to meet. The concern being that we did not want to separate a child from a parent and not be able to reunite them in their home country.…

> [T]here is no easy solution to the issue of prosecuting individuals traveling with their children and separating children from their parent(s). However, we have endeavored to balance the needs of effectively enforcing our laws with minimizing the harm to juveniles separated from their parent.

Bash told the OIG that to his recollection no one from DOJ followed up about family unit adult prosecutions after the January 8 request, and he did not recall forwarding the memorandum to ODAG or to the OAG. The OIG reviewed email records and found no evidence that the memorandum was forwarded outside of the U.S. Attorney's Office (USAO). The OIG also found no evidence that DOJ leadership sought additional information after January 8 about the El Paso

---

[34] Then OAG Chief of Staff Whitaker told the OIG that he did not recall having knowledge of the El Paso Initiative, but he was "sure that we would have discussed [the Initiative] at the time, and what we learned from it, and the best practices from it."

Initiative and, specifically, the WDTX's prosecution guidelines for family unit cases; the reasons such standards were adopted; or the challenges associated with reunifying separated children, as documented by Judge Torres, prior to the Attorney General's April 2018 announcement of the zero tolerance policy. As explained below, notwithstanding the limited understanding of the El Paso Initiative and its consequences, the OAG drew upon this limited knowledge of the El Paso Initiative in formulating the zero tolerance policy and in advocating for DHS to begin referring family unit adults for prosecution throughout the Southwest border USAO districts.

Bash told the OIG regarding family unit prosecutions that he assumed "the idea was abandoned or that [DOJ headquarters] had obtained the information they wanted from elsewhere." He noted that he did not believe it would have been "advisable" to "re-commence the discussion" with ODAG after its January request because he had "no interest in pushing DHS to restart family unit referrals or in nationalizing the concluded pilot program."[35] He added, "Months later, in early May, family unit referrals restarted, without anyone from Main Justice asking me or my office for our views on the appropriate prosecution standards for those cases."

### The Department's Development and the Attorney General's Announcement of the Zero Tolerance Policy on April 6, 2018

According to Hamilton, a number of events and ongoing concerns about increases in border apprehensions contributed to Sessions's decision to issue the zero tolerance policy on April 6, 2018. We were told that one of the events generating concerns within DOJ, DHS, and the White House was a migrant caravan of 1,540 Central Americans that was moving toward the United States through Mexico on 16 buses. On April 3, 2018, the Department drafted a statement for Sessions about the caravan, which was issued the next day, April 4:

> Earlier this week, media outlets reported that a so-called "migrant caravan" was making its way through Mexico with the intent of illegally crossing the southern border of the United States. The President was clear that this caravan needed to be stopped before it arrived at our southern border, and his efforts now appear to be successful. But let me be clear as well: we will not accept the lawlessness of these types of efforts and those who choose to violate our laws, and those who conspire to assist others to violate our laws, will face criminal prosecution.

---

[35] The OIG asked Bash about a WDTX memorandum, dated May 1, 2018, that was emailed to the Director of the Executive Office for United States Attorneys (EOUSA) and later to ODAG seeking more AUSAs to increase the number of immigration prosecutions under the zero tolerance policy. The memorandum noted: "Although [family unit adult] referrals discontinued [in December 2017], should [the Border Patrol] again refer adults traveling with minor children for prosecution, which this District supports to discourage the misuse of children for the nefarious purpose of attempting to avoid prosecution, the number of additional prosecutions will be substantial." Bash told the OIG that he believed a supervisory AUSA inserted this sentence after Bash had already reviewed and approved the memorandum. Bash further stated that he interpreted the sentence as referring "to case by case prosecutions of people traveling with children, seemingly to use them to get into the country, not necessarily a Zero Tolerance proposal." Bash further stated, "I certainly didn't know that was happening as of May 1, 2018."

> When I visited Nogales, Arizona, in April 2017, I announced my direction to federal prosecutors to prioritize the prosecution of all illegal entry, illegal reentry, and alien smuggling offenses....  I will soon be announcing additional Department of Justice initiatives to restore legality to the southern border.

Hamilton told the OIG that Sessions directed him to draft a policy directive for the Southwest border USAOs to work with DHS to increase the number of referrals from DHS and to accept as close to all of these referrals for prosecution as possible.  Hamilton told the OIG that Sessions instructed him to coordinate the new policy within the OAG and to vet it with ODAG and the Executive Office for United States Attorneys (EOUSA) to ensure it was workable and there were no red flags.[36]

On April 3, Hamilton circulated talking points to two OAG officials, two ODAG officials, and a Criminal Division Deputy Assistant Attorney General (DAAG) for review and comment.  Hamilton asked the recipients for "thoughts in ten minutes, if possible."  The talking points were subsequently shared with other officials in ODAG.  After reviewing a draft of this report, Hamilton told the OIG that the talking points were for Sessions in preparation for a White House meeting that day.  The April 3 White House meeting also included then DHS Secretary Kirstjen Nielsen.  The talking points stated that the USAOs along the Southwest border would soon receive guidance concerning "a targeted increase in illegal entry prosecutions by 40%."  The document continued, "Increasing prosecutions—and communicating that we will not tolerate illegality along our southern border—should help to produce a deterrent effect and reduce the number of attempted illegal entries into the United States."  The talking points did not address the potential for criminal prosecution of adult family unit members traveling with children or the possible separation of children from those adult family unit members.

The next day, April 4, Hamilton emailed several Department officials a draft of the zero tolerance policy.[37]  As with the Sessions talking points from April 3, the draft policy did not address the

---

[36]  EOUSA's mission is to provide executive and administrative support, including legal education, administrative oversight, technical support, and the creation of uniform policies, among other responsibilities, for the 93 USAOs.

[37]  After reviewing a draft of this report, in written comments, Hamilton told the OIG that:

> On April 4, the day following that White House meeting, the Attorney General called me into his office and directed me to write the Zero Tolerance memorandum....  The Attorney General directed the creation of a memorandum that would accomplish his goal of prosecuting as many cases as possible at the border.  The Attorney General was aware of White House desires for further action related to combatting illegal immigration, imminent and ongoing actions by the Department of Homeland Security, and he perceived a need to take quick action to ensure that the Department of Justice did its part to address ever-increasing illegal immigration, human smuggling, and human trafficking....  AG Sessions directed that I draft a memo that would put in effect a zero tolerance approach to immigration enforcement at the border—akin to 'Operation Streamline' and other historical efforts at the border.

potential for criminal prosecution of adult family unit members traveling with children, or possible family separations.  The initial draft stated in part:

> I hereby direct each United States Attorney's Office along the Southwest Border—to the extent practicable, and in consultation with the Department of Homeland Security—to adopt immediately a zero tolerance policy for all offenses referred for prosecution under section 1325 of title 8, United States Code.

An ODAG official told the OIG that the official advised Hamilton, after reviewing the draft, that it was necessary to include the phrase "to the extent practicable" in any final policy document "because it was standard language we'd put in other documents to have flexibility [to decline cases]."[38]  According to the official, ODAG wanted to ensure that U.S. Attorneys would have the discretion to prioritize resources and decline cases when appropriate.  The official also told the OIG that, when the April 2018 zero tolerance policy was announced, the official had no understanding that family separations would occur.

Also on April 4, an ODAG supervisor directed an ODAG official to consult with the five Southwest border U.S. Attorneys about the draft policy.  The official emailed Bash the revised draft policy, which included the "to the extent practicable" language that had been inserted by ODAG, and asked Bash whether anything in the policy was "operationally objectionable."[39]  Bash responded that he did not have any operational concerns but did comment on a jurisdictional issue.  The other Southwest border U.S. Attorneys received notice by telephone from the ODAG official about the zero tolerance policy and discussed with the official ODAG's efforts to add "to the extent practicable" to the draft policy to provide the U.S. Attorneys with standard discretion to decline cases, as appropriate, after the policy was issued.  Bash told the OIG that he "did not think that anyone expected that when the zero tolerance policy memorandum was issued, that it was a family unit policy—even though maybe we should have put two and two together, that family units might be referred and then they would have to decide whether the memo applies."  After

---

[38]  After reviewing a draft of this report, ODAG stated that the ODAG official advised Hamilton about including the phrase "to the extent practicable" after discussing the bullet points with an ODAG supervisor and taking direction from that supervisor.  In its comments, ODAG further clarified its process, stating that when policy issues or case decisions are raised to ODAG for consideration, such as the draft zero tolerance policy, these matters are resolved by the Deputy Attorney General, Principal Associate Deputy Attorney General, or another ODAG Supervisor, and the decision may be conveyed by one of them through another ODAG official to a U.S. Attorney's Office.

Additionally, as indicated above, OIG interviews with ODAG personnel and ODAG's comments to a draft of this report indicated that the phrase, "to the extent practicable," was added at the request of ODAG.  However, the OIG's reviews of records indicate that the initial draft circulated by Hamilton already included this phrase.

[39]  Bash and Adam Braverman, then U.S. Attorney for the Southern District of California, served as vice chair and chair, respectively, of the Immigration and Border subcommittee of the Attorney General's Advisory Committee, which represents the U.S. Attorneys and provides advice and counsel to the Attorney General on matters of policy, procedure, and management affecting the USAOs.

reviewing a draft of this report, the Department told us that ODAG staff also did not know prior to issuance of the zero tolerance policy that it was to be tied to the prosecution of family unit adults.

On April 5, another Counselor to the Attorney General remarked to Hamilton that, as drafted, the directive "might not change much," because it was "limited to cases 'referred for prosecution'" by DHS. Hamilton agreed with the other Counselor's assessment, but noted, "DHS will soon be presenting many more of these cases." On the same day, Hamilton provided the draft policy to the DOJ Office of Legal Counsel for review.

Then Deputy Attorney General Rosenstein told the OIG that he did not think he saw the draft of the policy before it was issued on April 6 and that zero tolerance was "just [an issue] that the AG and his staff were intimately involved in. So, I would have been less likely to have been engaged." Rosenstein acknowledged that the "to the extent practicable" language in the draft policy reflected ODAG's input.

On April 6, 2018, Sessions issued the zero tolerance policy, which was entitled "Zero-Tolerance for Offenses Under 8 U.S.C. § 1325(a)." His memorandum noted that "the recent increase in aliens illegally crossing our Southwest Border requires an updated approach. Past prosecution initiatives in certain districts—such as Operation Streamline—led to a decrease in illegal activities in those districts. We must continue to execute effective policies to meet new challenges."[40] The memorandum continued:

> Accordingly, I direct each United States Attorney's Office along the Southwest Border—to the extent practicable, and in consultation with DHS—to adopt immediately a zero-tolerance policy for all offenses referred for prosecution under section 1325(a). This zero-tolerance policy shall supersede any existing policies. If adopting such a policy requires additional resources, each office shall identify and request such additional resources.

The memorandum concluded by stating: "Remember, our goal is not simply more cases. It is to end the illegality in our immigration system." The memorandum did not address the issue of criminal prosecution of family unit adults or the possibility of family separations.

Hamilton emailed the final memorandum to DHS leadership shortly before its public release, writing: "This was signed today and will be going out shortly. We appreciate your work and look forward to increased referrals under [8 U.S.C. Section] 1325."[41]

---

[40] Operation Streamline was a 2005 immigration initiative of the Border Patrol. For more information, see Appendix 3.

[41] Hamilton emailed the policy to the CBP Commissioner, the acting ICE Director, the DHS Chief of Staff, the DHS Deputy Chief of Staff, and several legal advisors in the DHS Office of General Counsel and within ICE.

Rosenstein said that the April 2017 memorandum had made illegal entry cases a priority "but didn't tell [the prosecutors] to stop declining cases, [whereas the] 2018 message was, 'don't decline these cases.' And, so that was a significant policy change."

According to Rosenstein and Hamilton, Sessions was aware at the time he announced the zero tolerance policy that its full implementation would require the prosecution of family unit adults and result in the separation of families.[42] Rosenstein stated that he thought Sessions "understood what the consequences were," but emphasized that the policy was not only about family members. The "AG's goal...was to create a more effective deterrent so that everybody would believe that they had a risk of being prosecuted if they were to violate the law." He added, "I think the AG's perspective was that people smuggling children were actually more culpable than people who were coming alone because they're not just themselves violating the law...[but also] endangering the child."

Hamilton stated that prosecuting adults entering the country as part of a family unit was a "difficult" choice for Sessions but that Sessions "thought it was the right thing to do" and believed that the policy was necessary as part of Sessions's effort "to restore legality to the border." According to Hamilton, Sessions was concerned that apprehensions at the border were increasing, the President was concerned about this problem, and "there was no deterrent, no consequences for unlawful entry, especially if people were coming over with children...and there needed to be consequences."

In written comments submitted after reviewing a draft of this report, Hamilton added that the OIG did not "provide important context about the extent and makeup of illegal migration during this time period" and noted that this context was important in considering Sessions's reasons for adopting the zero tolerance policy. He emphasized:

> Hundreds of thousands of family units, some of which were not family units, were violating our immigration laws with little to no ability of the U.S. Government to verify the existence of familial ties and to screen for indications of trafficking.... These [were] matters of which the Attorney General was well aware and that were discussed among relevant agencies at the highest levels, including DHS and HHS.

Hamilton further noted the impact of a 2015 district court decision which, according to Hamilton, "found that the *Flores* Settlement Agreement applied not only to unaccompanied minors—but

---

[42] As noted in the <u>Scope and Methodology of the OIG Review</u> section above, Sessions did not agree to appear for an interview after being contacted multiple times by the OIG.

In a follow-up interview, after reviewing a draft of this report, Rosenstein stated that he could not recall when he came to understand that Sessions's understanding of the zero tolerance policy was that it would require the prosecution of family unit adults and result in the separation of families.

also to minors who illegally entered the United States with their parents."[43]  According to Hamilton, after this decision:

> DHS lost the ability to house families together for the period required to complete an immigration court proceeding.  "Catch-and-release" followed, and hundreds of thousands of individuals in so-called family units flowed into the United States in the months and years that followed….  The inability to expeditiously remove those family units with no viable claim for relief or protection had completely overwhelmed the entire immigration enforcement and adjudication apparatus.
>
> And of course, none of the above even scratches the surface about the unfortunate facts that individuals in the immigration world know to be true—including the extent of the human suffering, sexual assaults, human trafficking, kidnapping, and other unspeakable things.  Protecting our borders, enforcing our laws, and ensuring the continued sovereignty of the United States were all important to the Attorney General and others, but eliminating all of the human suffering associated with the journey to the border was an incredibly important goal for everyone with whom I spoke during this time.  And all of these issues were motivating factors that influenced the Attorney General to issue the Zero Tolerance policy.

An ODAG official told us that the official called each of the five Southwest border U.S. Attorneys to explain to them that they would have discretion to decline cases under the new policy, and, with that understanding, each told the official that the policy "sounded fine."  However, as discussed below, the OIG determined that Sessions did not communicate to the U.S. Attorneys until the following month his expectation that the zero tolerance policy would include the criminal prosecution of family unit adults and that the U.S. Attorneys' discretion to decline such cases would be limited, despite the "to the extent practicable" language included in the zero tolerance policy.  As Bash told the OIG, the USAOs did not understand the zero tolerance policy to apply to family units, and U.S. Attorneys expressed surprise when they learned in early May 2018 that DHS would begin referring family unit adults for prosecution.  As noted above, the ODAG official similarly told the OIG that, when contacting the U.S. Attorneys, the official had no awareness that the zero tolerance policy would result in the prosecution of family unit adults.  Similarly, after reviewing a draft of this report, ODAG noted that ODAG staff had no knowledge at the time the zero tolerance policy was issued in 2018 that DHS would modify its policy in May 2018 and begin referring family unit adults for prosecution.  The challenges encountered by the USAOs in the prosecution of family unit adults are discussed in detail below.

In addition to not informing the Southwest border USAOs that family unit adults would be prosecuted under the zero tolerance policy, EOUSA and USMS officials told us that DOJ leadership did not consult with them prior to the announcement of the zero tolerance policy and that they

---

[43]  In his comments, Hamilton referenced the District Court's decision in _Flores_ v. _Johnson_, 212 F. Supp. 3d 864 (C.D. Cal. 2015), which was affirmed in part in _Flores_ v. _Lynch_, 828 F.3d 898 (9th Cir. 2016).

too were unaware that Sessions intended that the policy would result in the prosecution of family unit adults traveling with children, necessitating family separations.[44]  The EOUSA Deputy Director told us that he learned of the policy the day it was issued.  EOUSA's liaison on border security matters to ODAG and the OAG (EOUSA Liaison), an AUSA who served as the day-to-day communications channel between DOJ headquarters and the Southwest border USAOs, said that the EOUSA Liaison did not receive any advance notice of the zero tolerance policy.

According to the USMS acting Associate Director for Operations and the acting Assistant Director for Prisoner Operations, the Department did not consult with USMS leadership prior to issuing the zero tolerance policy.  Hamilton told us that he assumed ODAG would have coordinated with the USMS, but he said he was unsure whether such discussions took place.  As previously noted, ODAG was provided a copy of the draft policy only on April 4, 2 days before the policy was issued.  Below, we discuss in more detail the operational and resource challenges, in particular those for the USMS, that were not addressed by the Department prior to the implementation of the zero tolerance policy, as well as the Department's efforts to coordinate with the USMS after the policy was issued and implemented.

Additionally, in our interviews and review of emails and documents, we did not find evidence that DOJ leadership had discussions about the zero tolerance policy or family separations with HHS prior to the announcement.  We further determined that this lack of communication occurred even though the OAG was coordinating with HHS leadership on other immigration-related issues at the very same time the Department was drafting and issuing the zero tolerance policy.[45]

Similarly, in a report dated March 2020, the HHS OIG found that DOJ did not notify HHS of the zero tolerance policy in advance of issuing the policy:

> On the basis of interviews with and written responses from senior HHS officials, as well as a review of correspondence and interagency meeting records, [the HHS] OIG found no evidence that HHS was notified in advance by either DOJ or DHS that the zero-tolerance policy would be implemented.  In fact, senior HHS officials generally reported that they first learned of the spring 2018 implementation of zero-tolerance when it was reported by the media.  This lack of communication occurred despite a

---

[44]  As noted above, after reviewing a draft of this report, ODAG stated that "had ODAG known that DHS was going to significantly alter the number and nature of its proposed prosecutions, ODAG would have provided notice to the Southwest border U.S. Attorneys and all relevant DOJ Headquarters components and coordinated preparative action in advance.  Instead, like the U.S. Attorneys and other DOJ stakeholders, ODAG was unaware of the DHS policy until after it was issued."

[45]  For example, we found that, in early April 2018, Hamilton coordinated with HHS officials (as well as DHS and DOJ leadership) to finalize a memorandum of agreement addressing enforcement actions against sponsors, and members of their household, attempting to assume custody of UACs from HHS.  Due to the scope of this review, we did not investigate any relationship between the zero tolerance policy, which could result in family separations, and interagency work related to UAC policies occurring in 2017 and early 2018.

variety of channels that exist to facilitate high-level interagency coordination and engagement on immigration issues...[that] usually include officials representing DOJ and DHS as well as other Federal agencies.[46]

The HHS OIG report further found that the lack of advance notice from DOJ and DHS hindered HHS Office of Refugee Resettlement (ORR) staff's ability to plan for the family separations that eventually resulted from the zero tolerance policy, leading to insufficient bed capacity to house children, care provider facilities struggling to meet separated children's needs, data limitations, and difficulties identifying separated children for later reunification.[47]

We asked then OAG Chief of Staff Whitaker whether he was aware of any DOJ interactions with DHS or HHS officials prior to the announcement of the zero tolerance policy.  Whitaker told us that he recalled speaking with then DHS Secretary Nielsen in "a couple conversations leading up to [the zero tolerance policy] where the discussion was that if we had a zero tolerance policy and we prosecuted all illegal entry and re-entry cases that would lead to unexpected consequences, including what is known as family separation."  Whitaker said that he did not recall any similar interactions with HHS.

In a follow-up interview with Rosenstein conducted after he reviewed a draft of this report, Rosenstein noted that it was unusual for a policy with so many operational implications to be run out of the OAG, rather than ODAG, but stated that immigration was an issue of unique concern to the Attorney General.  He stated that the lack of coordination with DOJ components prior to the policy's announcement was a consequence of this and that, from a "managerial perspective," the zero tolerance policy "should have been developed from the bottom up."

## After Issuing the Zero Tolerance Policy, DOJ Officials Urged DHS to Refer More Cases for Prosecution, Including Those Involving Family Unit Adults, Despite Concerns Raised by Southwest Border USAOs

Sessions's announcement of the zero tolerance policy on April 6 did not result in an immediate change to the DHS practice of not referring family unit adults for prosecution if the referral would result in a family separation.  That DHS policy decision occurred nearly a month later, on May 4, 2018, after weeks of engagement on the issue between the OAG and DHS officials, and with the urging of Sessions.  We found that Sessions sought this change in policy despite significant concerns having been raised in late April by the Southwest border U.S. Attorneys.  Moreover, with the exception of a White House meeting on May 3, the day before the DHS policy change, we found no evidence in our interviews and document review that these discussions included officials

---

[46]  HHS OIG, *Communication and Management Challenges Impeded HHS's Response to the Zero-Tolerance Policy*, OEI-BL-18-00510 (March 2020), www.oig.hhs.gov/oei/reports/oei-BL-18-00510.pdf (accessed January 12, 2020),14.

[47]  HHS OIG, *Communication and Management Challenges*, 19–22.

from HHS, which would have primary responsibility for handling children separated from family unit adults as a result of the policy change.

On April 20, Sessions hosted a meeting with then DHS Secretary Nielsen at DOJ headquarters. According to emails reviewed by the OIG, also in attendance were Rosenstein, Whitaker, Hamilton, the DHS Chief of Staff, and the DHS General Counsel. Prior to the meeting, the DHS Deputy Chief of Staff told Hamilton in an email that Nielsen could be expected to raise six issues, one of which was "Catch and release/100% referral." In written comments submitted after reviewing a draft of this report, Hamilton stated that the zero tolerance policy was a primary discussion topic at the meeting, and that "the Attorney General and the Deputy Attorney General both expressed a willingness to prosecute adults in family units if DHS made the decision to start referring such individuals for prosecution." Rosenstein told the OIG he had no recollection of the meeting, which was not shown on his calendar.

The following day, Hamilton sent a follow-up email to an ODAG official and the DHS General Counsel to introduce them so that the Department and DHS could coordinate on AUSA staffing to prepare for increased prosecutions under the zero tolerance policy.

On April 22, Hamilton sent ODAG and EOUSA an email with information on the number of Border Patrol apprehensions, including apprehensions of family units, by sector.[48] Hamilton's email referenced the prosecution of family unit adults and included charts that compared the total number of apprehensions to the total number of prosecutions for each Border Patrol sector and USAO district. In each location, the total apprehensions greatly outnumbered total prosecutions. Hamilton wrote:

> I think it would be helpful to convey to our USAOs what the total volume of potential referrals could be if [the U.S. Customs and Border Patrol (CBP)] starts referring all or close to all of its apprehensions for prosecution…. Prosecuting the adults in the family units will require some coordination between DHS and ORR, but we're going to have to figure out things on our end, too.
>
> We are going to need each USAO to coordinate with their local sector leadership, figure out a plan to increase/enhance prosecutions in that sector, and press "go" as soon as they are ready.

The next day, Hamilton forwarded the email to Whitaker and two other OAG officials.

---

[48] Emails that the OIG reviewed indicate that Hamilton had requested the border apprehension statistics during a meeting with the U.S. Border Patrol Chief on April 19, 2018, the day before the Attorney General's meeting with the DHS Secretary, and that the Border Patrol had provided the statistics to Hamilton later in the day on April 19.

On April 24, Hamilton emailed the DHS Chief of Staff and CBP Commissioner to share data with them "on the delta between total apprehensions and prosecutions."  His email continued:

> We simply need more cases referred for prosecution across the board.  So, with over 63k single adults and 49k family units (not sure what percentage of the FAMU [family unit members] are adults, but it's a large number either way) apprehended in [the Rio Grande Valley] sector in FY17 alone, with under 14k prosecutions, it's apparent that they can't get to 100% overnight.  But the goal is to ramp up resources to prosecute as many apprehensions as possible….  [F]rom our perspective, each Sector Chief should start immediately referring more cases to their respective USAO than they did yesterday….
>
> The worst our USAOs can say is "no, we're at capacity right now."  When that happens, we expect that they will be in contact with us to let us know what they need, and we will work to provide it.  But we'd like to see the referrals increase immediately.

That same day, Hamilton asked an ODAG official to request that the EOUSA Liaison forward the data Hamilton had shared with DHS and the CBP to the Southwest border USAOs on behalf of the OAG and ODAG with some additional "questions regarding the AG's recent memo of zero-tolerance in prosecuting [illegal entry] offenses and your coordination with your DHS/CBP law enforcement partners in implementing the new policy."  Specifically, Hamilton wanted to know from the districts whether they had seen an increase in referrals for prosecution from the CBP under the zero tolerance policy and, if not, to provide their understanding of when referrals would begin to increase.  The coordinated EOUSA response to Hamilton's request, which was provided to Hamilton on April 27 by the ODAG official, expressed concern about the possible referral for prosecution of adult family unit members and stated in pertinent part:

> All districts reported that if DHS/CBP changes its policy on referring individuals apprehended in Family Units, the number of referrals will significantly increase and the offices will not, at their present resource levels, be able to accommodate those numbers with criminal prosecutions.  Currently, DHS/CBP does not refer individuals who are apprehended as a family unit to the USAOs for prosecution.  If there is a change in this policy, DHS/CBP would refer the adults from these units for prosecution.  This change in policy would result in new referrals of 20 to 400 cases per day, depending on the district.  The USAOs and other interested stakeholders could not absorb this increase.  Furthermore, DHS/CBP would not be able to process these numbers within the time constraints set for presentment in criminal court.  The medical screening for TB, chicken pox, measles; much less the processing of these individuals in establishing identity, alienage, criminal and/or immigration history, etc. would be practically impossible to accomplish within the constitutionally mandated time constraints to present the defendants in court.

Despite initiating the request for this information from the USAOs, Hamilton told the OIG that he "missed" the EOUSA response and was not aware that the USAOs had raised these specific concerns about family unit prosecutions.

According to then Deputy Attorney General Rosenstein, during April and into May, as the OAG was pushing DHS for more referrals, DHS leadership was also flagging cases that had been referred for prosecution but declined by the USAO, which generated concerns within DHS.  Rosenstein told the OIG that he and then DHS Secretary Nielsen had regular conference calls and weekly meetings to discuss the zero tolerance policy and other immigration enforcement issues.  He added that the DHS Secretary would "point the finger at DOJ" for not accepting specific referred cases for prosecution.  Rosenstein characterized these discussions as an example of the "extraordinarily high level of engagement" by DOJ and DHS leaders to ensure the effective implementation of the zero tolerance policy.  Emails also show phone calls in May between Rosenstein and Nielsen "regarding prosecution of illegal border crossers."  On May 1, Hamilton and two ODAG officials briefed Rosenstein prior to a call with Nielsen.  Similar direct, interagency leadership communication took place on May 14, when Nielsen requested a call with Rosenstein to discuss zero tolerance and the "need to work together to ensure all are prosecuted" along with "concerns from the field."

On May 1, 2018, Hamilton emailed the CBP Commissioner to request an update on "the timing of the implementation phase-in" of family unit referrals.  In written comments submitted after reviewing a draft of this report, Hamilton noted that this email was preceded by numerous "high-level discussions and meetings," including between Sessions and Nielsen, during which "DHS indicated that it was contemplating such a change in policy."  Hamilton indicated that this email may have been prompted by these discussions, as well as White House interest in the migrant caravan.  The CBP Commissioner responded the same day, "Looking at next week, likely, for FMUA [family unit] adults phase in."  In the same email, the CBP Commissioner sent Hamilton a list of three adults who were traveling in a migrant caravan and "were separated from minor children for the purpose of federal prosecution" in the Southern District of California (SDCA).[49]  The email indicated that one of the three adults was separated from a 12-year-old child, another of the adults was separated from an 8-year-old child, and the third adult was separated from four children from 8 to 17 years old.  Hamilton forwarded the list of three adults as well as the six children and their ages to then SDCA U.S. Attorney Adam Braverman and an ODAG official.

---

[49]  DHS provided Hamilton with additional details on its operations in response to the caravan in a May 2 email, sent from the CBP Commissioner to Hamilton, as well as to DHS leadership in ICE and U.S. Citizenship and Immigration Services.  The email included a spreadsheet, entitled "Master Caravan List," containing details on caravan members "for follow up reporting and coordination on enforcement efforts."  The CBP Commissioner also reported initiation of 14 prosecutions, including "2 female HOH [head of household] (FMUA [family member unit adult] separations)," noting, "children turned over to ICE/ERO [Enforcement and Removal Operations]."  These prosecutions of family unit adults appear to be among those reported in the Attorney General's May 3 talking points, discussed below.

Hamilton's email to Braverman did not include the broader discussion about the "phase-in" of family unit referrals. The next day, Hamilton asked Braverman to confirm prosecution details related to the migrant caravan, writing: "Most time-sensitive issue is whether or not there are any adults from family units in this group. Will need that stat for a meeting for the boss tomorrow." In response, Braverman confirmed that the "3 claimed mothers" were prosecuted for illegal entry under 8 U.S.C. § 1325.

On May 3, in connection with a meeting later that day at the White House that included the DHS and HHS Secretaries, Hamilton prepared draft talking points for Sessions. The draft talking points suggested that Sessions lead a discussion on family unit prosecutions and stated:

- An illegal alien should not get a free pass just because he or she crosses the border illegally with a child.

- We are prepared to accept for prosecution referrals of adult members of 'family units' who violate our criminal immigration laws in each U.S. Attorney's Office along the Southwest border.

  o The Western District of Texas employed a pilot program [the El Paso Initiative] that involved the prosecution of adults in family units last fall—and it worked.

- The prosecution of an adult member of a family unit will necessarily result in their transfer to the U.S. Marshals Service. Any minors in the family unit will remain in DHS custody, and likely eventually transferred to the Office of Refugee Resettlement.

  o DHS should consider—separately—whether the requirements of the *Flores* consent decree and the general inability to detain entire family units for the duration of immigration court proceedings justifies *administrative* separation of family units.[50]

The document also noted that DOJ was "currently prosecuting three adult members of family units in the Southern District of California who were in the 'caravan' and illegally entered the United States over the weekend." The talking points also included a meeting topic entitled "Ensuring the Referral of Cases from CBP to DOJ," which similarly noted, "You should lead this discussion."

We asked Hamilton about the reference to the El Paso Initiative and the document's characterization that "it worked." Hamilton stated: "It worked in the sense that it was our

---

[50] The July 2015 judicial decision in *Flores* v. *Reno* (in chambers-order) stipulated that children could not be held in administrative detention together with their parents for more than 20 days. Since most non-expedited family removal proceedings would not be completed in that timeframe, this ruling resulted in few families being held in family detention facilities for the full pendency of their immigration cases. See Appendix 3 for more information on the *Flores* settlement.

understanding that the number of apprehensions was going down for DHS.  As far as my understanding of the program itself, it was only general, what I heard from here.  I couldn't tell you the specifics, but the representation to me was that apprehensions went down in El Paso."  He explained:  "CBP and the USAO seemed to think it was going okay, but I don't know the number of prosecutions or whether they were able to reunify the families on the back end.  They just reported that it was going okay."  Specifically, Hamilton recalled, "Our U.S. Attorney reported that everything seemed to go okay" with the El Paso Initiative.

Hamilton also stated that he would be surprised "to an extent" to learn whether "issues were raised [related to family separations and reunification] and we weren't notified.  I'd expect that folks would make those concerns known.  That's my general expectation as a government employee, that if you see problems you let someone know."[51]  Hamilton told the OIG that he did not request or review any after-action assessment of the El Paso Initiative and that "we weren't aware of any problems with the El Paso project."[52]  As noted above, we found no evidence that the OAG sought information about the challenges encountered during the El Paso Initiative, including the government's inability to reunify separated families, prior to referencing the Initiative as a basis for expanding referrals of family unit adults throughout the Southwest border.

Before providing the talking points to Sessions, Hamilton sent them to Whitaker and a Senior Counselor to the Attorney General in an email stating, "in case you want to see it."  Whitaker stated that he did not recall the May 3 meeting or the talking points in particular; but, with regard to the talking points draft, he told the OIG, "I am sure I saw it."

Rosenstein told the OIG that he was only generally aware of the El Paso Initiative and that concerns related to family separations did not come to his attention until the spring of 2018, long after the El Paso Initiative had been terminated.  He further stated that he understood that Sessions used the El Paso Initiative as a model for the zero tolerance policy and that he believed Bash and the other U.S. Attorneys would have "flagged any issues that arose."  In a follow-up interview with Rosenstein that was conducted after Rosenstein reviewed a draft of this report, he

---

[51]  As noted above, Bash stated that he did not believe it would have been "advisable" to "re-commence the discussion" about the El Paso Initiative with ODAG and the OAG because he had "no interest in pushing DHS to restart family unit referrals or in nationalizing the concluded pilot program."  Bash further explained, "Months later, in early May, family-unit referrals restarted, without anyone from Main Justice asking me or my office for our views on the appropriate prosecution standards for those cases."  Bash told the OIG that he did not believe he was "required to re-commence the discussion on that topic" and "that many other people at DOJ, DHS, and HHS presumably had firsthand knowledge of the program because they had worked with my predecessor on that program in 2017."  As noted above, the El Paso Initiative occurred during the tenure of then acting U.S. Attorney Durbin and was terminated by the Border Patrol before Bash was sworn in.

[52]  According to a DHS OIG report, after CBP headquarters instructed that the El Paso Initiative be halted, the CBP El Paso Sector provided an after-action report to the Border Patrol's acting Chief of Operations, calling for greater coordination among the various stakeholders.  DHS OIG, *DHS Lacked Technology,* 15.  In our interviews and review of emails and documents, we found no evidence that DOJ officials asked DHS whether it had conducted an after-action review of the El Paso Initiative.

noted, "I recall[ed] hearing about this El Paso program that had been a great success.…  I didn't personally study the El Paso program, so I didn't know whether it was a success or not."  He continued:  "My impression at the time was, hey, we're just doing what we did at El Paso.  It works.  But, you know, if somebody had sat down and actually studied what had happened in El Paso, they would have understood the issues, and would have had a very different perspective about it, so absolutely, there should have been a deeper level of policy development."

On May 4, then DHS Secretary Nielsen signed a policy memorandum citing "recent presidential direction and guidance from the Attorney General" and directing DHS Border Patrol sectors to refer for prosecution all adults apprehended for crossing the border illegally.  The document explicitly included family unit adults.  A report by the DHS OIG characterized Nielsen's May 4 memorandum as DHS's implementation of the zero tolerance policy.  The report stated:

> On May 4, 2018, the DHS Secretary approved the adoption of the Zero Tolerance Policy based on the outcome of the 2017 El Paso Initiative, which CBP claimed had reduced family apprehensions by 64 percent.  However, DHS did not first confirm whether the various technology-related challenges documented and reported from the El Paso Initiative had been resolved.[53]  In fact, on May 4, 2018, the same day the Secretary signed the memorandum implementing the Zero Tolerance Policy, Border Patrol instructed field personnel to use spreadsheets to track separations because [database] system changes were still pending.  One senior CBP official who participated in Zero Tolerance Policy planning meetings stated that key stakeholders had pressured DHS to implement the policy in early May 2018 before identified deficiencies in [the database] were resolved.

Hamilton told the DOJ OIG that he was "fairly certain [that DHS was] going to start referring [family unit] cases to us for prosecution."  He stated that "we made folks [at DHS] aware that [Sessions] wanted to see more prosecutions."  But he also stated that DOJ was not pushing DHS to adopt the May 4 policy and was not the driving force behind it.  Whitaker told the OIG:

> I want to make sure I'm clear that if Secretary Nielsen and DHS did not want to refer people with minors, with children, then we wouldn't have prosecuted them because they wouldn't have referred them.  And ultimately that decision would be between

---

[53]  The DHS OIG report described the technology-related challenges as follows:

> DHS did not have the IT system functionality needed to accurately track and account for the total number of families separated during the Zero Tolerance Policy period.  Border Patrol agents adopted ad hoc techniques to work around the system limitations, but these techniques introduced data errors that further hindered [ICE] officers' ability to track migrant parents separated from their children.  DHS was aware of these IT deficiencies prior to Zero Tolerance Policy implementation, but IT modifications implemented in preparation for the policy did not fully resolve the problems.  DHS personnel faced equally significant IT challenges interfacing and coordinating with HHS to facilitate the transfers of thousands of children to ORR custody.

Secretary Nielsen and the President, and not the Department of Justice.  And I know because I follow this enough in the press, to know DHS claims "we didn't know what this meant" and "we weren't coordinated with," that "DOJ was driving this."  That is a false narrative because DHS had to refer the cases, they could have categorically said, "We are not referring people with children."  And that was not under our discretion.

Notwithstanding these statements, the OIG determined that the OAG was a driving force behind the decision to refer family unit adults for prosecution, as evidenced by Sessions's and the OAG's urging and support for this change to DHS policy between December 2017 and May 2018.

Although concerns about family separations had been identified by DOJ prosecutors, judges, and other stakeholders during the El Paso Initiative, Hamilton and Rosenstein stated that they were not aware of any indications that DHS would have difficulty tracking separated children.  Hamilton told us that he sought assurances from DHS about family separations and reunifications prior to the implementation of the zero tolerance policy:

We told [DHS] that if we do this, we have to figure out how to put folks back together.  We did not have individual discussions with HHS before the zero tolerance policy announcement.  We didn't call HHS because it was a DHS function to take care of aliens.  So we assumed that DHS knows what they're going to do with the children.  DHS had made representations to me that they knew what would happen on the back end.

Hamilton also told us that, while he did not recall the specific details, he believed that he spoke about family separations with the U.S. Immigration and Customs Enforcement (ICE) Director or Deputy Director and that the "messaging from DHS was, 'We've got it under control, don't worry about it.'"[54]  He continued, "My approach was to trust them and presume that their folks were going to administer it as they should, and I thought it was not for me to micromanage someone else's business."

Rosenstein told the OIG, "I wouldn't have asked for assurances because I would have assumed that they have appropriate systems in place."  He further explained:

You would expect DHS and HHS to be able to manage the children who were entrusted to them.  I think that's something they should have considered.  They should have said, "Hey, there's problems if we do this, we're going to lose track of

---

[54]  After reviewing a draft of this report, in written comments, Hamilton told the OIG he was "provided *multiple* assurances on the phone and in person that DHS possessed the ability to adequately manage the process of prosecuting eligible members of family units.  Those assurances came from officials with ICE, CBP, and other DHS officials" (emphasis in original).

the kids and we're not going to be able to reunify the kids."  That's an issue that they should have flagged.  I just don't see that as a DOJ equity.

In a follow up interview conducted after Rosenstein reviewed a draft of this report, Rosenstein noted:  "The government was not prepared to deal with [family separations].  And [the change to DHS's policy on family unit referrals] should not have been implemented....  I just wasn't involved in the formulation of the policy, and [as] it was under way, I was getting reassurances that I now believe to be wrong."

### DOJ Leadership Informed Southwest Border USAOs that the Zero Tolerance Policy Required Prosecution of Family Unit Adult Referrals From DHS, Despite the "to the Extent Practicable" Language in the Policy, but Provided Little Guidance on How to Address Child Separation Issues

Hamilton and Rosenstein told the OIG that the Attorney General intended for the zero tolerance policy to result in DOJ criminal prosecutions of family unit adults referred by DHS.[55]  Indeed, the OAG pressed DHS to change its policy on family separations, which DHS did on May 4.  Nevertheless, Sessions did not inform Southwest border USAOs of his expectation that the zero tolerance policy announced on April 6 would result in USAOs prosecuting family unit adults, thereby separating these adults from their accompanied children, and did not provide sufficient guidance to USAOs on how to address the increase in family unit separations.

We found that the earliest discussion by Sessions with Southwest border U.S. Attorneys as a group about the possibility of prosecuting family unit adults likely occurred during a conference call on May 1, 2018.  According to notes from a U.S. Attorney who was present on the call, there was concern expressed that illegal entry numbers "are [rising] again," and mention of the need to "look to changing the situation."  The notes further reflect that the concept of family unit prosecutions was discussed; specifically, the notes state, "prosecute parent and not kids of family units" and "[Western District of Texas (WDTX) U.S. Attorney] John Bash—did so in El Paso for a while" (emphasis in original).  When the OIG asked the U.S. Attorney about the notes, the U.S. Attorney said that they appeared to be from a call with Sessions on May 1 and that the U.S. Attorney recalled Bash mentioning the past prosecution of family unit adults in El Paso on the call but could not recall further details beyond his mentioning it.

Similarly, District of New Mexico (DNM) U.S. Attorney John Anderson told the OIG that DOJ headquarters notified the Southwest border U.S. Attorneys of the change to DHS's family separation policy during a conference call around the time of its implementation on May 4, although Anderson did not recall the date of the call.  Anderson described the notification as "just an advisement of, 'Hey, DHS has a new policy.  Now they're going to be doing X, instead of Y.'"  He further recalled that the U.S. Attorneys had "practical implementation" questions.

---

[55]  In addition, Whitaker told us that he had more than one discussion with Nielson, in advance of the zero tolerance policy, about the referral and prosecution of family unit adults.

However, when the OIG asked Bash about when the Southwest border U.S. Attorneys learned of the DHS policy change, Bash told us that he believed DOJ leadership held a call with the U.S. Attorneys only after DHS began referring family unit cases for prosecution, possibly on May 6.

Emails we reviewed indicate that the Southwest border U.S. Attorneys were surprised when they learned of the implementation of policy change from their DHS and Border Patrol counterparts. On the evening of Friday, May 4, then SDCA U.S. Attorney Braverman received notice from the El Centro, California, Border Patrol Sector Chief that the Border Patrol was initiating "100% immigration violation prosecution referrals for **all amenable adults**" (emphasis in original). Braverman forwarded the email to the other Southwest border U.S. Attorneys and stated, "If you've formulated any responses, I'd love to hear about it this weekend…because one of our sectors is implementing the policy Monday [May 7]." Ryan Patrick, U.S. Attorney for the Southern District of Texas (SDTX), replied: "I just saw an email from the Laredo sector chief that will start referring adult males in family units. That's a change they didn't share with us until the email just worked its way to me." Anderson added: "According to what I learned earlier this evening from CBP, El Paso sector will begin referring all eligible adults for prosecution, even if discovered in family units. That policy starts at midnight tonight."[56] Later that evening, Bash circulated an email he had sent to WDTX officials, which stated:

> I was just informed that the Border Patrol [in El Paso and Del Rio Sectors] will be presenting for prosecution family unit cases. Their directive is to present cases for prosecution where the children are older than 5 years of age, after conducting a medical screening, and to separate the parent from the child. If the family unit included children under the age of 5, then those cases will not be presented unless the second parent is present, and the father will then be presented for prosecution and separated from the family. If the family unit consists of two parents and the children are over the age of 5, both parents will be separated from the children and presented for prosecution. This policy goes into effect tomorrow night at midnight.

Elizabeth Strange, then acting U.S. Attorney for the District of Arizona (DAZ), replied, "To my knowledge, we have not been notified of a change in DHS policy in AZ…. We'll see what Monday morning brings."

Bash told the OIG that he did not believe any of the USAOs expected, at the time the zero tolerance policy was issued in early April, that it would result in a change to the family unit policy. He said that all of the U.S. Attorneys were surprised when the Border Patrol started referring family unit cases to them around May 5, 2018. Bash recalled that on Sunday, May 6 the Southwest border U.S. Attorneys had a conference call with the OAG and ODAG, during which instructions

---

[56] As referenced above, the Border Patrol's El Paso Sector covers parts of the USAOs in the DNM and the WDTX. See Appendix 3 for a map of Border Patrol sectors and the USAOs they cover.

from Sessions were conveyed.[57]  Bash provided an email from a senior WDTX AUSA to WDTX leadership, sent on May 6 after the phone call, in which he stated:

> Over this weekend, we were informed that Border Patrol (BP) received the directive from their leadership to refer all apprehended adult aliens for prosecution.  This directive includes Family Member Units (FMUs), which is a significant change from previous referrals where one FMU alien was allowed to remain with the minor child.

> As instructed by AG Sessions, we are to accept all unauthorized aliens, including members of family units.  We do have discretion to decline prosecution based upon unique case-specific circumstances.  Please continue your practice of specifically documenting the information presented for prosecutorial review and, if appropriate, the reasoning for declination.

On May 7, 2018, Sessions publicly announced the Department's intention to prosecute family unit adults in a speech in San Diego, California.  In his address, Sessions stated, "If you are smuggling a child, then we will prosecute you and that child will be separated from you as required by law."  Sessions's speech was the first official public confirmation, by DOJ or DHS, that the zero tolerance policy would result in the prosecution of family unit adults and the corresponding separation of families.  The acting ICE Director attended the San Diego announcement and spoke after Sessions.

Hamilton told the OIG that then DHS Secretary Nielsen and Sessions were initially scheduled to jointly announce the policy in San Diego.  However, according to Hamilton, DHS unexpectedly withdrew Nielsen from participating in the event "to protect Secretary Nielsen from bearing the wrath of the policy."  He added, "We were therefore out there on our own, and somehow we ended up announcing their decision for them.…  It was kind of weird, but Sessions didn't care, because he thought it was the right thing to do."

After the public announcement of the policy to refer family unit adults for prosecution, the Southwest border U.S. Attorneys sought further guidance from DOJ headquarters on the policy implementation and prosecution criteria.  For example, Strange emailed Sessions's speech to her staff and highlighted the statements on family separations, noting that this was a "sensitive issue" and that the district still needed further guidance from the Department prior to proceeding.

Two days later, on May 9, 2018, Yuma Border Patrol officials presented six family unit adults for prosecution to the DAZ and the DAZ AUSAs declined prosecution.  DHS leadership brought the matter to Hamilton's attention, and he forwarded the DHS request for an explanation to an ODAG official and asked, "Why would they be declining these cases?"  The ODAG official in turn forwarded the request to Strange, who responded, "With respect to the prosecution of 'family unit' adults, although such cases have not been traditionally referred to our office for prosecution,

---

[57] After reviewing a draft of this report, ODAG told the OIG that no ODAG staff participated in the May 6 call.

there has been extensive discussion over the past few days about changing this practice." Strange clarified that the cases had not been declined, but that her office requested that the Yuma Border Patrol keep the defendants in administrative detention until the USAO received guidance from the Department on "how, exactly, such cases should be handled." Strange noted that a conference call with Hamilton had been scheduled to discuss family unit prosecutions.

By May 10, all five Southwest border U.S. Attorneys had contacted Hamilton, an ODAG official, or the EOUSA Liaison to discuss family unit prosecutions. The U.S. Attorneys also proposed having a discussion with DHS and the USMS on issues related to the implementation of the zero tolerance policy. For example, Braverman emailed Hamilton, an ODAG official, and the four other Southwest border U.S. Attorneys, and explained that there was a need to address the unique challenges of each district. These challenges included the lack of detention space and courthouse space in the SDCA, court-mandated limits on the number of defendants per day in the DAZ, Ninth Circuit shackling rulings that could further limit the number of prosecutions, and medical screening issues that would also make prosecuting a larger number of defendants each day a challenge. Braverman's email emphasized that a meeting between DOJ and DHS national and district leadership would "provide an opportunity to address challenges that affect multiple districts and an environment to generate solutions." The ODAG official elevated this request within ODAG, and the request went to Hamilton for coordination with DHS headquarters and USMS leadership. Braverman told us that no such meeting occurred, but that weekly internal DOJ calls were initiated.

On Friday, May 11, the five Southwest border U.S. Attorneys, the EOUSA Liaison, and two ODAG officials were scheduled to speak with Hamilton to discuss the zero tolerance policy and the DHS referrals of family unit adults. However, shortly before the call was to begin, the EOUSA Liaison sent an email to the U.S. Attorneys stating that Hamilton would not be able to join the call. The five U.S. Attorneys, who had already dialed into the conference line, decided to stay on the line to discuss their concerns about family unit prosecutions and the separation of children from the parents. The EOUSA Liaison and one of the ODAG officials were also on the conference call.

Following the U.S. Attorneys' discussion, the EOUSA Liaison sent an email to Hamilton, two ODAG officials, and an EOUSA Assistant Director and EOUSA Deputy Director, describing the U.S. Attorneys' concerns about the policy change. The EOUSA Liaison wrote that Bash recommended that the Department develop and coordinate talking points regarding the prosecution of family units and the separation of children. The liaison also stated that all of the U.S. Attorneys agreed that the Department should have a consistent message and strategy on these issues. The liaison wrote that most of the districts had received media inquiries about family separations and were requesting guidance and assistance in responding to the inquiries. The liaison noted that the WDTX Federal Public Defender was not waiving preliminary and detention hearings on family unit cases, that this would "clog up the system," and that the SDCA was also facing legal challenges to the new policy. Finally, the EOUSA Liaison highlighted the U.S. Attorneys' primary concern:

BIG CONCERN:  What is happening with these children when they are being separated from the parent?  It appears that once DHS turns the child over to HHS, DHS is out of the picture and cannot give information.  What are the safeguards to the children....  Also, what is the age cutoff for children and parents to be separated?  So far, there are representations that if the child/children are 5 years and older that the parents/child will be separated.

How is DHS arranging for Central and South American family units to be deported after the misdemeanor prosecution of the parent?  How are they getting the child back to the parent?  Mexico will not allow them to be turned over to Mexico.  Will these individuals all be released into the US pending removal?  Where are the kids during that time?

The EOUSA Liaison concluded, "US Attorneys are deeply concerned about this issue and will make themselves available for a call later tonight...or this weekend.  I can arrange."

After receiving the email from the EOUSA Liaison, one of the ODAG officials forwarded it to Bash, asking, "Is there anything key missing from your perspective?"  Bash responded, "No.  We need a complete understanding of what happens to children when the parents are prosecuted and then craft that into talking points for the press and potentially filings for courts."  The ODAG official forwarded Bash's response to Hamilton, stating, "I double checked with USA Bash to get his take on the call.  Please see below for his take on the bottom line, in case helpful for you too."

Later that afternoon, then acting U.S. Attorney for the DAZ Strange wrote an email to a USAO official in her office, stating that it was her understanding that family members prosecuted in her district were not being reunited with their children immediately after the defendants received time-served sentences.  She added that this was contrary to what Sessions had communicated, noting, "My understanding is that even though the parents will be sentenced to 'time served' for the misdemeanor, they will not be immediately reunited with their children (which USA John Bash and I recalled was not the AG's understanding in the call with the [Southwest border] Districts last week)."

After Hamilton received the email on May 11 from the EOUSA Liaison expressing the concerns of the five Southwest border U.S. Attorneys, Sessions scheduled a conference call with them for later that same day, May 11.  Based on notes from the call taken by multiple U.S. Attorneys, Sessions thanked the U.S. Attorneys for "stepping up" and said that there had been "lots of progress" made on immigration.  Sessions offered to get the Southwest border USAOs additional personnel and urged them to "move rapidly" on hiring.  According to the notes, Sessions also told the U.S. Attorneys that the Department was committed to prosecuting individuals who enter the country illegally to ensure a conviction was on their record.  The notes further recorded Sessions telling the U.S. Attorneys, "we need to take away children; if care about kids, don't bring them in; won't give amnesty ~~to kids~~; to people with kids" (strikethrough in original).

39

SDTX U.S. Attorney Patrick sent an email to his staff soon after the call with Sessions.  In his email, he stated:  "I just got off the phone with the Attorney General.  He praised our office on ramping up so quickly on the new zero tolerance stance….  He wants an honest assessment of conditions, but he doesn't want excuses, and he isn't hearing them from us."

That evening, Hamilton emailed the Chief of Staff and Acting Deputy Chief of Staff of ICE, the CBP Chief of Staff, and the Director of ORR asking for a telephone call in the next few days "to confirm some logistical matters for our U.S. Attorneys on the Southwest border about the handling of minors whose parents are criminally prosecuted for illegal entry—and issues related to their reunification after they serve time for any criminal offense."  After reviewing a draft of this report, Hamilton told us that, although he did not recall the specifics of those conversations with the four officials, he asked generally about reunification practices and had received assurances, as he said he had received in prior months, that DHS and HHS were working together to address such matters.

Additionally, in a late May 11 email exchange with the CBP Commissioner, Hamilton also mentioned the Attorney General's call with the Southwest border U.S. Attorneys and recommended that DOJ and DHS convene "a summit" that would allow the USAOs, USMS, and DHS stakeholders to "gather in one room [and get] everyone on the same page at the same time."  The CBP Commissioner had earlier emailed Hamilton about a communication from the Border Patrol stating that "USAOs in San Diego and Tucson will NOT prosecute adults arriving as part of family units, and that most [Southwest border] USAOs have no immediate plans to increase prosecutions" (emphasis in original).  Hamilton responded, "That is not our understanding of the situation at all.  Look forward to clarifying."

On Saturday, May 12, the five Southwest border U.S. Attorneys participated in a call with Hamilton, the EOUSA Deputy Director, and two ODAG officials in response to the EOUSA Liaison's May 11 email and request the previous day.[58]  Prior to the call, Hamilton spoke by phone with the Director of the HHS ORR to receive additional information about the government's process of caring for separated children when a family unit is prosecuted.  During the subsequent call with the U.S. Attorneys, according to notes of the call, the U.S. Attorneys asked for specific information about this process.  Hamilton described his understanding of the process in detail and told the Southwest border U.S. Attorneys that HHS was "working closely" with the ORR to care for the separated children.  He added that the Attorney General's message was that "no one was exempt" from prosecution, including parents traveling with children.  According to notes of the call, Hamilton also stated that, absent prosecution, when cases moved into immigration court, DHS would "then determine if civil separation is in the best interest of the child" but that "prosecution makes separation a reality."  After the May 12 conference call, Strange emailed her office, stating that she had asked during the call for more detailed guidance, such as an "age cut-off for the

---

[58]  After reviewing a draft of this report, ODAG told the OIG that the purpose of the call was for the OAG to provide guidance to the U.S. Attorneys on the Attorney General's policy.

children."  Strange said that she did not receive any guidance to her specific questions and was told that answers would be forthcoming.

As discussed above, the phrase "to the extent practicable" was added to the draft of the zero tolerance policy to give the U.S. Attorneys discretion to decline criminal referrals from DHS.  The ODAG official who suggested that this language be added to the policy told us that the official was surprised to learn, after the zero tolerance policy was implemented, that U.S. Attorneys were being given less than standard discretion to decline cases.  The official added:  "That was important because later it turns out [that the U.S. Attorneys] didn't have the discretion which I thought I had promised them.  I feel like I put myself out there to get the sign off and give them discretion, and later I get calls from the U.S. Attorneys saying it turns out we had less discretion."  Further, the OIG was told by the ODAG official that the official did not know that the zero tolerance policy was tied to prosecuting family unit adults, and was surprised to learn that after May 4 DHS would begin referring family unit adults to for criminal prosecution.

We found that the Attorney General expected Southwest border USAOs to prosecute as many illegal entry cases as possible, including cases involving family unit adults, until all available resources were exhausted.  Rosenstein told the OIG that he initiated several calls with the U.S. Attorneys and that the focus of these calls was to ensure that the U.S. Attorneys were fully engaged on immigration prosecutions.  Rosenstein also stated that he wanted to ensure that the U.S. Attorneys understood how significant the zero tolerance policy was to the Attorney General and that the Department was monitoring the volume of prosecutions at the Attorney General's direction.  With regard to the ability of individual USAOs to exercise prosecutorial discretion on illegal entry referrals during implementation of the zero tolerance policy, Rosenstein stated that there was "confusion" about the meaning of "zero tolerance."  He added, "I would never construe zero tolerance to mean don't exercise judgment in individual cases.  To me, as a U.S. Attorney, you're always going to exercise judgment in individual cases."

However, the U.S. Attorneys offered a different understanding of the Department's guidance on their discretion under the zero tolerance policy, especially as it related to family unit adults.  WDTX U.S. Attorney Bash explained to the OIG:

> Zero tolerance, per our instructions, it's basically sapping prosecutorial discretion....
> [I] still can determine whether it's a readily provable offense, and...the Deputy
> Attorney General...said we could take into account things like, if the child has a
> disability or he only speaks pre-Columbian languages, and so forth, and so, it would
> be particularly onerous on the child if they were put into the HHS system.  But even
> with respect to age of the child, it was a categorical, "We're prosecuting all."...[N]o
> one in this office, including me, had any discretion on whether to accept if we were
> under the zero tolerance requirement from the Attorney General.

On May 22, 2018, the Southwest border U.S. Attorneys had a conference call with Rosenstein. Following this call, Bash summarized Rosenstein's guidance to the USAOs in an email to WDTX supervisory AUSAs:

> I just spoke with the DAG.  He instructed that, per the [Attorney General's] policy, we should NOT be categorically declining immigration prosecutions of adults in family units because of the age of a child.  In other words, our directive is that if [the Border Patrol] refers a single parent of a child of any age to us (or both parents of a child of any age), we should not decline prosecution absent case-specific special circumstances (e.g., the child is seriously ill, the child speaks only a native language, etc.).  I had understood that [the Border Patrol] itself had a policy of not referring parents to us when doing so would separate children under 5 from the parents.  But apparently [the Border Patrol] did so yesterday in El Paso in two cases, and we declined per our understanding of the policy.  Under the directive I just received from the DAG, however, those two cases should not have been declined.

When asked about the May 22 call, Rosenstein stated that his guidance was consistent with the Attorney General's policy.  In a follow-up interview with Rosenstein after he reviewed a draft of this report, Rosenstein added that he did not believe his intention was to instruct the U.S. Attorneys to prosecute family unit adults with young children without exception.  After reviewing Bash's email to WDTX officials, Rosenstein stated that he had approved declinations under circumstances in which the separated child spoke only a pre-Columbian language; he noted that the basis for approving these declinations was that the separated child would be unable to communicate with DHS or HHS officials with whom the child would be placed.  In light of this authority to decline cases involving older, non-Spanish speaking children who could not communicate with HHS or DHS officials because of language barriers, Rosenstein questioned why the U.S. Attorneys would have understood his direction to allow for a declination in that circumstance, but not in the case of an infant who also could not communicate with DHS or HHS officials.  He concluded: "If somebody got the idea that they were supposed to be just like a soldier, prosecuting every case without regards to the facts, that didn't come from me, and if you look at Bash's emails, he says, consider case-based circumstances.  And he doesn't limit it to two categories."

The OIG also reviewed the notes of another U.S. Attorney who was on the May 22 call.  These notes indicate that Bash informed Rosenstein during the call that the WDTX had declined a case involving the referral of a parent by DHS that resulted in the separation of a child that was under 5 years old.  In response, according to the U.S. Attorney's notes, Rosenstein stated, "It's [the Border Patrol's] decision, not ours."  According to the notes, Rosenstein continued, "AG is clear:  Prosecute parents if DHS decides to separate families; use your prosecutorial discretion w/r/t [with regard to] illness, language issues; no categorial decisions w/r/t [with regard to] age; fact-based decisions ok."

After the OIG discussed these notes with Rosenstein, Rosenstein told the OIG: "I do not recall anybody asking me, 'Are we required to prosecute parents of infants and near infants?' I don't recall anybody asking me that question. My answer would have been no. We can consider those circumstances." He added, "If that's the way anybody understood it, they should have asked for clarification, that's not what I had in mind."

The May 22 call between Rosenstein and the five Southwest border U.S. Attorneys was the first of what became regularly scheduled weekly, and sometimes biweekly, calls between Rosenstein and the U.S. Attorneys. Rosenstein explained, "My goal was to make sure [each] U.S. Attorney is personally engaged [in the implementation of zero tolerance policy] and that's one of the reasons why we [had] these regular conference calls...where we would get all five districts on the phone and talk to them about what issues were arising in their districts." Braverman described the conference calls with Rosenstein as a chance to raise "anything that we needed, from a headquarters perspective."

Two days later, on May 24, ODAG began convening coordination meetings with DOJ and external agency stakeholders. Rosenstein chaired the coordination meetings, which also included senior officials from DOJ, DHS, and HHS, among others. In addition to Rosenstein, the May 24 attendee list included Whitaker, Hamilton, then Principal Associate Deputy Attorney General Edward O'Callaghan, two other OAG officials, and three other ODAG officials. A second coordination meeting took place on May 31. DOJ officials interviewed by the OIG could not recall the substance of the meetings, but a summary from one of coordination meetings stated that family reunification "is an ongoing process as the separations recently began" and included an expectation with regard to apprehensions that "family unit numbers will fall in 2 weeks."

After reviewing a draft of this report, ODAG stated that ODAG staff:

> [were] not aware of the Attorney General's plan to tie his policy to family unit adult prosecutions, with extraordinary volume increase, and without giving U.S. Attorneys discretion to decline those cases. This left ODAG in a reactive 'crisis response' posture, where ODAG was also frustrated in its efforts to obtain information for U.S. Attorneys. As ODAG received incoming questions from U.S. Attorneys, ODAG advocated on their behalf before OAG on a near real-time basis, seeking OAG engagement with DHS and HHS because OAG served as the point of contact for the Department's engagements with them.

Despite ODAG's efforts to coordinate with the U.S. Attorneys and other inter-agency partners in response to the May 4 DHS policy change, Bash told the OIG that U.S. Attorneys had hoped to get "an accurate and full summary of what happens to children, how they're cared for, and so forth. And we never really got that." As explained in the section below, the USAOs struggled to provide information about separated families in response to judicial inquiries and were frustrated in their

efforts to gather additional information from DOJ headquarters, DHS, and HHS about the separation and reunification process.

## U.S. Attorneys Continued to Seek DOJ Guidance as Federal Judges and Other Stakeholders Raised Concerns About Family Unit Prosecutions and Family Separations

Between May 5 and June 20, 2018, the zero tolerance policy resulted in the separation of approximately 3,000 children from their families when a parent was referred to DOJ for prosecution.[59]  During this period, the Southwest border USAOs continued to request guidance from DOJ leadership on family separations, as judges and defense attorneys in multiple districts raised concerns regarding the separation and tracking of children.

For example, on May 29, DAZ Magistrate Judge Leslie Bowman asked USAO staff to meet with her as part of an inquiry she was conducting "on behalf of other magistrates and public defenders," due to questions from parents, through their counsel, about the whereabouts of their children. According to emails between CBP and DOJ's Civil Division, Bowman was initiating her own fact finding on issues related to the separation of families and the USAO was seeking guidance from DOJ headquarters on whether to participate.  Bowman's request was shared with DOJ's Civil Division, which elevated it to the OAG and ODAG, noting there was "some urgency" since "the Magistrate Judge is pressuring them to meet with her next week."  A Senior Litigation Counsel in the Office of Immigration Litigation, which oversees civil immigration matters, attempted to provide ODAG and the OAG with additional context about Judge Bowman's concerns, stating, "One of the problems is that the criminal AUSAs don't at all understand…what happens to any of the aliens outside of the prosecutions, so there has been a problem of some of them giving wrong information to the judges."

Also on May 29, the Federal Public Defender's office in McAllen, Texas, emailed a proposal to local federal judges and the SDTX USAO for a coordinated effort to address children separated under the zero tolerance policy through a "Child Welfare Court."  Sessions and Rosenstein, among others, were notified of the proposal, which stated:

> For the last few weeks our office has routinely represented parents in misdemeanor court who have been separated from their children and who have been given no information about their whereabouts, their well being, or any plans to reunite them. Most of these individuals are from Guatemala, El Salvador and Honduras and have no immigration or criminal history.  The children are as young as 3, 5, 7, 9 and 11 years old….

---

[59]  DHS OIG, *DHS Lacked Technology,* 8.  Note: This DHS OIG report estimated that 3,014 children were separated from their families while the zero tolerance policy was in place, though it also stated that "Without a reliable account of all family relationships, [DHS OIG] could not validate the total number of separations, or reunifications."

Our office has not been given any satisfactory answers from the Government as to the process of placing these children or any efforts to track and reunite them with their families.  We continue to point out to the magistrate courts that our clients are enduring the punishment of separation from their children which is greater than any jail time they can have imposed upon them.…  Some of the children are being separated from their parents on the day of their arrest 3 days prior to their court date whereas other parents are separated from their children on the morning they are brought to court.  None of the parents are being told when the children will be returned to them.

By the evening of May 31, the Federal Public Defender's email had been forwarded to HHS and DHS headquarters; the White House; and to Rosenstein, who provided it to Sessions.

The May 29 request from Judge Bowman was followed by a similar inquiry and order from SDTX Magistrate Judge Ronald Morgan.  On June 4, Judge Morgan ordered the USAO to submit a list to the court of all separated children, including the "minor child's name, child's current location after being taken from their parent, and the date/place of reunification with their parent," by June 8.  During the June 4 hearing, which involved the cases of several defendants charged with immigration offenses, Judge Morgan asked defendants who had been accompanied by a child to stand up and to state whether their child or children had been separated from them.  He called on each of the seven defendants and asked them to identify themselves and provide the name(s) and age(s) of their children.  The defendants stated their children's ages, which ranged from 7 to 17.  After each defendant had spoken, Judge Morgan continued:

> What I'm going to do is to require of the U.S. Attorney's Office and of the Border Patrol folks that they identify where these children who have been identified this morning, where they're sent, where the parents are sent, when and where the parents and the child are to be rejoined or if the parent and child are not to be rejoined, then with whom or to whom the child has been placed.  That information will be provided in a report that the United States Attorney's Office is to submit each Friday to this Court.

> Again, as I said at the beginning, I'm not concerned with whose fault or who brought it upon whom that the children are separated from their parents.  My concern is that the children not suffer unnecessarily.  And given the age of the children, it's almost an innate suffering that's going to happen when they're separated from their parents.  Having said that, we will now go back to these proceedings.  Just understand something.  It's the Court's intention to do this every day when we have the zero tolerance type of approach.  The Court has no obligation, no difficulty, no concerns about the government's right to institute the zero tolerance.  But there are costs and those costs have to be addressed.

In response to Judge Morgan's oral order, the SDTX USAO requested that the CBP begin regularly providing information about separated children to the USAO. According to an AUSA's notes, the CBP stated in response that it "does not have all the information because they send the kids to HHS, and BP [Border Patrol] does not keep track. HHS in turn has set up a hotline for the parents to find their kids, but the hotline does not work. It is a mess and everyone is pointing the finger at each other."

Ultimately, the SDTX USAO sent a letter to Judge Morgan contesting the court's jurisdiction to request the information by judicial order because the defendants had already been sentenced at the time of the order. After receiving the USAO's letter, Judge Morgan worked with the USAO outside of the proceeding to receive responses to additional questions, such as the efficacy of the HHS hotline for separated parents.

Similar concerns were raised by other federal judges and Federal Public Defenders. For example, on June 7, Rosenstein emailed Hamilton and other senior staff stating that he had attended a meeting of the Federal Judiciary's Committee on Defender Services at the Administrative Office of the U.S. Courts (Committee). The Committee includes Federal District Judges and Federal Public Defenders who were appointed by the Chief Justice. According to Rosenstein, Committee members "raised concerns about the executive branch's strategy to keep parents who are detained on federal criminal charges advised about the location and condition of their children, and requested that we join them in a working group to address the issue." Rosenstein added, "It may be beneficial to us to hear their concerns, instead of requiring our AUSAs to deal with ad hoc concerns locally." The Department agreed to participate in the resulting Joint Task Force on Southwest Border Issues, which brought together representatives from DOJ, DHS, HHS, the federal judiciary, the Administrative Office of the U.S. Courts, and the Federal Public Defenders. U.S. Attorneys Bash and Anderson participated on behalf of DOJ.[60]

When asked by the OIG about this effort, Rosenstein explained:

> You can fault us for not anticipating [DHS and HHS management issues], but we really did try to manage our lane…. I actually think we made efforts to go outside our lane with regard to implementing the AG's mandate, because I recognized that the courts, for example, and the Public Defenders had issues [with family separations]…. I said go talk to them [the courts and Public Defenders] and figure out what their problem is and see if we can help…. So we did try to make efforts to reach out a little bit beyond our lane, but there are limitations to what you can

---

[60] According to an agenda for the Task Force's initial meeting on July 9, the Joint Task Force addressed: Detention, Transportation, and Related Issues (defendant detention, including remote detention, multiple detention locations, family issues, attorney-client meetings, and transportation challenges); Court Operations Issues (space and facilities challenges, magistrate judge workloads, presentence investigations, interpretation issues, consular access and availability, and defender representational issues); and Post-District Court Issues (the process for detention and removal at the completion of district court proceedings, such as removal times and processes and return of defendant property).

accomplish.…  [W]e're going to manage this agency appropriately and we can't solve all the [government's] problems."

On June 13, an SDTX official sent an email that was circulated to the DOJ Office of Public Affairs, ODAG, and the OAG, stating that "we have two judges (maybe more) that are demanding from the prosecutors [in cases that involve] the separation of children…[that] the AUSA inform the court where the child is and how they are going to be reunited.  We have advised verbally and in writing that there is no way for the AUSAs (and for that matter the BP agents) to know the answer to that." That same day, these ongoing issues in the SDTX, as well as other zero tolerance policy implementation issues, were outlined by an ODAG official in an email to then Principal Associate Deputy Attorney General O'Callaghan and another ODAG official in connection with preparing Rosenstein for his next coordination phone call with the Southwest border.  The ODAG official's email stated that there were two SDTX judges concerned with "issues related to children."  The official's email noted that Judge Morgan "is now ok with how things stand," after receiving additional information from the USAO on the ability for parent-defendants to use an HHS hotline to contact separated children.  The official cautioned in the email, however, that "there is now a District Judge who has also expressed strong concerns over children (Judge [Ricardo] Hinojosa— former Chief Judge and former Chair of Sentencing Commission—who now sits in McAllen)."  The ODAG official also noted in the email that a Criminal Division Deputy Assistant Attorney General (DAAG) and Bash represented the Department at a federal judges conference in El Paso on June 12 and that they fielded "heavy criticism from both Article III and Magistrate Judges for how the [government] has been handling issues related to children."

To ensure that OAG heard these concerns directly, on June 13 ODAG convened a conference call for OAG staff with the Criminal Division DAAG, Bash, and Braverman.  Notes from the conference call indicate that OAG staff were told that federal judges had "begged" Bash and the Criminal Division DAAG to elevate the judge's concerns about family separations to Rosenstein and requested that the Department provide the courts with relief from the heavy volume of zero tolerance policy cases.  Additionally, the notes reflected that a WDTX Magistrate Judge stated that there should be a standing order regarding discovery requiring the USAO to provide information on the location of any separated children.  Emails indicate that the ODAG official asked Bash, in light of this judicial feedback, to put together a list of questions for each Southwest border U.S. Attorney to ask his or her DHS and HHS counterparts about the family separation process. According to the ODAG official, the goal of the questions was "to get a full understanding of what is happening in each District" with regard to the separation of families to help prepare Rosenstein for his upcoming call with the Southwest border U.S. Attorneys.

Accordingly, over a month after the USAOs began prosecuting family unit adults, and after raising similar concerns to DOJ leaders, Bash developed a list of process questions for DHS and HHS so the U.S. Attorneys in the border districts could better understand the family separation process and provide accurate and timely information in court proceedings.  In an email to the Criminal Division DAAG, Hamilton, Braverman, and an ODAG official, Bash stated, "These are the first

questions I would ask DHS and HHS officials if I were doing a thorough inquiry and developing a report and set of recommendations.  I would also visit a lot of sites personally and talk to folks on the ground, asking these same questions."  Among dozens of additional questions, the list included:

- How are children and parents separated?  Is it true that they are often pulled apart physically?  What training do [Border Patrol] officers receive on dealing with children humanely?

- What are parents told at the point of apprehension about where their children are being taken?

- What do [Border Patrol] officers do with pregnant women?

- Can information about children be provided to defense counsel and courts?

- How does DHS deal with children who speak only indigenous languages?

- How does DHS deal with infants?

- What are children told about what is happening to them?

- How long does the average child spend in an HHS facility?

- How long does the 90th percentile child spend in an HHS facility?

- Does HHS facilitate calls between parents and children?  How often?  Does HHS coordinate with USMS on setting up calls?  Do parents have to pay for the calls?

- Why doesn't HHS return the child to the parent as soon as the parent is out of the criminal-justice system, on the view that at that point the child is no longer an "unaccompanied minor"?

- What technology could be used to ensure that parents don't lose track of children?  Low-tech (bracelets with information)?  High-tech (PIV card type technology)?

The ODAG official informed Bash by email that the list of questions would be conveyed to Rosenstein in advance of his June 15 conference call with the U.S. Attorneys.  During the call, Rosenstein instructed the U.S. Attorneys to request responses from DHS and HHS officials in their districts to get a "baseline" of information regarding separated families in each district.

Although the USAOs were asked to submit the questions to their local counterparts, the OIG did not identify any responses from DHS, which told multiple USAOs that requests relevant to the prosecution of family units should be addressed through DHS headquarters.  For example, on June 18, SDTX U.S. Attorney Patrick told an ODAG official that he "got a stiff arm from DHS trying to answer the questions the DAG wants answered."  DHS's reluctance to provide additional information was reported to Hamilton on June 19, and Hamilton attempted to coordinate with the

DHS Office of General Counsel. But Hamilton subsequently wrote to the ODAG official that an intervention by the Deputy Attorney General was needed to affect DHS's responsiveness.

USAO concerns and questions about the family separation process continued to be raised in communications with ODAG and OAG officials. For example, on June 18, Bash emailed OAG and ODAG personnel about a communication he had received from the Federal Public Defender in his district. Bash stated: "Two clients have told [the Federal Public Defender] that they were told by [Border Patrol] officers that their children were being taken for baths and then never saw them. I had assumed that the story about that in the news was either false or a one-off miscommunication, but this is concerning to me." The Federal Public Defender also alerted Bash to difficulties the Public Defender was encountering in connecting parents in USMS custody with children in the custody of ORR. Bash noted that, while the Federal Public Defender was an advocate for her clients, he believed that he had a good working relationship with her office and considered her statements trustworthy.

An ODAG official forwarded Bash's email to Rosenstein. In response, the following day, Rosenstein asked Hamilton and others whether DHS maintained a master list of separated children, so that DOJ could use it to facilitate contact between children in HHS custody and parents in DOJ custody. An ODAG official informed him that no such list existed, and Hamilton added "DHS is building such report this week." Rosenstein explained to the OIG:

> To me that's sort of Management 101. [DHS and HHS] should [have been] able to produce a list. Again [HHS Secretary] Alex Azar's position was that he was tracking [the children] but [DHS] also apparently [did] not have some centralized list. And to me…when you take someone into custody, they get a number, it goes in our computer, [and] the Marshal Service can tell me exactly where they are at any moment. And I just assumed that there would be a similar system in place at DHS.

Rosenstein continued, "I think if [DOJ] had anticipated the issue with [reunifying] the children, [DOJ] would have engaged with DHS and HHS earlier about that issue." Additionally, in a follow-up interview conducted after Rosenstein reviewed a draft of this report, Rosenstein stated:

> I did not understand at the time…that there was no coordination with DHS at all [on family separations]…. [The OAG] was very reassuring that this was all fine. And [the OAG said] DHS had a plan, and whatever messaging I heard, I think publicly from the administration was consistent with that. And obviously, in retrospect, it turns out to be wrong.

The following day, June 20, President Donald J. Trump issued an Executive Order temporarily instructing DHS to maintain "family unity" during the pendency of any criminal proceeding. Below we discuss the Executive Order and its effect on family separations.

### The Department's Failure to Adequately Coordinate with U.S. Attorneys and DHS and HHS Officials Resulted in a Lack of Understanding by Senior DOJ Officials About the Family Separation Process and Impact of the 72-hour Rule

We found that Sessions and other senior DOJ officials did not adequately understand the family separation process that would accompany prosecution of family unit adults and that they had expectations about the process that were inconsistent with the realities in the Southwest border districts.  For example, as noted above, according to Strange's notes of a conference call with the Southwest border U.S. Attorneys in early May, Sessions communicated his understanding that prosecuted adults would be "immediately reunited with their children."  Similarly, Hamilton told the OIG that "our understanding" at the time the zero tolerance policy was issued was that the prosecution and sentencing of family unit adults could be completed in an "afternoon or in days" and that defendant-parents would be reunited with their children shortly after being sentenced to time served, without a prolonged separation from their children.[61]  However, we found that Department leaders were notified during implementation of the zero tolerance policy that the average amount of time a defendant remained in DOJ custody during prosecution for an illegal entry charge was 3 to 7 days and a significantly longer period in some districts.

As noted in the Introduction, when a child enters the country as part of a family unit, and the parent is transferred to USMS custody, DHS then designates the child as an Unaccompanied Alien Child (UAC).  The Trafficking Victims Protection Reauthorization Act (TVPRA) requires DHS to place UACs into ORR custody within 72 hours, absent "exceptional circumstances."  In practice, at most Border Patrol stations, staffing and space limitations related to children (who must be held separately from unrelated adults under *Flores*) often result in the transfer of children to ORR custody in significantly less time, often immediately after the adult is referred to DOJ for prosecution.

Accordingly, we found that in most cases, the expectation, as communicated by Sessions to the Southwest border U.S. Attorneys, of a brief prosecution followed by an immediate reunification of the family while the child remained in DHS custody was a practical impossibility.  Moreover, the OIG found that DOJ leadership did not consider the average sentencing practices in the districts, assess the impact of the TVPRA's 72-hour rule, or adequately consult with the USAOs, the USMS, HHS, or the Border Patrol in advance of implementing the zero tolerance policy.

We asked Rosenstein, Hamilton, and Whitaker about DOJ headquarters' understanding of the family separation process and their views on whether the process broke down.  Rosenstein stated that he learned of the difficulties related to the separation of families after the zero tolerance policy was issued.  He stated that he participated in discussions to consider whether it would be

---

[61]  After reviewing a draft of this report, in written comments, Hamilton told the OIG:  "No one expected that everything would be done in 72 hours or that minors wouldn't go into HHS custody.  Regardless of where the minor was, the expectation was that they would be reunified with their parents as quickly as possible.  We sought assurances and received them [from] the entities most responsible for both family separations and reunifications."

possible to prosecute family unit adults "the same day" so that separated family members could be reunited shortly after the prosecution. "My thought was maybe we just release [the defendant] back to DHS and they can just hold the kid for a few hours while the parent was in court, and then they would be back together that night." Rosenstein stated his understanding that the primary challenge in achieving this outcome was the limited amount of detention space for children in DHS custody and the related legal constraints on detaining children in adult detention facilities. Additionally, he stated that transport times in districts with large geographical areas would preclude such solutions. Based on our interviews and document review, the OIG found no evidence that DOJ leadership engaged in discussions with the U.S. Attorneys, the USMS, or DHS, prior to the implementation of the zero tolerance policy, about a process for expediting prosecutions of family unit adults so that child separations would not occur.

Hamilton told us that he thought families would be immediately reunified by DHS after the parent received a sentence for time served for a misdemeanor illegal entry violation. Hamilton stated:

> It was our understanding that prosecution would happen in an afternoon or in days, [that a child would remain] in DHS custody and then there would be reunification with the children…. We didn't ever imagine DHS would lose track of the kids and their location. Like sending children off to a shelter in New Jersey. That was not our understanding at all.[62]

Hamilton further told the OIG that it was his understanding that the entire family would receive "expedited removal" orders at the time of apprehension from DHS. Hamilton stated that prior to the zero tolerance policy it was DHS's practice to issue expedited removal orders to families, who would then go through credible fear screening for asylum seekers and be released into the United States to await an immigration hearing if they passed the screening. Otherwise, they would be deported as a family. Hamilton stated that DOJ expected DHS to continue the same expedited removal process, "which would have helped." Hamilton stated that he discussed this process with Sessions and communicated DOJ's recommendation to DHS to issue expedited removal orders to families at the time of apprehension so that family members were "linked" in DHS systems before the parent was referred to DOJ for prosecution.[63] Hamilton stated that DHS understood the

---

[62] As noted above, however, in the May 3 talking points that Hamilton drafted for Sessions in preparation for the White House meeting on immigration policy, Hamilton wrote: "The prosecution of an adult member of a family unit will necessarily result in their transfer to the U.S. Marshals Service. Any minors in the family unit will remain in DHS custody, and likely [be] eventually transferred to the Office of Refugee Resettlement." In written comments submitted after reviewing a draft of this report, Hamilton emphasized that he and others in the OAG "clearly had the understanding that there would be reunifications between DHS and HHS even if minors went into ORR custody."

[63] As noted, Hamilton made this recommendation to DHS in December 2017, in comments he provided to the DHS Chief on the DHS document, "Policy Options to Respond to Border Surge of Illegal Immigration," discussed above. That document specifically noted that "parents would be prosecuted for illegal entry (misdemeanor) or illegal reentry (felony) and the minors present would be placed in HHS custody as UACs."

recommendation and that he "was assured multiple times that DHS had reunifications under control, including by senior leadership at ICE."

Notwithstanding these assurances, Hamilton described multiple "breakdowns" in the process of separating and reunifying families following the prosecution of the family unit adult:

> My general understanding is that at the point of apprehension, [DHS] did not apply expedited removal to the family together.  Instead they split them up and the parent was referred for prosecution and the child was referred to HHS.  The child was then treated as a UAC and given a Notice to Appear, and HHS looked for a sponsor to try to place the child with someone.

> There were multiple breakdowns—HHS making the parent go through the formal sponsorship process rather than quickly reunifying the family for whatever period they could put them together for….  [T]hen the mom is in Texas and the kid is in New Jersey, and it's…impossible to reunify them quickly…instead of just keeping the families together or linking them better, because the prosecutions occurred quickly. From where I sit, it was incredibly frustrating to see that.  If they had expedited removal and would reunify the family quickly in one to three days, they could have stayed together.

Whitaker told us that he "didn't have a full understanding certainly as to what the implementation would cause at the HHS and DHS level and the fact that HHS and DHS would consider the children to be unaccompanied minors and that would go a different direction because of the way [UACs] are processed."

After reviewing a draft of this report, Rosenstein emphasized his agreement with "Hamilton's view that the process of separating and reunifying families following prosecution had broken down." Rosenstein also told the OIG that HHS Secretary Alex Azar had told Rosenstein that many reports regarding the family separation process had been misleading and that HHS had not lost track of the children.  Additionally, Rosenstein told the OIG during his initial interview that DOJ leaders had coordinated effectively with DOJ partners at DHS during the implementation of the zero tolerance policy and that, notwithstanding DOJ's efforts to coordinate with DHS, the family separation process had broken down.  When asked to generally describe the coordination between DOJ and DHS, Rosenstein characterized it as "tremendous."  He added:

> I mean I think it's unlikely that ever in American history has there been more coordination about enforcement….  I'm not bragging about it.  It's just this was so important to the administration, and the Secretary of Homeland Security was personally engaged in this, and then at a later stage, the Secretary of Health and Human Services….

> I think it's unlikely that the HHS secretary in the past has been present at so many high level White House meetings [about immigration enforcement].... So I would say the level of coordination, of the communication, was really significant. This was not an issue that was just left to the field. The Secretary of DHS and Attorney General were being very responsive to what they understood to be the administration policy of doing something...about the surge in the illegal immigration.

In an interview conducted after Rosenstein reviewed a draft of this report, Rosenstein distinguished between the high level coordination that occurred between the Attorney General and the DHS Secretary with the lack of "operational coordination" that occurred prior to implementation of the policy. He stated:

> I had this false sense of security that DHS has this under control.... [After] the AG had rolled this out, my understanding was it was coordinated with DHS, who handled [the way in which] children are going to be taken care of...And so I had this false sense of security that I'm just doing what I can to provide logistical support and obviously, looking at it in retrospect, I have a very different perspective.

We found that, with additional efforts to coordinate prior to the implementation of the zero tolerance policy, it may have been technically and logistically possible in some cases for the prosecution of family unit adults to occur without a prolonged separation of the children from the defendant-parent, as OAG officials told the OIG they expected at the time the zero tolerance policy was implemented. However, we found that, even when prosecution occurred within a brief timeframe and defendant-parents received time-served sentences, children were most often transferred from DHS to HHS custody and over 1,900 separations resulted.[64]

Moreover, our review identified numerous indications during the zero tolerance policy's implementation that most of the prosecutions could not be completed in a matter of hours or days. For example, on May 30, 2018, the EOUSA Liaison provided ODAG and OAG officials a memorandum with the average length of sentence for illegal entry prosecutions by Southwest border district. According to the districts, the average sentence for illegal entry defendants after the implementation of the zero tolerance policy varied. In Arizona, New Mexico, and the SDTX, defendants with no prior criminal or immigration history were given a time-served sentence, which was typically 3 to 7 days, depending on the day of the arrest, with weekend arrests taking

---

[64] In its November 2019 report, *DHS Lacked Technology,* the DHS OIG noted:

> During the Zero Tolerance period, Border Patrol agents reportedly reunified 530 children (of 2,458 total children whose parents received minimal or no jail-time) with their parents at CBP facilities. Border Patrol was unable to reunify 1,928 children and their parents in instances when the parents received little or no jail time. This occurred because Border Patrol, as required, had already transferred the children to ORR custody before CBP returned their parents from court.

longer.  In the SDCA, defendants with no prior criminal or immigration history were typically sentenced from 10 to 14 days.  In the WDTX, sentences depended on the court and the sentencing Magistrate Judge and could be completed in as few as 2 days; but in Del Rio and El Paso, some judges sentenced defendants to an average of 10 to 14 days.

Accordingly, based on the average sentencing practice during implementation of the zero tolerance policy, we found that it would not have been possible for most defendants to reunite with their children immediately after sentencing and prior to the child's placement with HHS, which had to occur within 72 hours of apprehension.  During interviews and document review, we found no evidence, before or after receipt of the memorandum, that DOJ leaders sought to expedite the process for completing sentencing in order to facilitate reunification of separated families and prior to the 72 hours required for transfer of children from DHS to HHS.[65]

DOJ leaders received additional indications from DHS that separated children were not being immediately reunited with defendant-parents and that increased prosecutions under zero tolerance were taxing available DHS and HHS resources.  For example, on June 2, 2018, the then DHS Deputy Secretary emailed Rosenstein and another, following a request from the Office of Management and Budget Deputy Director for increased interagency coordination.  In her email, the DHS Deputy Secretary noted that, under the zero tolerance policy, DHS was experiencing "challenges with the placement of UACs" with HHS.  According to the DHS Deputy Secretary, DHS was "seeing proportionately more tender age children (under 12) and more very young children (5 and under) vice older children."  The DHS Deputy Secretary stated that, with the increase, the CBP was unable to comply with the 72-hour rule and that, as of June 2, the "CBP had 109 UACs [in custody] over 72 hours (in violation of a requirement of *Flores* settlement agreement) and [was] experiencing significant slowdowns in placement of the UACs which will only exacerbate that issue."[66]  She added, "If we cannot turn this around and timely place UACs, we will have no choice but to scale back on [the zero tolerance policy] and undermine the deterrent effect we are looking to achieve."

Rosenstein responded to the then DHS Deputy Secretary, asking whether it was possible to change the 72-hour requirement if meeting it was not feasible.  The DHS Deputy Secretary stated that the 72-hour rule was from a judicial order, adding that "border patrol stations are not designed or staffed to house children for any extended period of time and many are over 100% capacity.  So it becomes a real issue on many fronts."

---

[65]  After reviewing a draft of this report, in written comments, Hamilton stated:  "Whether the minor went to HHS or not, our expectation and understanding was that DHS had figured out how to put family members back together.  Faulting us for not expediting things fails to acknowledge this basic issue.  Whether it took 24 hours, or 24 days, the point is that there would be a reunification on the back end."

[66]  See Appendix 3 for discussion of the *Flores* settlement agreement.

Rosenstein forwarded the DHS Deputy Secretary's response to Hamilton and ODAG officials for clarification. Hamilton responded to the email by advising Rosenstein that, in addition to the *Flores* settlement, which stipulated a 72-hour rule for UACs, the 72-hour requirement was also codified in federal law under the TVPRA. Rosenstein responded to Hamilton: "That's a law. But it does not require the government to stop filing criminal charges when appropriate."

Rosenstein also forwarded the DHS Deputy Secretary's email to Sessions, who responded by encouraging DOJ to continue to increase the percentage of prosecutions of those apprehended at the border but added, "We have to do all we can to help with UACs. Every little bit helps." Sessions noted that the USMS must take steps to ensure that it was moving "rapidly" to process defendants. Sessions sent the email chain from Rosenstein on to Hamilton, adding, "If things are not moving at any DOJ agency don't hesitate to report it to me, and Rod [Rosenstein] or I may need to call them. We are in post 9/11 mode. All is asap."

Another factor that prevented some illegal entry prosecutions and sentences from being completed within 72 hours was that pretrial detainees in USMS custody had to receive a medical screening and would be subject to quarantine periods in detention if they were found to have contagious conditions such as scabies, lice, measles, or chicken pox. As we further discuss below, USMS district staff told us that such outbreaks occurred frequently during implementation of the zero tolerance policy and contributed to delays in detainees' initial court appearances as well as to untimely releases after sentencing.

These and other factors, as well as concerns about lengthy separations and systemic difficulties in reuniting separated families, prompted U.S. Attorney Bash to ask senior WDTX officials whether it would be possible to hold a child in DHS custody while the parent was prosecuted, thus avoiding the lengthy separation of the family that occurs when the child is transferred to HHS ORR custody. On June 9, 2018, Bash told his office, "I'm trying to figure out what I could propose to Main Justice that is workable to deal with the family-separation issue while adhering to the AG's zero-tolerance policy." In response, a senior WDTX AUSA noted that "there are multiple agencies and a maze of procedures when we accept prosecution on a family unit" and cited a lengthy list of potential obstacles to Bash's proposal.

After further internal discussions, WDTX officials reached out to local CBP, ICE, and ORR officials and the federal courts in an effort to coordinate on prosecutions and the resulting family separations in a manner that had not occurred at the Department level at any point prior to or during the implementation of the zero tolerance policy. As of June 19, email records indicate that the project was gaining some traction but was not pursued further because the following day the President issued the Executive Order temporarily instructing DHS to maintain family unity during the pendency of any criminal proceeding.

In an interview conducted after Rosenstein reviewed a draft of this report, we asked Rosenstein whether the Department considered informing DHS in late May or early June that DOJ would no

longer accept referrals of family unit adults until DHS addressed identified breakdowns in the process related to the separation and reunification of children. Rosenstein told the OIG: "My view is that if the U.S. Attorneys had that level of discomfort they should have stopped prosecuting. And I would have respected that decision." He added: "My view is they are the front lines. They're handling the cases." He continued, however, that Sessions "was always adamant that this program needs to continue, because [Sessions believed] there's a crisis" on the border. Rosenstein noted that Sessions continued to publicly support the zero tolerance policy even after issues related to the separation and reunification of children surfaced. For example, Sessions gave a speech on June 14, 2018, in Fort Wayne, Indiana, in which he stated:

> Yes, we are pursuing a "zero tolerance" prosecution policy at the border. Under the laws of this country, illegal entry is a misdemeanor. Re-entry after having been deported is a felony. Under the law, we are supposed to prosecute these crimes. Accordingly, I have ordered our prosecutors to pursue 100 percent of the illegal entries on the Southwest border that DHS refers to us.

> If you cross the Southwest border unlawfully, then the Department of Homeland Security will arrest you and the Department of Justice will prosecute you. That is what the law calls for—and that is what we are going to do. Having children does not give you immunity from arrest and prosecution.

As noted above, approximately 1 week after Sessions's speech, President Trump issued an Executive Order temporarily instructing DHS to maintain family unity during the pendency of any criminal proceeding. We discuss the Executive Order and its effect on family separations in the following section.

### After President Trump's June 2018 Executive Order, the Southwest Border U.S. Attorneys Continued to Seek DOJ Guidance Regarding Family Separations

On June 20, as concerns about the separation of families continued, President Trump issued Executive Order 13841, temporarily directing DHS to maintain family unity throughout federal prosecutions for illegal entry.[67] On June 21, Attorney General Sessions gave a media interview during which he acknowledged the concerns about family separations. He stated that the optics of family separations at the border had not been good and that the "American people don't like the idea that we're separating families, and we never really intended to do that."

We found that the Southwest border USAOs continued to seek guidance from Department leadership after the June 20 Executive Order largely curtailed the referral of family unit adults for

---

[67] We found emails showing that U.S. Attorney Bash proposed several edits to the draft Executive Order, including one capturing his understanding that "we are not under a legal duty to bring every [illegal entry] prosecution" and another to preserve the Department's ability to "later argue that the [2016 judicial ruling finding that the *Flores* settlement agreement covered accompanied minors] was wrong."

prosecution.  Specifically, some USAOs were uncertain whether they could exercise discretion to dismiss pending cases involving family unit adults in order to attempt to expedite reunification of a separated defendant-parent.  For example, Bash told the OIG that ODAG provided contradictory and confusing guidance.  He said that initially an ODAG official told him that he had clearance to dismiss pending cases; however, after doing so and releasing a public statement to that effect, he said that he was later told by ODAG, "You can't dismiss them."  According to Bash:

> We were given some confusing guidance…that didn't make sense, like, dismiss them if they're going to be immediately removed.…  But, until you get through the criminal justice process, there is no removal order.  So, that would be [none of our cases].  It doesn't make any sense.…  Then we got further guidance that you can [make dismissal decisions] case by case, but it can't just be the mere fact that it's a family that you do it.

On June 22, in preparation for a call with the Southwest border U.S. Attorneys, OAG, ODAG, and Office of Legal Counsel officials discussed what guidance to provide the U.S. Attorneys regarding their authority to dismiss pending cases involving family unit adults in order to return defendants to DHS custody to try to reunify families.  An email from an ODAG official informed the group:

> [For your awareness] for the call with [the Southwest border] Districts.  I just spoke with the DAG.  His directive was the following:  (1) USAOs should not dismiss 1325 cases for the purpose of trying to send parent-defendants back to DHS custody for possible family reunification.  (2) USAOs should also continue to prosecute all [illegal entry] cases referred to them, as long as there is evidentiary basis to do so.  DHS will be responsible for determining as initial matter which parent-arrestees should be referred.

The email from the ODAG official continued that, according to Rosenstein, "per earlier [White House] meeting, no class of illegal entrant is exempt from the law.  DHS should minimize family separations, and will work with DOJ and HHS on that process."  After receiving the proposed guidance from the ODAG official, Hamilton responded, "That is consistent with the AG's guidance." After the call with the Southwest border U.S. Attorneys, the ODAG official informed other ODAG officials, "We did not receive any pushback" from the U.S. Attorneys on the guidance.

On June 26, SDCA federal district court Judge Dana Sabraw issued a preliminary injunction prohibiting DHS from separating family unit adults from their children.[68]  The judge also ordered the government to reunify children younger than age 5 with their parents within 14 days of the order and children 5 years and older within 30 days of the court order.  The judge's order effectively resolved many of the requests for guidance that U.S. Attorneys had been directing to

---

[68]  See Appendix 3 for more information on *Ms L.* v. *ICE* and injunctions related to the zero tolerance policy and family separations.

DOJ headquarters related to family unit adult prosecutions because it meant that DHS could no longer refer family unit adults for prosecution if the referral would result in the separation of the family.

## The Department Did Not Plan for the Operational, Resource, and Management Impacts that a Substantial Increase in Immigration Prosecutions Resulting from the Zero Tolerance Policy Would Have on the USMS, the USAOs, and the Federal Courts

We found that, because DOJ leadership did not include the USMS in discussions on the zero tolerance policy prior to announcing it, the USMS faced challenges with respect to staffing, bed space, and medical care for detainees, among other issues.  These challenges had significant ramifications for the USMS, including for its budget and the safety of USMS personnel working in border districts.  Additionally, after family separations began without advance notice to the USMS, the USMS did not have policies or procedures to facilitate communications between migrant children in HHS ORR custody and their parents in USMS custody, which resulted in delays in establishing contacts between separated family members.  We also found that although each Southwest border USAO informed the Department that resource limitations would negatively impact its ability to implement the zero tolerance policy, these concerns were not considered by DOJ leadership until after the policy's implementation and, even then, were not addressed in a timely manner.  Lastly, we found that federal judges in Southwest border districts received no advance notice of the zero tolerance policy, resulting in burdens on the courts with respect to increased staffing, space, and equipment needs due to the large increase in caseloads that affected USAO prosecutions.

### The Zero Tolerance Policy Affected the USMS's Staffing and Budget, as Well as Its Ability to Provide Safe and Secure Housing and Medical Care to Criminal Detainees

As discussed above, prior to issuing the zero tolerance policy, DOJ leadership did not include the USMS in its discussions on increasing illegal entry prosecutions.[69]  As a result, we found that the USMS did not have an opportunity to advise the Department of its significant resource needs resulting from the new policy until after then Attorney General Sessions's announcement in April 2018.  In its efforts to address the increase in immigration arrests resulting from the zero tolerance policy, the USMS faced challenges with respect to its own staffing, obtaining adequate bed space for criminal detainees, and providing sufficient medical care for criminal detainees.  We found that these issues had significant ramifications for the USMS's budget and for the safety of USMS personnel in border districts.

---

[69]  At the time of the implementation of the zero tolerance policy, the USMS, for the first time in the agency's history, had neither a Director nor an acting Director, and the acting Deputy Director was the highest ranking USMS official.  The agency lacked a Director from January 4, 2018, until Donald W. Washington was sworn in on March 14, 2019.

On April 11, 2018, about 1 week after the zero tolerance policy announcement, the USMS Prisoner Operations Division (POD) requested that each Southwest border U.S. Marshal submit, within 10 days, a district-specific assessment of staffing needs, current prisoner population, and available bed space. The POD prepared its own summary assessment for the USMS's internal use in a document entitled "Impact of Attorney General Jeff Sessions's Zero-Tolerance Policy for Criminal Illegal Entry." The POD assessment stated:

> The USMS Salaries & Expenses (S&E), Federal Prisoner Detention (FPD), and Construction appropriations **do not** have sufficient resources to meet the requirements generated by the AG's policy. At current resource levels, increased court proceedings would have negative impacts on additional duties, threat investigations, fugitive apprehension, and other collateral duties at the district offices. This additional workload, without appropriate resources, would bring additional risk to other duties, audit readiness, and the overall ability for the USMS to complete its mandated missions. An increase in proceedings would also have an increased demand on facilities, which would strain the already scarce construction funding….

> [Without additional funding, the] USMS would continue to provide a best level-of-effort in support of its missions, however inevitably there would be a degradation of service and security. Additionally, it will not be possible to house, feed, and transport the projected increase in the USMS prisoner population as a result of this policy without supplemental funding to the FPD appropriation.

After the USMS's internal review of the district-specific resource concerns described above, on April 27, the USMS Chief of Staff emailed the OAG and ODAG with an assessment of the zero tolerance policy's overall budgetary impact on the USMS.[70] Based on this assessment, the email stated that the USMS projected a fiscal year 2019 funding shortfall of $227 million and a shortage of about 3,000 beds without additional resources. Department emails indicate that on May 5, the day after DHS announced that it would begin referring family unit adults for prosecution, an ODAG official was tasked with undertaking coordination efforts with ODAG's USMS liaison regarding capacity issues for housing detainees. However, then Deputy Attorney General Rosenstein told us that he was unaware of the USMS's budget shortfall projections or concerns about staffing shortages and bed space and that he was assured by USMS leadership that the USMS had no constraints in implementing the zero tolerance policy.

As the number of immigration prosecutions increased in May, staffing and resource concerns continued to create challenges for the USMS, which the USMS reported to DOJ leadership. For example, the then USMS acting Deputy Director cautioned the OAG and ODAG in an email that the demands on the Southwest border were impacting the USMS's ability to fulfill mission requirements across the United States. Southwest border USAOs recognized the challenges

---

[70] This assessment also included the impact of Violent Crime Reduction Initiatives.

facing the USMS in their districts due to the zero tolerance prosecutions and advocated for additional resources for them.  For example, in an email to the OAG, then SDCA U.S. Attorney Braverman noted that in the SDCA the USMS was down 38 operational staff from the FY 2012 operational staffing levels and that this created a significant shortage in USMS support for immigration prosecutions.  Braverman stated that he was able to get a commitment from DHS to supplement USMS staffing in arraignment court; but he noted that it was only a "quick fix" and that "a more permanent solution is necessary to maintain our current [prosecution] level and increase our levels upon obtaining additional detention space.  Any additional increase in USMS staffing levels is greatly appreciated."

The OAG forwarded Braverman's email to USMS headquarters with the notation "FYI.  We should discuss if possible on Monday."  The USMS acting Deputy Director noted, "This is a global issue for the USMS and any support we provide to the [Southwest border] will impact other districts around the country, so we need to be very precise on the assistance needed and ultimate deployment of resources."

According to ODAG and documents reviewed by the OIG, ODAG subsequently convened a number of coordination meetings with internal and external agency partners that took place beginning May 24, including interagency meetings chaired by the Deputy Attorney General, hosted at DOJ, that included relevant officials from DOJ, DHS, and HHS, among others.  ODAG invited the USMS to the May 24 meeting, and a summary of the discussion prepared by an ODAG official included bullet points stating that the USMS "would not turn anyone away," and was "at 80% capacity along the border."  The summary points also stated that the USMS had the ability to transfer detainees to BOP custody and that the BOP had no constraints in accepting individuals from the USMS.[71]

However, the then USMS acting Associate Director for Operations told us that the communication with the OAG and ODAG was "never in the weeds" and said that he was never sure that the issues being raised internally within the USMS were getting through to the OAG and ODAG.  He also said that, after the zero tolerance policy was announced, the Deputy Attorney General assured USMS leadership that resources would be provided to support the policy's implementation.  However, he said that DOJ's Justice Management Division repeatedly asked the USMS how it planned to address its budget shortfall without committing to additional resources.

At the Southwest border district operational level, we found that implementing the zero tolerance policy created staffing and bed space challenges and presented challenges related to medical care and language barriers.[72]  For example, several districts stated that they were required to absorb

---

[71]  Additionally, ODAG stated to the OIG that the USMS was invited to at least one other interagency coordination meeting chaired by the Deputy Attorney General that occurred on May 31.

[72]  We found that, similar to the USMS, the Southwest border USAO districts faced resource and logistical constraints in implementing the zero tolerance policy.  Districts cited court-mandated capacity limitations on the number of daily immigration prosecutions, USMS staffing shortages, and bed space in detention facilities as logistical and operational

(Cont'd)

the increased number of prosecutions despite having a significant percentage of vacant positions, including at least one USMS office staffed below 50 percent of its allocated positions.  The Department's efforts to address these vacancies, through measures such as temporarily detailing staff from other districts to the Southwest border, were not always implemented in a timely manner.  WDTX U.S. Marshal Susan Pamerleau told the OIG that the USMS uses a district staffing model that estimates personnel needs based on workload during the previous year, so there is generally a 1-year lag to address an increased workload with additional staff allocations and there was no prior-year planning for the zero tolerance policy.  Additionally, the USMS had advocated for the ability to hire new Deputy U.S. Marshals (DUSM) using excepted service rules but did not receive the authority until July 2018, over 3 months after the zero tolerance policy was issued.

With regard to bed space to house defendants, the USMS generally houses prisoners through intergovernmental agreements and contracts with federal, state, and local detention facilities.  However, many of these facilities also house prisoners of other law enforcement agencies and grant space to the USMS on an "as available" basis, making it challenging for the USMS to predict its detention capacity.  Accordingly, advance notice of projected increases in the USMS's prisoner population is important for planning.  Because the USMS was not notified of the zero tolerance policy before it was issued, the USMS could not take steps to obtain additional bed space.  For example, USMS district officials noted that the contract for a 600-bed facility was allowed to lapse only months before the zero tolerance policy was announced.  According to one district official, "There is no future planning….  It's like it's done on a whim."

Indeed, on the day the zero tolerance policy was announced, Counselor to the Attorney General Hamilton inquired with ICE about whether the USMS could use a shuttered ICE facility in El Centro, California, to accommodate the additional detainees in the SDCA that it would need to house under the zero tolerance policy.  In early June 2018, Hamilton emailed USMS leadership to ask what the USMS would need to get the facility "up and running in two to three weeks," since "[Attorney General Sessions] says we are in post 9/11 mode."  The USMS Chief of Staff informed Hamilton that the USMS would need approximately 6 months to complete procurement and that, since the facility had been vacant and unused for the previous 4 years, its systems were in need of repair.  The USMS completed a reimbursement agreement with ICE for use of the facility by September 2018, but it was not until December 2019 that a contractor announced that it had reached an agreement to begin operating the facility for USMS effective that month.

We also found that the USMS was not provided adequate time to prepare for a broad range of implementation challenges related to medical care demands due to the influx of additional criminal detainees.  For example, one district official stated that, because "zero tolerance came out of nowhere," his district had not been able to budget in advance for the increased costs to ensure adequate medical care of detainees.  USMS staff, as well as Federal Public Defender personnel,

---

issues.  Despite prior knowledge of these issues, the Department did not attempt to address these concerns until after implementation of the zero tolerance policy.

told us that the large volume of detainees after the zero tolerance policy went into effect and frequent medical quarantines delayed some detainees' initial appearances in court and led to individuals sometimes being transferred to ICE custody after their court-mandated release dates.[73]  For example, USMS staff told us that the USMS would contact ICE to request pick-up of an individual who had received a sentence of time served but ICE would refuse because the person was medically quarantined.  Then SDTX U.S. Marshal Gary Blankenship cited the frequent outbreaks of infectious conditions as an issue that also made it more difficult to retain USMS staff in his district.

According to USMS district staff, the increased number of illegal entry prosecutions also resulted in an increase in language barriers due to arrests of individuals from various indigenous language groups.  We were told that these language barriers challenged USMS staff in cellblock settings because detainees needed to sign medical and property documents and USMS staff could, in some cases, communicate with detainees only through hand gestures.  Further, we were told that, while the courts had to bear the additional costs for interpreters in the courtroom, the need to use indigenous language interpreters for the increased numbers of detainees extended court proceedings by hours, which strained USMS court security staffing.

We found that implementation of the zero tolerance policy had a significant impact on the USMS's budget.  The USMS's acting Assistant Director for Prisoner Operations told us that the USMS ultimately faced a deficit of $210 million for fiscal year 2019 due, in significant part, to implementing the zero tolerance policy.  While the Department requested approval from Congress to reprogram funds to cover $155 million of the deficit, the Justice Management Division told USMS leadership that the USMS had to try to make up the remaining shortfall with "efficiencies."  However, USMS leadership said that the shortfall was driven by increased housing costs under the zero tolerance policy and that these costs could not be made up solely through efficiencies.[74]  USMS leadership at headquarters and in the districts stated that the USMS was required to house all detainees remanded to its custody and therefore could not avoid incurring increased costs on account of the increased prosecutions.[75]

---

[73]  In a 2016 report, the OIG examined the issue of late releases of inmates by the Department.  See DOJ OIG, *Review of the Federal Bureau of Prisons' Untimely Releases of Inmates*, Evaluation and Inspections Division Report 16-03 (May 2016), www.oig.justice.gov/reports/2016/e1603.pdf.

[74]  The USMS's funding shortfall for fiscal year 2019 was not resolved until July 2019.  In late June 2019, Congress approved an emergency supplemental appropriation for $155 million for the USMS in lieu of approving its request to reprogram funds.  The Department then requested and received approval to reprogram an additional $72 million to make up the full amount of the shortfall, which ultimately totaled $227 million, the same amount the USMS had projected to the Department in its April 2018 summary of resources needed to implement the zero tolerance policy.

[75]  We found that a Deputy Attorney General directive to the Southwest border USAOs may have exacerbated the USMS budget shortfall from mid-May of 2018 onward.  Specifically, USAOs were told that prosecutors could not cite to a lack of USMS bed space as a reason for declining illegal entry cases.  Instead, the Deputy Attorney General required the USAOs to accept such cases for prosecution and the USMS would be responsible for rejecting the detainees and justifying the

(Cont'd)

In addition to the budget impact, USMS district offices told us that, in order to increase staffing for prisoner processing, court security, and detention related to the zero tolerance policy, the USMS had to shift staff away from serving warrants and apprehending fugitives.  District personnel told us that this had an impact on public safety, as well as the safety of DUSMs.  An Assistant Chief DUSM stated that "when you take away manpower, you cannot make a safe arrest."  Because of the increased number of prosecutions of illegal entry misdemeanors, some district offices were able to provide DUSMs to serve warrants only outside of courtroom hours, in the mornings or evenings, and one office relied on DUSMs working overtime to perform enforcement duties.  A Supervisory DUSM from the SDCA wrote in an email to other staff that, "While these tactics [reassigning investigative and enforcement staff to court duties, etc.] have worked for short term crisis operations, they are not sustainable long term if we are to meet our mandated responsibilities."  USMS district managers further told the OIG that the zero tolerance policy limited their staffs' ability to participate in training and take leave and that the longer work hours had an impact on DUSMs' work life.

USMS district personnel also described risks associated with overcrowded court and detention facilities.  According to both USMS headquarters and district officials, courtroom security was sometimes compromised during implementation of the zero tolerance policy.  The USMS's acting Assistant Director for Prisoner Operations told us that he and other USMS officials were uncomfortable with the ratio of DUSMs to defendants that they observed in Southwest border courtrooms crowded with hundreds of illegal entry detainees.  Blankenship told us that under the zero tolerance policy the USMS permitted different courtroom security standards along the Southwest border than for the rest of the country to enable "mass production" of illegal entry prisoners.  He added that this was clearly a safety compromise.

We were told that, due to the shortage of available beds to house illegal entry prisoners, several districts had to resort to using what USMS policy refers to as "overflow housing" in order to accommodate the increased numbers.[76]  In our interviews and in the USMS emails we reviewed, these measures were informally referred to as triple bunking or "boat beds" (stackable temporary bedding laid on floors).  A U.S. Marshal stated that one district facility became so overcrowded

---

rejections to the Department based on the USMS's bed space limitations, even though USMS leadership's understanding was that the USMS had to accept all detainees the USAOs prosecuted.

[76]  On May 18, 2018, the then Assistant Director of the POD issued a memorandum to the Chiefs of the Office of Detention Standards and Compliance and the Office of Detention Services with guidelines for USMS contract facilities to use "boat bedspace" and "third bunk capacity" as contingency housing for the large increase in USMS detainees under the zero tolerance policy.  The memorandum stated:  "POD recognizes that the use of boat beds has the potential to introduce increased problems within detention facilities.  Detainees will be in crowded sleeping arrangements which can cause higher levels of stress and potential violence."  Accordingly, the memorandum required advance POD approval of contingency housing plans, close monitoring by the Office of Detention Standards and Compliance, and evaluation of compliance and necessity every 90 days.  Additionally, the memorandum set forth a list of rules for contingency housing, such as dedicated toilet facilities, increased recreation programming, and ear plugs for detainees.

that at one point 300 to 400 inmates were triple bunked, which was concerning because "there's the tendency for prisoner on prisoner assaults, prisoner on staff assaults, those kinds of things."

According to USMS district and headquarters personnel, the combination of these challenges associated with the implementation of the zero tolerance policy had a significant impact on morale and working conditions for the USMS and contributed to district staff attrition.  The acting Assistant Director for Prisoner Operations said that there was "fear and panic" regarding the initial forecasts at the USMS about the policy's resource demands.  In mid-May, an SDCA USMS supervisor wrote in an email to staff that, "Our manpower has been completely depleted...we are in 'crisis mode,' 'critical mass' 'DEFCON 1' or however you want to phrase it."

### The Department's Lack of Advance Coordination with the USMS and HHS Resulted in the USMS Not Having Policies or Guidance to Facilitate Communications Between Parents in USMS Custody and Their Children in HHS ORR Custody

At the time of the announcement of the zero tolerance policy in April 2018, we found that the USMS did not have policies or procedures to facilitate communications between migrant children in HHS Office of Refugee Resettlement (ORR) custody and their parents in USMS custody.  However, HHS ORR policy requires case managers to coordinate biweekly telephone calls between separated children and their detained parents.[77]  As a result, USMS district staff faced challenges as HHS ORR case managers began reaching out to the USMS to coordinate communications between separated families, which contributed to delays in establishing contact between separated family members.  We concluded that the Department did not provide the USMS sufficient notice of the change in the family unit referral policy to allow the USMS to adopt procedures to facilitate communication with the ORR.

According to USMS emails, district staff began to receive calls from HHS ORR case managers in mid-May 2018 regarding children who had been separated from their adult family members when the adults were prosecuted for illegal entry under the zero tolerance policy.  At the district level, USMS staff told us that they did not receive guidance from headquarters on sharing information with ORR case managers to facilitate communication between separated children and parents in USMS custody apart from the designation of points of contact in the districts to work with HHS.  USMS case management systems were not designed to track or document whether an individual had a separated child in ORR custody, according to USMS headquarters officials.[78]  Headquarters and district personnel also told us that the USMS generally did not receive such information from prisoners, USAOs, or the arresting agency when it received illegal entry offenders for processing.

---

[77]  HHS ORR, "Children Entering the United States Unaccompanied," January 30, 2015, www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied (accessed January 12, 2020), Section 3.3.10.

[78]  For example, one USMS detention facility's booking system did not record more than one last name, making it more difficult to locate parents of separated children with two last names (a frequent circumstance for prisoners with names of Hispanic origin).

In the absence of any policies or procedures, USMS district offices faced several challenges coordinating with HHS ORR to facilitate communication between separated family members.  For example, in the WDTX, a district that provided extensive documentation of USMS communications with the ORR regarding separated family members, some USMS managers were entirely unfamiliar with the ORR and had to research on the internet to learn what it was.  Also, the district's detention facilities had different procedures for inmate calls and, in some facilities, staff shortages resulted in an inability to facilitate detainee calls in a timely manner.  Accordingly, in some cases, USMS staff in the district had to coordinate on an ad hoc basis with facilities so a defense attorney could go to the facility in person to facilitate a call between the parent and child or case worker.  In addition, some parents in USMS custody may not have been able to make collect calls or did not have money to pay telephone charges, so calls between separated family members could occur only if a charity or public defender organization provided money for calls.  USMS staff had to facilitate this assistance as well.

In at least one district we found that the lack of guidance resulted in delays of 1 to 8 weeks before separated children and parents in custody could establish contact.  We also found that the responsiveness of USMS staff to HHS ORR inquiries varied across the five Southwest border districts.  For example, in the absence of component-wide or DOJ policies and procedures, the WDTX staff established a new process and a vetting system for providing information to ORR case workers and facilitating calls.  Additionally, USMS staff in the WDTX stated that ORR case managers requested assistance from them due to difficulties the case managers had in working with the USMS in other districts to facilitate communications between separated family members.  USMS staff in two other districts said that they were not aware of attempts made by ORR case managers or defense attorneys to locate parents of separated children or to facilitate communication between separated family members in 2018.

The HHS OIG reported in a March 2020 review that ORR case managers experienced difficulties in working with the USMS to facilitate communication with and locate separated family unit adults in USMS custody:

> Facility staff reported that U.S. Marshals Service staff told them it did not have the same obligations as DHS to share information about parents with ORR.  As of April 2019, ORR staff reported that the UAC Program continued to experience significant difficulties obtaining information about parents who were in U.S. Marshals Service custody.  Several court filings…have included the statement that "defendants also have reached out to representatives for the Bureau of Prisons and the U.S. Marshals Service to ensure that those entities are included in discussions regarding… processes and procedures" related to children in ORR care.  However, it is not clear what, if any, specific actions have been taken.[79]

---

[79] HHS OIG, *Communication and Management Challenges,* 26.

Accordingly, we recommend that USMS and DOJ leadership establish guidance and procedures for USMS staff to follow in working with HHS ORR case workers to facilitate communication between parents in USMS custody and their children in HHS ORR custody.  Additionally, we recommend that USMS and DOJ leadership work with the HHS ORR and DHS to develop a formal interagency agreement (such as memorandum of understanding) regarding the facilitation of communication between separated children and their parents in USMS custody.

### In Addition to the Challenges Associated with the Prosecution of Family Unit Adults, the USAOs Experienced Resource and Logistical Challenges in Their Implementation of the Zero Tolerance Policy, Including Challenges That Were Known but Not Addressed Prior to the Policy's Implementation

The zero tolerance policy stated that each Southwest border USAO should identify and request any additional resources needed to effectively implement the policy.  We found that each Southwest border USAO informed DOJ leadership of limited available personnel and courthouse capacities that would negatively affect its ability to implement the zero tolerance policy.

On April 24, 2018, the Department surveyed the five Southwest border districts regarding the recent zero tolerance approach to prosecuting illegal entry offenses.  The OIG found that each district responded with staffing and infrastructure concerns and that the DAZ, DNM, and the SDTX were concerned that, if the Border Patrol changed its policy and began referring family unit adults, their offices would be overwhelmed.  Specifically, the DNM reported that, in addition to the need for previously requested AUSA positions, without additional support staff resources the district could not increase the number of illegal entry prosecutions, including those of individuals apprehended in family units.  In response to the USAOs' concerns, on May 2 Sessions announced that 35 additional AUSAs would be added to Southwest border districts to support the implementation of the zero tolerance policy.  However, we found that district officials did not expect the additional AUSAs to be in place along the Southwest border until about 6 months after the Attorney General's announcement.[80]

USAO officials told us that increased caseloads in some Southwest border districts impacted the prosecution of other important cases.  For example, an AUSA in the SDCA told us that the increase in misdemeanor prosecutions placed a "massive burden" on the office's resources, including staff.  He explained that lawyers in other Southwest border districts might spend only 4 hours on a case due to same-day plea agreements.  However, he noted that the procedures in the SDCA required

---

[80]  According to data provided by the Executive Office for United States Attorneys, none of the AUSAs were on board prior to the June 20 Executive Order that largely curtailed family separations under the zero tolerance policy.  Although 2 AUSAs onboarded in the SDCA on July 22, 2018, the remaining 33 AUSAs did not arrive in their districts until September 2018 or later.

AUSAs to spend up to 60 hours on a comparable misdemeanor case, which took time away from other priorities.[81]

Similarly, an AUSA in the SDTX told us that implementing the zero tolerance policy had a considerable effect on his office's resources and affected their ability to prosecute other substantive crimes.  Another SDTX AUSA emailed the Executive Office for United States Attorneys' (EOUSA) Border Security Coordinator, stating that the McAllen Sector Border Patrol was telling him that the focus on apprehending and processing misdemeanor illegal entry cases meant that the Border Patrol was "sending the really bad guys back without prosecution.  We are learning after the fact that, for instance, sex offenders were released."  When we asked the AUSA about this issue, he explained that the Border Patrol's intake processing was overloaded and there was insufficient "capacity to identify and screen the most serious offenders out because they were so pressed to do the [illegal entry cases]."  In interviews with the OIG, multiple SDTX officials, including U.S. Attorney Patrick, raised similar concerns about the Border Patrol not identifying criminal histories after apprehension.  In addition, the EOUSA Liaison reported to EOUSA officials in a late May 2018 email that:

> [The Border Patrol] cannot process all of the aliens apprehended in their sectors in time for court....  There have been recent "anecdotal" accounts from the field, that [the Border Patrol] is missing actual worthy felony defendants, including sex offenders.  These "missed" defendants typically get [returned] to Mexico and then try again.  Issue will be if one gets across, lives in the US and commits a crime; all because of this initiative and [the Border Patrol] not being able to properly process and identify serious/dangerous criminal aliens.

### The Department Did Not Inform the Federal Courts About the Department's Intention to Substantially Increase the Number of Immigration Prosecutions, Leading to Resource and Logistical Challenges for the Judiciary

We found that federal judges in Southwest border districts expressed concerns regarding strained resources within the court system resulting from the implementation of the zero tolerance policy, which led to a large increase in cases and placed a burden on staffing, space, and equipment needs.  The EOUSA Liaison told the OIG that judges expressed frustration to the Department about courts not receiving advance notice of the zero tolerance policy so that they could plan

---

[81] Later, implementation of the zero tolerance policy in the SDCA suffered legal setbacks.  In July 2019, a decision from the Ninth Circuit identified a flaw in the specific illegal entry misdemeanor charge brought by the USAO during nearly all of the Section 1325(a) prosecutions in 2018 and much of 2019.  See *United States* v. *Corrales-Vazquez*, 931 F.3d 944 (9th Cir. 2019).  The Ninth Circuit decision would require thousands of illegal entry convictions to be vacated if individuals were to challenge their past conviction.  The Ninth Circuit subsequently denied the Department's appeal for en banc review.

appropriately.  The EOUSA Liaison added that the courts should have received advance notice of the policy to assess its impacts and coordinate their resources.

These concerns were most acute in the SDCA, but not limited to that district.  A former Chief Judge in the District told us that he did not believe that the Department considered in advance how the courts would handle cases, including where the district would house defendants because there were not enough beds or how the courts would provide enough defense attorneys to handle the cases.  The judge told us that the district had a panel of about 110 defense attorneys and federal defenders; but, if the court kept assigning the attorneys to "zero tolerance immigration cases," they could not handle all of the court's other cases.  He also said that felony cases involving other types of crimes dropped in the district during this time.  For example, drug smuggling cases were instead referred to the state for prosecution.  SDCA Magistrate Judges also expressed concerns directly to the USAO about the lack of notice and planning with the courts prior to the policy's implementation.  In a May 30, 2018 letter to then SDCA U.S. Attorney Adam Braverman, SDCA judges wrote, "We believe very careful consideration should be given to whether any increase in the number of cases per day can feasibly be handled given the constraints on our resources, the need not to overtax judges, staff and others in the system, and our need to make sure defendants' constitutional rights are not abridged."

Similarly, a WDTX judge told the OIG that individuals with significant criminal histories were falling through the cracks because DHS and DOJ were trying to move the cases through the system so quickly.  He stated that other districts were conducting "quick passes" of cases in the interest of faster prosecutions and in some instances did not check the person's criminal history for crimes committed in other districts.  He added that in his district a prosecutor brought a case involving a defendant who had been convicted of sexual assault in the SDCA, which the Border Patrol had overlooked in referring him for felony illegal reentry.  When the case was prosecuted in the judge's district, the defendant was sentenced to 37 to 46 months of jail time.

Another judge told us about the difficulty his district faced in finding the balance between zero tolerance prosecutions and maintaining the constitutionality of the courts.  He said that judges had been conscientious about ensuring that they had meaningful proceedings that met all constitutional requirements.  However, he also said that case volume created a constant tension to maintain those standards.  We believe that, if the courts had received advance notice of the zero tolerance policy, such notice could have assisted with coordinating the implementation of the policy at the local level.

# CONCLUSION AND RECOMMENDATIONS

## Conclusion

We found that DOJ leadership failed to effectively prepare for implementation of the zero tolerance policy.  Then Attorney General Sessions was aware that full implementation of the zero tolerance policy would result in criminal referrals by the U.S. Department of Homeland Security (DHS) of adults who entered the country illegally with children and that the prosecution of these family unit adults would result in children being separated from families.  In fact, we found that the Office of the Attorney General (OAG) was a driving force in DHS's decision to begin referring family unit adults for prosecution, as evidenced by the OAG's urging and support for this change to DHS policy between December 2017 and May 2018.

DOJ leadership told us that Sessions's priority was to increase the number of immigration-related prosecutions in order to "restore legality" to the Southwest border and decrease the number of illegal entries into the United States.  Our review found that the Department's single-minded focus on increasing prosecutions came at the expense of careful and appropriate consideration of the impact that prosecution of family unit adults and family separations would have on children traveling with them and the government's ability to later reunite the children with their parents.  While DOJ leadership told us that the decision to begin referring family unit adults for criminal prosecution was a DHS decision, the record indicates that DHS made this decision with the input and encouragement of the OAG and in response to the Department's zero tolerance policy.  Under the zero tolerance policy, after DHS began referring family unit adults to DOJ for criminal prosecution, an estimated 3,000 children were separated from their families, and issues regarding reuniting children with parents remain as of the date of issuance of this report.  On October 20, 2020, the government and plaintiffs in the *Ms. L. v. ICE* litigation jointly reported to the court that there were 545 children separated from parents in 2017 or 2018 for whom outreach efforts had yet to make contact with the separated parent.

As explained in detail in the <u>Results of the Review</u>, the OAG urged DHS to refer family unit adults to DOJ for prosecution without coordinating with the Southwest border U.S. Attorneys, the U.S. Marshals Service (USMS), DHS, the U.S. Department of Health and Human Services, or the federal courts about this policy change and did not seek their input on issues and obstacles it would present.  DOJ officials also did not attempt to inform themselves, prior to implementation of the zero tolerance policy, about the problems that arose when the Western District of Texas and the District of New Mexico prosecuted family unit adults as part of the El Paso Initiative in 2017.  Further, the OAG issued and implemented the policy without an adequate understanding of the family separation process and the relevant legal requirements, particularly the 72-hour rule that limited detention of alien children in DHS custody.  The Department's failure to effectively prepare for the implementation of the zero tolerance policy also created resource, logistical, and related challenges for DOJ components, specifically the USMS and the Southwest border USAOs, as well as for the federal courts in the Southwest border districts.

# Recommendations

To assist the Department in implementing future policies, we make the following recommendations:

## To the Department

1.  Prior to issuing a significant policy affecting multiple Department of Justice components, other Executive Branch agencies, or the courts, coordinate directly with affected stakeholders to ensure effective implementation.

## To the USMS

2.  Establish guidance and procedures for U.S. Marshals Service staff to follow in working with the Department of Health and Human Services' Office of Refugee Resettlement case workers to facilitate communication between family unit adults separated from associated family unit minors, especially parents in U.S. Marshals Service custody and their children in Office of Refugee Resettlement custody.

## To the USMS and the Department

3.  Work with the Department of Health and Human Services' Office of Refugee Resettlement and the Department of Homeland Security to develop a formal interagency agreement (such as a memorandum of understanding) regarding the facilitation of communication between separated children in Office of Refugee Resettlement custody and their parents in U.S. Marshals Service custody.

APPENDIX 1

# PURPOSE, SCOPE, AND METHODOLOGY

The OIG examined the Department's planning and implementation of the zero tolerance policy and its coordination with the U.S. Departments of Homeland Security (DHS) and Health and Human Services (HHS) regarding the policy.  Consistent with the Inspector General Act of 1978 and the OIG's role within DOJ, we did not attempt to evaluate the substantive merits of the policy.  Rather, this review evaluated the planning and implementation of the policy and makes recommendations to DOJ and its components that could inform future policy initiatives.

Our review included site visits, interviews, and policies and documents from multiple components within DOJ, specifically the Office of the Attorney General (OAG), the Office of the Deputy Attorney General (ODAG), the Office of Legal Counsel, the Executive Office for Immigration Review (EOIR), the Office of Justice Programs, the Executive Office for United States Attorneys (EOUSA), the five Southwest border U.S. Attorney's Offices (USAO), and the U.S. Marshals Service (USMS).  To evaluate coordination with external stakeholders, we also analyzed information from DHS, HHS, and federal court and Federal Public Defender personnel.  The information we analyzed was limited to the period from January 1, 2017, through September 30, 2018.

Given the involvement of DOJ, DHS, and HHS in issues surrounding the zero tolerance policy, the Inspectors General at each agency and the Government Accountability Office have kept one another apprised of planning for reviews on this topic, the status of ongoing work, and the issuance of reports.  We did not directly review the actions of DHS and HHS with regard to the zero tolerance policy, family separations, or court-ordered reunification efforts.  However, we cited work completed by the DHS and HHS Offices of Inspector General, where appropriate.  The following sections provide additional information about our standards and our methodology, which consisted of site visits, interviews, and reviews of documents and policies.

## Standards

The OIG conducted this review in accordance with the Council of the Inspectors General on Integrity and Efficiency's *Quality Standards for Inspection and Evaluation* (January 2012).

## Site Visits

We conducted site visits to five USAO and USMS districts:  (1) Southern California, (2) Arizona, (3) New Mexico, (4) Western Texas, and (5) Southern Texas.  We selected these sites because all five are located on the Southwest border and the zero tolerance policy applied exclusively to these districts.  Within these districts, we interviewed USAO and USMS officials and staff in the cities of San Diego, California; Tucson, Arizona; Las Cruces, New Mexico; El Paso, Texas; San Antonio, Texas; and Houston, Texas, in addition to federal judges and Federal Public Defender personnel in Southwest border districts.  Additionally, we conducted remote interviews by video teleconference

with staff in Phoenix, Arizona; McAllen, Texas; and Laredo, Texas.  In El Paso, Texas, we observed USMS prisoner processing and court proceedings for illegal entry offenders and U.S. Customs and Border Protection (CBP) provided a tour of one of its processing facilities.  We also observed court proceedings in San Diego, California.  Our site visits took place from April 30 through May 7, 2018.

## Interviews

We conducted 45 in-person, telephone, and video teleconference interviews during the course of our review (some interviewees spoke with us during more than one interview, and in some of our interviews we met with multiple interviewees).  At DOJ headquarters, we interviewed a Counselor to the Attorney General, the former Deputy Attorney General, additional ODAG officials, the EOIR Director, the EOUSA Principal Deputy Director, and EOUSA's former Border and Immigration Legal Issues Coordinator.  Former Attorney General Sessions spoke on the phone with the OIG on several occasions regarding the OIG's request for an interview.  However, he did not agree to be interviewed.  At USMS headquarters, we interviewed the acting Associate Director for Operations, the acting Assistant Director of the Prisoner Operations Division (POD), and the POD's Chief of Detention Operations.  In addition, we interviewed current and former U.S. Attorneys and acting U.S. Attorneys for the five Southwest border districts, as well as Assistant U.S. Attorneys in supervisory and management positions.  In the USMS Southwest border districts, we interviewed U.S. Marshals and Deputy U.S. Marshals in supervisory and management positions.  Finally, during our Southwest border site visits, we interviewed federal Chief Judges, a District Judge, Magistrate Judges, Federal Public Defenders, and Assistant Federal Public Defenders.

## Policy and Document Review

We requested and reviewed policies, documents, records, emails, and handwritten notes relating to the zero tolerance policy from the OAG, ODAG, EOIR, EOUSA, the Southwest border USAOs, and the USMS, as well as relevant or related policies and documents from external sources such as DHS, HHS, and the federal court system.  Policy and guidance documents included Attorney General memoranda, press releases, speeches, presidential Executive Orders, laws, international agreements, the Justice Manual, USAO district-specific and internal prosecution guidelines, CBP sector-specific guidelines on referrals of suspected illegal entry offenders for prosecution, and HHS Office of Refugee Resettlement policies.  Additionally, we reviewed court documents, memoranda, and correspondence from federal judges and Federal Public Defenders.  Other documents we reviewed included statistical and resource reports and assessments from the Department, its components as listed above, and the CBP; deliberative policy proposals, draft policy documents, and internal decision documents from DOJ and DHS; conference and meeting agendas, summaries, and notes; and financial records, budget documents, intergovernmental agreements, procurement documents, and memoranda of understanding.  We also reviewed a limited number of classified emails, meeting summaries, and policy documents provided to the OIG by the OAG and ODAG.  The coronavirus disease 2019 pandemic and resulting operational restrictions affected the production and review of a small number of classified documents.

We further reviewed approximately 10,000 pages of emails, records, and handwritten notes provided to the OIG by DOJ and its components as listed above and related to the planning, implementation, and coordination of the zero tolerance policy.  In addition, the OIG reviewed approximately 200,000 emails and calendar data files obtained through conducting searches of the electronic correspondence of 14 senior DOJ officials whom the OIG identified as having been involved in planning, implementing, or coordinating the policy, based on a list of search terms. The senior DOJ officials included the former Attorney General, the former Deputy Attorney General, other OAG and ODAG officials, and officials from the Office of Legal Counsel, Office of Public Affairs, and EOUSA.

APPENDIX 2

# THE ATTORNEY GENERAL'S APRIL 6, 2018 MEMORANDUM



### Office of the Attorney General
### Washington, D. C. 20530

APRIL 6, 2018

MEMORANDUM FOR FEDERAL PROSECUTORS ALONG THE SOUTHWEST BORDER

FROM:        THE ATTORNEY GENERAL    4/6/18

SUBJECT:     Zero-Tolerance for Offenses Under 8 U.S.C. § 1325(a)

On April 11, 2017, I issued a memorandum to all federal prosecutors entitled "Renewed Commitment to Criminal Immigration Enforcement," in which I directed the prioritization of the prosecution of certain criminal immigration offenses. I further directed each United States Attorney's Office along the Southwest Border to work with the Department of Homeland Security to develop guidelines for prosecuting offenses under 8 U.S.C. § 1325(a).

Those seeking to further an illegal goal constantly alter their tactics to take advantage of weak points. That means we must effectively respond with smart changes also. The recent increase in aliens illegally crossing our Southwest Border requires an updated approach. Past prosecution initiatives in certain districts—such as Operation Streamline—led to a decrease in illegal activities in those districts. We must continue to execute effective policies to meet new challenges.

Accordingly, I direct each United States Attorney's Office along the Southwest Border— to the extent practicable, and in consultation with DHS— to adopt immediately a zero-tolerance policy for all offenses referred for prosecution under section 1325(a). This zero-tolerance policy shall supersede any existing policies. If adopting such a policy requires additional resources, each office shall identify and request such additional resources.

You are on the front lines of this battle. I respect you and your team. Your dedication and insight into border reality is invaluable. Keep us informed, and don't hesitate to give us suggestions for improvement. Remember, our goal is not simply more cases. It is to end the illegality in our immigration system.

This guidance is not intended to, does not, and may not be relied upon to create, any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

APPENDIX 3

# FEDERAL LAW AND GOVERNANCE ON ILLEGAL ENTRY

Congress established the statute that became 8 U.S.C. § 1325(a), prohibiting improper entry by non-citizens into the United States, in the Immigration and Nationality Act of 1952.[82]  The law states:

> Any alien who (1) enters or attempts to enter the United States at any time or place other than as designated by immigration officers, or (2) eludes examination or inspection by immigration officers, or (3) attempts to enter or obtains entry to the United States by a willfully false or misleading representation or the willful concealment of a material fact, shall, for the first commission of any such offense, be fined under title 18 or imprisoned not more than 6 months, or both, and, for a subsequent commission of any such offense, be fined under title 18, or imprisoned not more than 2 years, or both.

Executive Branch policies regarding enforcement of the law have been affected by agency initiatives, international agreements on the treatment of refugees, and court rulings.

## Operation Streamline

In 2005, the U.S. Border Patrol, in collaboration with DOJ, began an initiative called Operation Streamline (Streamline) in response to increased apprehensions of individuals from non-contiguous countries whose detention and removal was more expensive and time-consuming for the government than that of contiguous country citizens.[83]  The goal of the initiative, according to the Border Patrol, was "to reduce the rate of alien re-entry recidivism."  Under Streamline, the Border Patrol referred these apprehended individuals to a U.S. Attorney's Office (USAO) for illegal entry prosecution, even when it was their first time committing the offense.  Prior to Streamline, such referrals of illegal entry misdemeanors for prosecution had occurred relatively rarely.[84] Participating USAOs agreed to prosecute these cases, and in some jurisdictions the U.S. Department of Homeland Security (DHS) also provided the USAOs with Customs and Border Protection (CBP) prosecutors, deputized as Special Assistant U.S. Attorneys, and carried out the prosecutions.

---

[82]  The language of the 1952 statute drew on a 1929 federal law under which unlawful entry could be punished with 1 year of imprisonment, in contrast to the current penalty of 6 months.

[83]  Differential treatment of individuals according to their country origin with respect to criminal prosecution practices may raise legal questions; however, the OIG did not analyze this issue for this report due to scope limitations.

[84]  DHS OIG, _Streamline:  Measuring Its Effect on Illegal Border Crossing_, OIG-15-95 (May 2015), www.oig.dhs.gov/assets/Mgmt/2015/OIG_15-95_May15.pdf (accessed January 12, 2020), 3.

Operation Streamline began in the Border Patrol's Del Rio Sector, which falls within the jurisdiction of the Western District of Texas.  At the initiative's fullest participation level, six Border Patrol sectors across Arizona, New Mexico, and Texas took part in it.  (Figure 1 below shows the Border Patrol sector boundaries in relation to those of the Southwest border USAOs.)  However, the El Paso Sector discontinued Streamline in 2013 and the Yuma and Rio Grande Valley Sectors ended their participation in 2014.  Del Rio, Tucson, and parts of the Laredo Sector continued to participate in Streamline through the announcement of the zero tolerance policy in April 2018.  A 2015 DHS OIG report on Streamline stated that participating sectors have used Streamline differently depending on their local resources, courthouse and jail infrastructure, geography, crossing population, and the prosecutorial priorities of their federal partners.[85]  Such priorities might include targeting persistent border crossers, or targeting aliens apprehended in a specific zone, regardless of criminal history.[86]

Figure 1

Map of Border Patrol Sectors and Southwest Border USAOs



Source:  Executive Office for United States Attorneys and DHS

---

[85] DHS OIG, *Streamline,* 6.

[86] DHS OIG, *Streamline,* 6.

## *Flores* Settlement, Trafficking Victims Protection Reauthorization Act Legislation, and *Ms. L. v. ICE* Court Ruling

As detailed throughout this report, individuals apprehended at the Southwest border in family units with children have raised special issues for illegal entry prosecution referrals.  A 1997 settlement in a Supreme Court case, *Flores v. Reno,* set standards for federal immigration authorities' treatment of detained children, including a requirement that the government hold the children in the least restrictive setting appropriate for their age and needs and hold them separately from unrelated adults.[87]  Under *Flores* requirements, if the Border Patrol refers family unit adults for prosecution, detained children may not be held in detention facilities together with adult detainees pending the adults' prosecution and sentencing.

In 2008, Congress passed the Trafficking Victims Protection Reauthorization Act, which codified some of the *Flores* settlement restrictions into law.  The law states:

> TRANSFERS OF UNACCOMPANIED ALIEN CHILDREN.—Except in the case of exceptional circumstances, any department or agency of the Federal Government that has an unaccompanied alien child in custody shall transfer the custody of such child to the Secretary of Health and Human Services not later than 72 hours after determining that such child is an unaccompanied alien child.[88]

In 2015, a further judicial decision in the *Flores* case stipulated that children could not be held in administrative detention with their parents for more than 20 days.[89]  Given the time required for adjudication of removal proceedings and limited administrative family detention space, rather than separating families for prosecution purposes, the Border Patrol would in most cases apply expedited removal or give family units a Notice to Appear before an Immigration Judge for immigration hearings and release them from detention, as long as the adults had no criminal history or other aggravating circumstances.

On June 26, 2018, 6 days after the President curtailed family separations by means of Executive Order 13841, a federal judge issued an injunction in a class action suit that the American Civil Liberties Union had brought against the government over family separations, *Ms. L. v. ICE*.[90]  The injunction stipulated that the government must reunify separated families within 30 days and must facilitate communication between the separated children and adults in the custody of DOJ, DHS, or the Office of Refugee Resettlement, with exceptions for cases in which the parent was

---

[87]  Stipulated Settlement Agreement, *Flores* v. *Reno,* No. 85-4544 (C.D. Cal. Jan. 17, 1997).

[88]  8 U.S.C. § 1232(b)(3).

[89]  *Flores* v. *Lynch,* 212 F. Supp. 3d 907, 914 (C.D. Cal. 2015).

[90]  *Ms. L.* v. *ICE*, No. 18-0428 (S.D. Cal. Jun. 26, 2018) (order granting preliminary injunction).

unfit or represented a danger to the child.[91]  As noted in the text of this report, the *Ms. L.* litigation is ongoing, as the parties continue to identify separated children and make efforts to contact separated parents for possible family reunification.

---

[91] *Ms. L.* v. *ICE,* supra.

APPENDIX 4

# FEDERAL IMMIGRATION ENFORCEMENT

### Figure 2

### Federal Criminal and Civil Proceedings for Individuals Suspected of Illegal Entry



Notes:  DHS=U.S. Department of Homeland Security; HHS ORR=U.S. Department of Health and Human Services Office of Refugee Resettlement; ICE=U.S. Immigration and Customs Enforcement; USAO=U.S. Attorney's Office; USCIS=U.S. Citizen and Immigration Services; USMS=U.S. Marshals Service.  This chart reflects practices during the scope of our review, January 2017–September 2018.  For further details on immigration processes for non-citizen minors who initially enter the United States outside designated ports of entry unaccompanied by a parent or guardian, see the Government Accountability Office's report on *Agency Efforts to Reunify Children Separated from Parents at the Border.*

Source:  Government Accountability Office, DHS Office of Inspector General, and DOJ OIG analysis

APPENDIX 5

# PREVIOUS RELATED OFFICE OF INSPECTOR GENERAL AND GOVERNMENT ACCOUNTABILITY OFFICE WORK

## *Special Review–Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy* (September 2018)

This U.S. Department of Homeland Security (DHS) Office of Inspector General (OIG) review found that DHS was not fully prepared to implement the zero tolerance policy or deal with some of its aftereffects.  Additionally, the review found that DHS struggled to identify, track, and reunify families separated under the policy due to limitations with its information technology (IT) systems, including a lack of integration between systems.

## *Unaccompanied Children:  Agency Efforts to Reunify Children Separated from Parents at the Border* (October 2018)

This U.S. Government Accountability Office (GAO) review cited officials from DHS and the U.S. Department of Health and Human Services (HHS) as stating that they were unaware of the zero tolerance policy before DOJ announced it publicly.  The report also found that the two agencies did not plan for the potential increase in the number of children separated as a result of the policy.  Additionally, the GAO found that prior to April 2018 DHS and HHS data systems did not have a consistent way to track separated children and parents.  Further, DHS and HHS officials and staff told the GAO that challenges to reunification included arranging communications between parents and children.

## S*eparated Children Placed in Office of Refugee Resettlement Care* (January 2019)

This HHS OIG review found that HHS's Office of Refugee Resettlement (ORR) received and released thousands of separated children, including an influx of separated children beginning in the summer of 2017 (prior to the formal announcement of the zero tolerance policy), before a court order required the government to reunify the families.  The report also found that HHS faced significant challenges in identifying separated children, including the lack of an existing integrated data system to track separated families across HHS and DHS, and that the total number of separated children remained unknown.[92]

---

[92]  The HHS OIG also reviewed ORR-funded facilities' efforts to ensure the health and safety of unaccompanied children. See HHS OIG, *The Office of Refugee Resettlement's Incident Reporting System Is Not Effectively Capturing Data to Assist Its Efforts to Ensure the Safety of Minors in HHS Custody*, OEI-09-18-00430 (June 2020), www.oig.hhs.gov/oei/reports/oei-09-18-00430.pdf (accessed January 12, 2020).

*Immigration Enforcement: Immigration-Related Prosecutions Increased from 2017 to 2018 in Response to Attorney General's Direction* (August 2019)

This GAO review found that immigration-related prosecutions increased from 2017 to 2018 in response to the Attorney General's direction.[93]

*DHS Lacked Technology Needed to Successfully Account for Separated Migrant Families* (November 2019)

This DHS OIG review found that DHS did not have the IT system functionality needed to track separated migrant families during the execution of the zero tolerance policy. According to the report, U.S. Customs and Border Protection (CBP) officials had been aware of IT deficiencies since at least November 2017, during the U.S. Border Patrol's El Paso Initiative; but the CPB did not address the deficiencies before implementing the policy in May 2018. Because of these IT deficiencies, the DHS OIG could not confirm the total number of families that DHS separated during the zero tolerance period but estimated that Border Patrol agents separated 3,014 children from their families while the policy was in place. Additionally, in a broader analysis of DHS data from October 1, 2017, to February 14, 2019, the DHS OIG identified an additional 1,233 children with potential family relationships that were not accurately recorded by the CBP. The DHS OIG further found that the policy did not achieve the original goal of deterring "catch and release," and that the surge in apprehended families during the policy's implementation resulted in children being held in CBP facilities beyond the 72-hour legal limit.

*Southwest Border: Actions Needed to Improve DHS Processing of Families and Coordination Between DHS and HHS* (February 2020)

This GAO review found that, while the CBP had developed some policies and procedures for processing apprehended family units, Border Patrol agents had not accurately and consistently recorded family units and separations. As a result, it was unclear the extent to which the Border Patrol had accurate records of separated family unit members in its data system. The GAO further found that U.S. Immigration and Customs Enforcement (ICE) relied on a manual process to track family separations that occurred in ICE custody and did not systematically record this information in its data system. As a result, ICE did not have reasonable assurance that parents whom ICE separated from their children and who were subject to removal were able to make arrangements for their children, including being removed with them. The GAO additionally found that, despite written interagency agreements regarding Unaccompanied Alien Children (UAC), DHS and HHS officials had not resolved long-standing differences about how and which information the agencies were to share related to the care and placement of separated children referred to HHS.

---

[93] The GAO did not release this report publicly but included its title on a list of reports restricted from public access due to sensitive but unclassified content.

The GAO concluded that increased collaboration between DHS and HHS about information sharing would better position HHS to make informed and timely decisions for UACs.

### *Communication and Management Challenges Impeded HHS's Response to the Zero Tolerance Policy* (March 2020)

This HHS OIG review found that poor interagency communication and internal management decisions that failed to protect children's interests left HHS unprepared for the zero tolerance policy.  The review also found that this lack of preparation impeded HHS's ability to identify, care for, and reunify separated children.  The HHS OIG found that care provider facilities faced significant operational challenges at every stage of reunification, causing additional stress to children.  The review concluded that, while HHS had taken steps to improve tracking and placement of separated children, vulnerabilities remained.

APPENDIX 6

# THE ATTORNEY GENERAL'S APRIL 11, 2017 MEMORANDUM



**Office of the Attorney General**
**Washington, D. C. 20530**

April 11, 2017

MEMORANDUM FOR ALL FEDERAL PROSECUTORS

FROM:                THE ATTORNEY GENERAL

SUBJECT:             Renewed Commitment to Criminal Immigration Enforcement

**Charging Practices**

It is a high priority of the Department of Justice to establish lawfulness in our immigration system. While dramatic progress has been made at the border in recent months, much remains to be done. It is critical that our work focus on criminal cases that will further reduce illegality. Consistent and vigorous enforcement of key laws will disrupt organizations and deter unlawful conduct. I ask that you increase your efforts in this area making the following immigration offenses higher priorities. Further guidance and support of executing this priority—including an updated memorandum on charging for all criminal cases—will be forthcoming.

8 U.S.C. §1324 ("[b]ringing in and harboring certain aliens") and related offenses: Each District shall consider for prosecution any case involving the unlawful transportation or harboring of aliens, or any other conduct proscribed pursuant to 8 U.S.C. § 1324. If a determination must be made regarding use of finite resources, a priority should be given to those who are bringing in three or more aliens into the United States and those who are transporting or harboring three or more aliens, as well as offenses where there are aggravating circumstances, such as those involving serious bodily injury, physical or sexual assault, or the death of any person. Priority should also be given to prosecuting any offenses under section1327 ("aiding or assisting criminal aliens to enter") and section 1328 ("importation of aliens for immoral purposes").

8 U.S.C. § 1325 ("[i]mproper entry by alien"): Each District shall consider for felony prosecution under 8 U.S.C. § 1325 any case where a defendant has two or more prior misdemeanor improper entry convictions or one or more prior misdemeanor improper entry convictions with aggravating circumstances, such as a felony criminal history, gang membership or affiliation, multiple prior voluntary returns, prior removal, deportation or exclusion, or other aggravating circumstances. Each District shall also consider for felony prosecution under 8 U.S.C. § 1325 any case where a defendant knowingly enters into a marriage for the purpose of evading any provision of the immigration laws.

Regarding misdemeanor violations of 8 U.S.C. § 1325, I ask that each U.S. Attorney's Office on the Southwest Border (i.e., District of Arizona, District of New Mexico, Southern

83

Memorandum from the Attorney General                                          Page 2
Subject: Renewed Commitment to Criminal Immigration Enforcement

District of California, Southern District of Texas, and Western District of Texas) work with the U.S. Department of Homeland Security and any other appropriate agency to develop a set of guidelines for prosecuting such violations. These guidelines should aim to accomplish the goal of deterring first-time improper entrants. Each District should submit its guidelines to the Office of the Deputy Attorney General by April 24, 2017.

8 U.S.C. § 1326 ("[r]eentry of removed aliens"): Each District shall consider prosecution of 8 U.S.C. § 1326 for each illegal reentrant. Priority, however, must be given to defendants who have been convicted of an aggravated felony, have any prior criminal history indicating the defendant poses a danger to public safety, have one or more administrative or criminal immigration violations, gang membership or affiliation, or where other aggravating circumstances are present.

18 U.S.C. § 1028A ("[a]ggravated identity theft") & 18 U.S.C. § 1546 ("[f]raud and misuse of visas, permits, and other documents"): Each District shall consider, to the extent practicable, prosecution of both aggravated identity theft under Section 1028A and document fraud under Section 1546 in relation to the immigration offenses listed above.

18 U.S.C. § 111 ("[a]ssaulting, resisting, or impeding" officers): Each District shall consider, to the extent practicable, prosecution of assault, resisting, or impeding officers under Section 111, while they are engaging in the performance of their official duties in the administrative and criminal immigration context. More information on this will follow.

### Sentencing Practices

At the sentencing phase of each federal case, prosecutors should seek, to the extent practicable, judicial orders of removal and a term of supervised release that is consistent with the factors set forth in 18 U.S.C. § 3553(a). I know many of you are already seeking these measures from District Courts, and I ask that you continue this effort to achieve the results consistent with this guidance.

### Border Security Coordinators

In furtherance of these objectives, I also direct every District to designate a Border Security Coordinator ("Coordinator") by close of business on April 18, 2017. These Coordinators will be responsible for:

- overseeing the investigation and prosecution of the offenses listed above;
- attending training programs with other Coordinators regarding these offenses;
- providing legal advice and training to AUSAs regarding these offenses; and
- maintaining and routinely reporting prosecution statistics related to these offenses.

Each Coordinator will be responsible for convening meetings with representatives from the Department of Homeland Security—including Immigration and Customs Enforcement, Homeland Security Investigations, U.S. Customs and Border Protection, and United States

Memorandum from the Attorney General                                          Page 3
Subject: Renewed Commitment to Criminal Immigration Enforcement

Citizenship and Immigration Services as well as other law enforcement partners deemed necessary to accomplish this criminal immigration enforcement effort.  The Coordinator will work with this group to (1) coordinate specific immigration enforcement initiatives, emphasizing those initiatives that will have the greatest impact on public safety; (2) initiate training programs; and (3) facilitate information sharing.

APPENDIX 7

# THE DEPARTMENT'S RESPONSE TO THE DRAFT REPORT



**U.S. Department of Justice**

Office of the Deputy Attorney General

---

*Bradley Weinsheimer*
Associate Deputy Attorney General                              *Washington, D.C. 20530*

| | |
|---|---|
| MEMORANDUM TO: | René Rocque Lee |
| | Assistant Inspector General, Evaluation and Inspections Division |
| | Office of the Inspector General |
| FROM: | *G. Bradley Weinsheimer* |
| | Bradley Weinsheimer |
| | Associate Deputy Attorney General |
| DATE: | January 7, 2021 |
| SUBJECT: | Audit Report, "Review of the Department's Planning and Implementation of Its Zero Tolerance Policy and Its Coordination with the Departments of Homeland Security and Health and Human Services" |

The Department of Justice (Department) appreciates the opportunity to respond to the Office of Inspector General's (OIG) formal draft report entitled, "Review of the Department's Planning and Implementation of its Zero Tolerance Policy and Coordination with the Departments of Homeland Security and Health and Human Services." While the Department does not agree with all of the analysis and conclusions contained in the formal draft report, it does concur with the OIG's three recommendations.

Consistent with the OIG's first recommendation, the Department will examine and modify as necessary its procedures to make certain that prior to issuing a significant policy affecting multiple Department of Justice components, other Executive Branch agencies, or the courts, the Department as appropriate will coordinate directly with affected stakeholders to ensure effective implementation. Consistent with the OIG's second and third recommendations, the Department and U.S. Marshals Service (USMS) in particular will work with the Department of Homeland Security (DHS) and Department of Health and Human Services to ensure that policies and agreements are in place to facilitate necessary communication between parents and children if parents are separated from associated family unit minors at the time DHS makes a criminal arrest and refers the adults to the Department for prosecution. There could arise, however, security-related concerns with releasing certain prisoner information to non-governmental entities and persons. To the extent these concerns might impede the establishment of the proposed agreement in recommendation three, the USMS will notify the OIG.

The Department anticipates that these reviews and any necessary policy modifications will be completed within the next 120 days. The date any interagency agreement is formally established of course will depend on concurrence from all involved agencies.

APPENDIX 8

# OIG ANALYSIS OF THE DEPARTMENT'S RESPONSE

The Office of the Inspector General (OIG) provided a draft of this report to the Department, the Executive Office for United States Attorneys (EOUSA), the Executive Office for Immigration Review (EOIR), and the U.S. Marshals Service (USMS) for their comment. The Department's response, which includes the USMS's response, is included in Appendix 7 to this report.[94] The OIG's analysis of the Department's response and the actions necessary to close the recommendations are discussed below.

## To the Department

### Recommendation 1

Prior to issuing a significant policy affecting multiple Department of Justice components, other Executive Branch agencies, or the courts, coordinate directly with affected stakeholders to ensure effective implementation.

**Status:** Resolved.

**The Department's Response:** The Department concurred with the recommendation and stated that it will examine and modify as necessary its procedures to make certain that, prior to issuing a significant policy affecting multiple DOJ components, other Executive Branch agencies, or the courts, the Department, as appropriate, will coordinate directly with affected stakeholders to ensure effective implementation.

**OIG Analysis:** The Department's planned actions are responsive to our recommendation. By May 6, 2021, please provide the OIG with a status update and documentation describing the procedures the Department has implemented to ensure that coordination regarding significant policy affecting multiple DOJ components occurs.

## To the USMS

### Recommendation 2

Establish guidance and procedures for U.S. Marshals Service staff to follow in working with the Department of Health and Human Services' Office of Refugee Resettlement case workers to facilitate communication between family unit adults separated from associated family unit minors, especially parents in U.S. Marshals Service custody and their children in Office of Refugee Resettlement custody.

---

[94] EOUSA and EOIR did not provide a formal response to the draft report.

**Status:**  Resolved.

**USMS Response:**  The USMS concurred with the recommendation and stated that it will work with the Department of Homeland Security (DHS) and Department of Health and Human Services (HHS) to ensure that policies and agreements are in place to facilitate necessary communication between parents and children if parents are separated from associated family unit minors at the time DHS makes a criminal arrest and refers the adults to DOJ for prosecution.

**OIG Analysis:**  The USMS's planned actions are responsive to our recommendation.  By May 6, 2021, please provide the OIG with a status update and a copy of any policies and agreements established in coordination with DHS and HHS to facilitate necessary communication between parents and children if parents are separated from associated family unit minors at the time of DHS criminal arrest and referral to DOJ for prosecution.

## To the USMS and the Department

### Recommendation 3

Work with the Department of Health and Human Services' Office of Refugee Resettlement and the Department of Homeland Security to develop a formal interagency agreement (such as a memorandum of understanding) regarding the facilitation of communication between separated children in Office of Refugee Resettlement custody and their parents in U.S. Marshals Service custody.

**Status:**  Resolved.

**The Department and USMS's Response:**  The Department and USMS concurred with the recommendation and stated that they will work with DHS and HHS to ensure that policies and agreements are in place to facilitate necessary communication between parents and children if parents are separated from associated family unit minors at the time DHS makes a criminal arrest and refers the adults to DOJ for prosecution.  There could arise, however, security-related concerns with releasing certain prisoner information to nongovernmental entities and persons.  To the extent these concerns might impede the establishment of the agreement proposed in Recommendation 3, the USMS will notify the OIG.

**OIG Analysis:**  The Department and USMS's planned actions are responsive to our recommendation.  By May 6, 2021, please provide the OIG with a status update and a copy of the interagency agreement regarding the facilitation of communication between separated children in Office of Refugee Resettlement custody and their parents in USMS custody.